**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>    Plaintiff, | |
|        v. | Civil Action No. |
| SPIVACK, INC. d/b/a VERREE PHARMACY <br>   and <br> MITCHELL SPIVACK, <br>     Defendants. | Jury Trial Demanded |

<u>**COMPLAINT**</u>

The United States brings this suit to hold Verree Pharmacy and its then-owner/pharmacist, Mitchell Spivack, accountable for the illegal dispensing of controlled substances, including opioids, and fraud on Medicare and other federal health care programs. Spivack and Verree Pharmacy, which was the top retail pharmacy purchaser of oxycodone in the entire state of Pennsylvania, pictured here, created a destructive enterprise that illegally dispensed unparalleled quantities of opioids and other controlled substances into the Philadelphia community and this District.



The pharmacy had a responsibility to dispense these risky and addictive drugs only when appropriate.  Instead, the pharmacy prioritized profits over patients, dispensing the drugs as long as the patients paid, despite numerous red flags suggestive of diversion—such as opioids in extreme doses, dangerous combinations of opioids and other "cocktail" drugs preferred by those addicted, excessive cash payments for the drugs, and other signs that the pills were being diverted for illegal purposes.  To avoid scrutiny from the drug distributors that sold the pills, Verree, through Spivack, made false statements to maintain the façade of legitimacy in order to keep the pharmacy stocked with these pills.  Tragically, patients suffered the severe consequences of this illegal scheme, including at least one patient who overdosed and died, found next to Verree Pharmacy bottles Spivack dispensed.

At the same time, Verree and Spivack were also orchestrating an expansive health care fraud scheme involving fraudulent billings for drugs not actually dispensed.  The cornerstone of the scheme was a code used by the pharmacy employees in their internal computer system: BBDF or "Bill But Don't Fill."  This fraud—which one of the employees admitted to investigators—resulted in significant damages to Medicare and other federal programs.

Verree and Spivack's schemes—maintained for years with sophisticated means and multiple participants—had a devastating impact on the community and on federal health care programs.  This lawsuit seeks to impose the civil penalties and damages on Verree and Spivack that their conduct demands.

## PARTIES

1.      Plaintiff is the United States of America.

2.      Defendant Spivack, Inc. d/b/a Verree Pharmacy (Verree) is a Pennsylvania corporate entity.  Verree was owned by Mitchell Spivack.  Verree was registered with the Pennsylvania pharmacy licensing board.  The Drug Enforcement Administration (DEA) granted

Verree a registration on September 8, 1987, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 7960 Verree Road, Philadelphia, Pennsylvania.[1]

3.       Defendant Mitchell Spivack is an individual residing in Montgomery County, Pennsylvania.  Spivack owned and managed Verree at all times relevant to this Complaint.  He was registered with the Pennsylvania pharmacy licensing board as Verree's pharmacist-in-charge at all times relevant to this Complaint.  He was registered as a pharmacist as of March 16, 1982.

4.       Defendants Verree and Spivack are collectively referred to as the "defendants."

## JURISDICTION AND VENUE

5.       This action is brought by the United States for civil penalties and injunctive relief under the Controlled Substances Act, 21 U.S.C. §§ 801-971, as well as civil damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

6.       This Court has subject matter jurisdiction over the Controlled Substances Act civil penalties, 21 U.S.C. § 842, pursuant to 21 U.S.C. § 842(c)(1)(A), and 28 U.S.C. §§ 1331, 1345, 1355.

7.       This Court has subject matter jurisdiction over the Controlled Substances Act injunctive relief pursuant to 21 U.S.C. §§ 843(f), 882, and 28 U.S.C. §§ 1331, 1345.

8.       This Court has subject matter jurisdiction over the False Claims Act counts for civil damages and penalties pursuant to 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331, 1345, 1355.

9.       This Court has subject matter jurisdiction over the common law claims pursuant to 28 U.S.C. §§ 1331 and 1345.

---

[1] State records indicate that Mitchell Spivack owns Spivack, Inc.  However, another entity may now be using the d/b/a of Verree Pharmacy.  Nonetheless, at all times relevant to this Complaint, Verree Pharmacy was the d/b/a trade name of Spivack, Inc. and was owned by Mitchell Spivack.

10.     This Court has personal jurisdiction over Verree because the entity is found in, incorporated in, transacted business in, licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

11.     This Court has personal jurisdiction over Spivack because he resides in, is domiciled in, transacted business in, was licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

12.     Venue is proper in the Eastern District of Pennsylvania because the defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, 28 U.S.C. § 1391; the claims accrued in this District, and the defendants are found in this District, 28 U.S.C. § 1395; and because the defendants are located, reside, did business, and engaged in the illegal conduct in this District, 21 U.S.C. § 843(f); 31 U.S.C. § 3732(a).

## THE CONTROLLED SUBSTANCES ACT

13.     The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and its regulations govern the distribution and dispensing of controlled substances.  The CSA establishes strict guidelines "to ensure a sufficient supply for legitimate medical . . . purposes and to deter diversion of controlled substances to illegal purposes.  The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under proper circumstances."  75 Fed. Reg. 61613 (Oct. 6, 2010).

**I.      Controlled substances are strictly regulated and scheduled based on their potential for abuse and medical uses.**

14.     Federal legislation dictates how prescription drugs are categorized.  Drugs can be placed in Schedules I through V based on, *inter alia*, their "potential for abuse" and whether they

have "a currently accepted medical use in treatment." 21 U.S.C. § 812(b). For example, Schedule II controlled substances are those that have a "high potential for abuse" that "may lead to severe psychological or physical dependence," but have "a currently accepted medical use in treatment." *Id.*

15.    Pursuant to legislation and administrative action by the DEA, certain drugs have been categorized as controlled substances. For example:

   a)    the opioid oxycodone (including drugs that contain it such as OxyContin, oxycodone-acetaminophen (APAP), and Percocet), the opioid fentanyl, the opioid methadone, and the amphetamine lisdexamfetamine (with brand names including Vyvanse) are drugs categorized as Schedule II controlled substances, *see* 21 C.F.R. § 1308.12;

   b)    buprenorphine (including drugs that contain it, and with brand names including Suboxone) is a drug categorized as a Schedule III controlled substance, *see* 21 C.F.R. § 1308.13;

   c)    the benzodiazepine alprazolam (with brand names including Xanax), the benzodiazepine diazepam, zolpidem, and the muscle relaxant carisoprodol (with brand names including Soma) are drugs categorized as Schedule IV controlled substances, *see* 21 C.F.R. § 1308.14; and

   d)    pregabalin (with brand names including Lyrica) is a drug categorized as a Schedule V controlled substance, *see* 21 C.F.R. § 1308.15.

## II.    Entities that distribute controlled substances or dispense them directly to patients, such as retail pharmacies, are required to register with the DEA and maintain strict controls.

16.    The CSA requires those who distribute or dispense controlled substances, including pharmacies that dispense controlled substances pursuant to a prescription, to obtain a

registration from the DEA.  21 U.S.C. § 822(a).  Individuals or entities who have a registration are commonly referred to as "registrants."

17.     The registration requirements for those who dispense are based on the statute's definition of a "dispenser," which is defined as "a practitioner who [] delivers a controlled substance to an *ultimate user*" "pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance."  21 U.S.C. § 802(10) (emphasis added).  That definition includes retail pharmacies that dispense controlled substances directly to patients.  *See id.* § 802(21) (defining "practitioner" to include a "pharmacy").  When controlled substances are delivered not pursuant to a valid prescription, the CSA defines this delivery as a "distribution."  *See* 21 U.S.C. § 802(11).

18.     Even when a registrant such as a retail pharmacy falls within the definition of "dispenser" and receives authorization through a DEA registration to dispense controlled substances, it may only dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA.  *Id.* § 822(b).

### III.    Retail pharmacies registered with the DEA are generally permitted to dispense controlled substances only to patients with a valid prescription for a legitimate medical purpose.

19.     For those entities such as retail pharmacies registered to dispense controlled substances, the CSA establishes strict limitations on when a controlled substance can be dispensed to the patient and ultimate user.  It generally provides that, unless a non-pharmacy practitioner dispenses directly or there is an emergency, Schedule II, III, and IV controlled substances can only be dispensed upon a "prescription."  21 U.S.C. § 829(a), (b).

20.     Even with an emergency, the "prescribing individual practitioner shall cause a written prescription for the emergency quantity prescribed to be delivered to the dispensing pharmacist" "[w]ithin 7 days after authorizing [the] emergency oral prescription."  21 C.F.R.

§ 1306.11(d)(4).  The prescription must also satisfy various other written requirements outlined in § 1306.11 and § 1306.05.[1]

21.     A prescription is effective only if issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).

22.     In addition, the CSA's implementing regulations provide direction specifically for pharmacists by providing that "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ."  *Id.* § 1306.06.

23.     The CSA's implementing regulations explicitly warn pharmacists of the consequences of dispensing or distributing a controlled substance without satisfying these requirements.  "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* [for proper dispensing of controlled substances] rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. [§ ]829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." § 1306.04(a) (emphasis added); *see also United States v. Rottschaefer*, 178 F. App'x 145, 147

---

[1] With respect to the form of the prescription, the CSA's implementing regulations require that a prescription for a controlled substance "be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."  *Id.* § 1306.05(a).

(3d Cir. 2006) ("The CSA's implementing regulations provide that, to be effective, a prescription 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice' . . . .").

**IV.    When pharmacists are presented with "red flags" through the prescription or otherwise, they cannot dispense the controlled substance unless they have dispelled the suspicion arising from those "red flags."**

24.    With respect to a pharmacist's "corresponding responsibility" to ensure proper dispensing and distribution of controlled substances, pharmacists have a legal duty to ensure that prescriptions for controlled substances are legitimate before dispensing the controlled substance. The fact that a licensed physician actually or ostensibly prescribed a controlled substance does not obligate a pharmacist to fill that prescription. A reasonably prudent pharmacist must be familiar with suspicious activity or "red flags" indicating that the controlled substances prescribed are at risk for abuse or diversion.

25.    A "red flag" can include anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice. Some of the red flags for diversion that all pharmacists should be familiar with include the following:

a)    The prescriptions are for high dosage strengths of the drug and/or for large quantities.

b)    The prescriptions are part of a prescription "cocktail." A prescription "cocktail" is usually a prescription for an opioid, such as oxycodone, combined with a prescription for a benzodiazepine (anti-anxiety drug) such as alprazolam (also known by its brand name, Xanax), and possibly a muscle relaxant, such as carisoprodol (also known by its brand name, Soma). Cocktail combinations are often sought by drug abusers because they

produce an intensified "high," but they can be particularly deadly.  The combination of an opioid, benzodiazepine, and muscle relaxant is sometimes referred to as a "Trinity" cocktail.

       c)      Patients are willing to pay large sums of cash (or write checks or use credit cards) for controlled substances, especially when the patients have insurance coverage available for the drugs.

       d)      Two or more controlled substance prescriptions are issued together which indicate duplicate therapy, for example, when a patient is issued two or more prescriptions known to treat the same condition in the same manner.

       e)      The patient's address is a significant distance from the prescriber's address and/or the pharmacy's address.

26.     When confronted with one or multiple red flags concerning a prescription for controlled substances, a pharmacist must intervene and resolve the red flags to determine whether or not the prescription is for a legitimate purpose before filling the prescription.  The pharmacist must also document his or her findings for future use and reference.

27.     Depending on the type of red flag, there are different steps that the pharmacist can take to determine whether or not the prescription is for a legitimate medical purpose.  These steps involve obtaining more information from the physician, the patient, or both.  For example, in situations where a customer from out of town is attempting to fill a controlled substance prescription, a pharmacist should seek information from the patient as to why he or she is in the area trying to fill the prescription at this pharmacy.

28.     When a pharmacist contacts a physician to address red flags, the standard practice is for the pharmacist to document that contact and the information the pharmacist learns. Documentation noting the red flag and how the pharmacist handled it is required.  This ensures

that the information is available for other pharmacy staff in the future.  Documentation is required even in a pharmacy with only one pharmacist because perfect recall of every encounter with every patient is not realistic.  If there is no documentation detailing how the pharmacist addressed the red flag, then it is reasonable to assume that the red flag was not resolved.  For example, if a conversation with the physician about the patient or the drug is not noted on the prescription or in the patient's profile, then a presumption that conversation did not happen is appropriate.

29.     There are some red flags that a pharmacist cannot resolve by contacting the physician, obtaining a report from the prescription drug monitoring program,[2] or obtaining more information from the patient, such as those cases when the pharmacist has reason to believe that the physician is complicit in abuse or diversion of the controlled substance.

30.     As a general matter, when red flags remain unresolved, a reasonable pharmacist exercising his or her corresponding responsibility should not dispense the controlled substance prescription.

**V.     The DEA has warned pharmacists of this corresponding responsibility to ensure the legitimacy of controlled substance prescriptions prior to dispensing.**

31.     The DEA has provided clear public guidance to make pharmacists fully aware of their corresponding responsibility to ensure the legitimacy of controlled substance prescriptions and dispel any suspicion when presented with a red flag.

---

[2] The prescription drug monitoring program (PDMP) is a state-run database that contains information on drugs, particularly controlled substances, dispensed to patients.  The database generally contains information on each dispensing event, such as the date, patient identifiers, pharmacy identifiers, prescriber identifiers, and the drug dispensed.  The PDMP is used by prescribers and pharmacies to investigate past dispensing history or practices, such as a patient's history of obtaining controlled substances.

32.     In 2010, the DEA issued a version of the *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*.[3]  The Pharmacist's Manual is "a guide to assist pharmacists in their understanding of the Federal Controlled Substances Act and its implementing regulations as they pertain to the pharmacy profession."

33.     After reminding pharmacists of their corresponding responsibility obligations outlined above, the Pharmacist's Manual explains that:

> A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription.  Such a determination is made before the prescription is dispensed.  The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin.  To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances.  Such action is a felony offense, which may result in the loss of one's business or professional license (see *United States v. Kershman*, 555 F.2d 198 [United States Court Of Appeals, Eighth Circuit, 1977]).

34.     The Pharmacist's Manual also reminds pharmacists of their "responsibility to ensure that a prescription has been issued by an appropriately registered or exempt practitioner."

35.     As for the red flags that obligate a pharmacist to dispel suspicion prior to dispensing, the Pharmacist's Manual identifies examples of "criteria [that] may indicate that a prescription was not issued for a legitimate medical purpose:"

- The prescriber writes significantly more prescriptions (or in larger quantities) compared to other practitioners in the area.

- The prescriber writes prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time.  Drug abusers often request prescriptions for "uppers and downers" at the same time.

---

[3] The Pharmacist's Manual was publicly available at: https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/index.html.

- The patient appears to be returning too frequently.  A prescription which should last for a month in legitimate use is being refilled on a biweekly, weekly or even a daily basis.

36. The Pharmacist's Manual also warns about the danger of forged prescriptions.

**Types of Fraudulent Prescriptions**

Pharmacists should be aware of the various kinds of forged prescriptions that may be presented for dispensing.  Some patients, in an effort to obtain additional amounts of legitimately prescribed drugs, alter the practitioner's prescription.

When there is a question about any aspect of the prescription order, the pharmacist should contact the prescriber for verification or clarification.

37. The Pharmacist's Manual provides additional instruction on how to handle forged prescriptions:

If a pharmacist believes the prescription is forged or altered, he/she should not dispense it and call the local police.

## VI. The CSA imposes strict obligations on dispensers to comply with record-keeping requirements to ensure accountability and protect against diversion of controlled substances.

38. Entities registered with the DEA to dispense controlled substances are also obligated to comply with important record-keeping and accountability measures to protect against the loss and diversion of controlled substances.

39. For example, every entity registered to dispense controlled substances is obligated to:

a) conduct a biennial inventory that includes "a complete and accurate record of all stocks thereof on hand," 21 U.S.C. § 827(a)(1); 21 C.F.R. § 1304.11(a), (c), (e)(6);

b) "maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him," including a record of dispensing, 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1304.21(a); § 1304.22(c); and

c) maintain the prescriptions underlying the dispensing, § 1304.04(h).

40. To the extent a dispenser has a theft or loss of a controlled substance that would impact inventory and accountability counts of the controlled substances, the dispenser is required to file a theft/loss report with the DEA.  21 C.F.R. § 1301.76(b).

**VII.  Pharmacies and pharmacists that violate these legal obligations expose themselves to substantial civil penalties and injunctive relief.**

41. The CSA imposes substantial civil penalties on pharmacies and pharmacists who dispense controlled substances in violation of their corresponding responsibility.

42. Any person "who is subject to the requirements of Part C [of the CSA who] distribute[s] or dispense[s] a controlled substance in violation of [the valid prescription requirement in] section 829 of this title" is subject to a significant civil penalty per violation.  21 U.S.C. § 842(a)(1); *see, e.g.*, *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2017 WL 1405164, at *4 (N.D.W. Va. Apr. 19, 2017), *aff'd sub nom. United States v. Wasanyi*, 801 F. App'x 904 (4th Cir. 2020).

43. Each violation exposes the pharmacy and pharmacist to "a civil penalty of not more than $25,000" for each violation on or before November 2, 2015, and not more than $68,426 for each violation after November 2, 2015.  21 U.S.C. § 842(a)(1), (c)(1)(A); 28 C.F.R. § 85.5.

44. As for equitable relief, the CSA authorizes the Attorney General "to commence a civil action for appropriate declaratory or injunctive relief relating to violations of this section,

section 842 of this title, or 856 of this title."  21 U.S.C. § 843(f); *see also* 21 U.S.C. § 882

(conferring jurisdiction on the district courts "to enjoin violations of this subchapter").

## MEDICARE PART D

45.     Medicare is a federal program administered by the Centers for Medicare &

Medicaid Services (CMS), a federal agency within the U.S. Department of Health and Human

Services, to pay for the costs of certain health care services provided to eligible individuals.

Individual entitlement to Medicare is largely based on age, disability, or affliction with end-stage

renal disease.  42 U.S.C. §§ 426, 426-1.

46.     One piece of the Medicare program is a voluntary prescription drug benefit

program known as Medicare Part D, which covers the costs of certain prescription drugs for

Medicare beneficiaries.  42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

47.     Medicare provides Part D coverage through plan "sponsors," which are private

entities that administer the prescription drug plans on behalf of the federal government.

48.     Generally, pharmacies submit claims to Medicare Part D plan sponsors for

covered outpatient drugs.  Part D plan sponsors provide reimbursement to pharmacies for these

drugs, such as oxycodone, Lyrica, and Invokana, dispensed to Medicare beneficiaries enrolled in

Part D.

49.     The pharmacy's claims for these drugs are documented in a prescription drug

event (PDE) record, which contains information about the drug dispensed, the beneficiary, the

practitioner who prescribed the drug, and the drug's cost.  Medicare relies on the accuracy of the

information in the claim when making payments.

50.     CMS makes payments to reimburse the sponsors through: (a) monthly estimated

payments based upon the beneficiaries enrolled; (b) cost-sharing subsidies for low-income

individuals; and (c) payments made annually that reconcile the estimated monthly payments with

14

the allowable costs the sponsor actually incurred.  The PDE records are a significant factor determining the reimbursement amounts.

51.      Part D plan sponsors repeatedly certify their compliance with applicable federal laws, regulations, and CMS guidance and certify to the accuracy and truthfulness of the data in the PDE records as a condition of payment.

52.      Medicare only covers drugs that are for a medically accepted indication, which is any use approved under the Food, Drug, and Cosmetic Act, or which is supported by one or more citations included or approved for inclusion in one of the listed compendia.  42 U.S.C. §§ 1395w-102(e), 1396r-8(g)(1)(B) & (k)(6); 42 C.F.R. § 423.100.  PDEs submitted to Medicare that are not for a medically accepted indication do not contain accurate, complete, and truthful information about all data related to payment.

53.      If prescriptions are issued for something other than a medically accepted indication, they are not covered by Part D.  42 U.S.C. §§ 1395w-102(e), 1396r-8(k)(6).

54.      In addition, with prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as recreational use, those drugs are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs.

55.      Finally, Part D plan sponsors are only permitted to provide benefits for Part D drugs "that require a prescription if those drugs are dispensed upon a valid prescription."  42 C.F.R. § 423.104(h).  A prescription is only valid if it "complies with all applicable State law requirements constituting a valid prescription."  42 C.F.R. § 423.100.  Pennsylvania state law provides that, for example, "[a] prescription for a controlled substance must be issued for a legitimate medical purpose by a licensed practitioner in the usual course of professional practice."  28 Pa. Code § 25.52; *see also* 49 Pa. Code § 27.18(u) ("A violation by a pharmacist of

the Federal Controlled Substances Act (21 U.S.C.A. § 321 *et seq.*) or The Controlled Substance, Drug, Device and Cosmetic Act (35 P.S. §§ 780-101-780-144) or the rules and regulations promulgated thereunder constitutes a violation of this chapter and of the act."); *id.* § 27.18(b)(2).

## MEDICAID

56.    Medicaid, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a cooperative federal-state program that provides medical assistance to certain low-income individuals.  To participate in Medicaid, a state must have a plan for medical assistance that has been approved by CMS, which administers the federal Medicaid program.  *Id.* § 1396a.  As part of a state's plan, a state may offer outpatient prescription drug coverage.  *Id.* § 1396d(a)(12).

57.    Although pharmacy coverage is an optional benefit under federal Medicaid law, all states currently provide coverage for outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their state Medicaid programs.

58.    CMS administers the Medicaid program at the federal level, and the Pennsylvania Department of Human Services (DHS) processes Medicaid claims directly or through a contractor for Medicaid beneficiaries in Pennsylvania.

59.    Pennsylvania Medicaid only pays for drugs that are "medically necessary."  55 Pa. Code §§ 1121.1, 1121.21.

## TRICARE

60.    TRICARE (formerly known as CHAMPUS), is part of the United States military's health care system, designed to maintain the health of active-duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, and military retirees and their dependents.  The military health system, which is administered by the U.S. Department of Defense (DOD), is composed of the direct care system, consisting of military hospitals and

military clinics, and the benefit program, known as TRICARE.  TRICARE is a triple-option

benefit program designed to give beneficiaries a choice between health maintenance

organizations, preferred provider organizations, and fee-for-service benefits.

61.    TRICARE prescription drug benefits are provided through three different

programs:  military treatment facility outpatient pharmacies, TRICARE network retail

pharmacies, and TRICARE's mail order service.  TRICARE contracts with a pharmacy benefit

manager (PBM) to administer its retail and mail order pharmacy programs.  In addition,

TRICARE beneficiaries can also pay out-of-pocket to fill prescriptions at non-network retail

pharmacies and submit claims for reimbursement directly with TRICARE's PBM.  The claims

process is different for each of these pharmaceutical programs.

62.    When a TRICARE beneficiary brings a prescription to a TRICARE network retail

pharmacy, for example, the pharmacy submits an electronic claim to the PBM for that

prescription event.  The PBM sends an electronic response to the pharmacy that confirms the

beneficiary's TRICARE coverage and, if the prescription claim is granted, informs the pharmacy

of the calculated pharmacy reimbursement amount and the co-pay (if applicable) to be collected

from the beneficiary.  The pharmacy then collects the co-pay amount (if any) from the

beneficiary and dispenses the medication.  After a 10-day hold to ensure the prescription was

picked up and not returned to the shelf by the pharmacy, the PBM sends a TRICARE Encounter

Data (TED) record electronically to TRICARE.  The TED record includes information regarding

the prescription event, including the reimbursement amount to be paid to the dispensing

pharmacy.  TRICARE then authorizes the PBM to make payment to the pharmacy for the

amount remaining (after co-pay) on the claim.  The PBM sends the payment to the pharmacy.

After the payment is made by the PBM's bank, the PBM's bank requests reimbursement from the Federal Reserve Bank (FRB).  The FRB then transfers funds to the PBM's bank account.

## FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM

63.     The Federal Employees Health Benefits Program (FEHBP) is a federally-funded insurance program established by Congress in 1959, pursuant to the Federal Employees Health Benefits Act.  5 U.S.C. § 8901 *et seq.*  FEHBP is for federal employees, retirees, and their spouses and unmarried children under the age of 26.  5 C.F.R. § 890.302.

64.     The Office of Personnel Management (OPM) administers FEHBP and contracts with various health insurance carriers (Carriers) to provide services to FEHBP members.  5 U.S.C. §§ 8902, 8909(a).  Benefits provided to FEHBP members include prescription drug coverage.

65.     Monies for the FEHBP are maintained by the United States Treasury in the Employees Health Benefits Fund (the Fund), which OPM administers.  5 U.S.C. § 8909(a).  The Fund—which the United States Treasury holds and invests—is the source of all relevant payments to the Carriers for services rendered to FEHBP members.  5 U.S.C. § 8909.

66.     Federal agencies and their employees contribute to the Fund through health insurance premiums, referred to as contributions.  5 U.S.C. § 8906.  Federal employees' portions of the contribution are withheld from each paycheck, then forwarded to the Fund by the employing agency, along with the agency's share of the premium.  5 U.S.C. § 8906(d), (e).  The Treasury holds and invests the Treasury Fund balances.  5 U.S.C. § 8909.  Proceeds from the Fund are used to pay Carriers for covered claims paid on behalf of FEHBP members.

67.     Carriers do not have any right to monies from the Treasury for reimbursement of benefits unless and until they incur legitimate costs for actual covered services rendered to the members and submit claims to the Government for the payment for those services.  FEHBP

benefits are payable only for services necessary to prevent, diagnose, or treat an illness, disease, injury, or condition.

**FACTS**

I.      **Verree Pharmacy registered with the DEA in 1987 to start operating as a retail pharmacy.**

68.     As outlined above, defendant Spivack Inc. d/b/a Verree Pharmacy is a Pennsylvania corporate entity that was owned, managed, and operated by pharmacist Mitchell Spivack at all times relevant to this complaint.  The DEA granted Verree a registration on September 8, 1987, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 7960 Verree Road, Philadelphia, Pennsylvania.



69.     Defendant Spivack is a pharmacist who was licensed in Pennsylvania.  He was the owner and pharmacist-in-charge of Verree at all times relevant to this complaint.

70.     Verree and Spivack employed, among others, three other individuals who were involved in the pharmacy: T.G., a pharmacist and a lawyer with an active license in Pennsylvania; E.P., a pharmacy technician; and L.K., another pharmacy technician or assistant. Prescriptions that were dispensed by Verree were almost always listed in their computer system as being handled by one of these two pharmacists, Spivack or T.G., and one of these two pharmacy technicians, E.P. or L.K.

71.     Verree utilized a computer system to acquire, track, dispense, and bill for its drugs.  This system generally required Spivack, T.G., E.P., and L.K. to log onto the computers each morning with their own login and password, assigning their initials to each activity taken. That computer system was imaged by the DEA upon consent and preserved in its original state. Below is a screen shot of the "home" screen of that computer system:



72.     When the pharmacy took certain actions, such as dispensing a prescription to a patient, its computer system would log the initials of both the pharmacist and the pharmacy technician who took the action.  The computer system used the initials of the pharmacist and technician who had logged into the computer.  The allegations below utilize that logging to reflect which of the Verree employees took the relevant action.

73.     Verree was able to bill, among other insurers, Medicare Part D for drugs it dispensed to Medicare Part D beneficiaries.  Its national provider identifier (NPI) was 1821198573.

74.     Verree was also enrolled as a pharmacy that could bill Medicaid in Pennsylvania for drugs dispensed to Medicaid beneficiaries.  It was enrolled no later than 1987.  E.P. was listed as one of the managing employees for purposes of Verree's Medicaid enrollment.



75.     Verree dispensed numerous drugs, both controlled and non-controlled substances. In addition, Verree billed federal and private health care programs, as well as individual patients, numerous times for drugs.

**II.    Verree has been a nationwide and regional outlier in its deviant purchasing, dispensing, and billing of controlled substances, with resulting scrutiny from its drug wholesalers and others.**

76.    Verree has obtained its controlled substances and non-controlled drugs from many different wholesalers over the years.  Its total purchasing of those drugs, particularly oxycodone, has made it an outlier.

77.    The DEA conducted analyses of Verree and its purchasing through its Automated Reports and Consolidated Orders System (ARCOS).  ARCOS is designed to track the delivery of certain controlled substances from the manufacturer all the way through its purchase by a pharmacy or other dispenser.  ARCOS allows the DEA to track the quantity and types of purchases that pharmacies are making and compare those purchases to other pharmacies.

78.    First, a comparison was made by the DEA of the ARCOS ordering patterns for Verree of oxycodone 30mg for pharmacies in their area and across the country.  For example, in 2017, Verree purchased 159,100 dosage units of oxycodone 30mg, which sharply exceeded the average purchasing of pharmacies in its zip code, in Pennsylvania, and even across the country.



79.     Second, an ARCOS analysis was performed by the DEA of all pharmacies in Pennsylvania sorted by their purchasing of oxycodone.  For retail pharmacies, Verree was one of the top purchasers of oxycodone in Pennsylvania in 2016 and 2017.  The following year, in 2018, Verree became the top retail pharmacy purchasing oxycodone for the entire state of Pennsylvania.

80.     Finally, a more granular comparison was made by the DEA of the ARCOS ordering patterns for Verree with pharmacies located in the same zip code from 2016 to 2019. During this time frame, there were at least 15 additional DEA registered pharmacies located in the Philadelphia, PA 19111 zip code.  This comparison indicates that Verree ranked as the top pharmacy in the purchasing of oxycodone product compared to other local pharmacies in the zip code.  Specifically:

a)     For 2016, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 692,300 tablets of combined oxycodone product.  The second top pharmacy purchased 232,500 tablets of combined oxycodone product.

b)     For 2017, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 623,100 tablets of combined oxycodone product.  The second top pharmacy purchased 273,600 tablets of combined oxycodone product.

c)     For 2018, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 570,250 tablets of combined oxycodone product.  The second top pharmacy purchased 418,900 tablets of combined oxycodone product.

d)     For 2019, Verree Pharmacy was the second top purchaser of oxycodone product, purchasing 339,700 tablets of combined oxycodone product with the top pharmacy, a cancer center pharmacy, purchasing 447,800 tablets of combined oxycodone product.

81.     Verree has also been an extreme outlier in its insurance billings for controlled substances.  For example, between January 2016 and October 2021, Medicare Part D paid Verree approximately $16 million for 157,306 prescription drug events (PDEs).  Schedule II controlled substances accounted for over $4 million of the total paid amount, accounting for over 25% of the total amount paid by Part D.  Nearly half (43.29%) of all beneficiaries associated with Verree had at least one prescription drug event for an opioid drug.  OxyContin and oxycodone HCL extended release were the top drugs for Verree's claims to Medicare by total paid, with a total paid of almost $2.9 million.

82.     For 2016, Verree was ranked as #24 nationwide and #3 in Pennsylvania for retail-only pharmacies based on the total morphine milligram equivalent (MME)[4] dispensed for Medicare Part D.  For 2017, Verree was ranked as #12 nationwide and #3 in Pennsylvania for retail-only pharmacies based on the total morphine milligram equivalent (MME) dispensed for Medicare Part D.

83.     Verree's deviant controlled substance activity has presented an issue in its relationships with its drug wholesalers, from whom Verree purchases controlled substances and other drugs.

84.     For example, Verree initially purchased many of its drugs from McKesson Corporation.  However, in June 2013, McKesson terminated their ability to purchase controlled substances.  Information obtained by federal investigators revealed that McKesson terminated

---

[4] Morphine milligram equivalents (MME), aka morphine equivalent doses (MED), are values that represent the potency of an opioid dose relative to morphine.  MME is a means to standardize the total opioid dose across different drugs and dosages.

Verree based on a review of its purchasing patterns.  Verree was therefore not permitted to order controlled substances from McKesson after this date.

85.     Verree then moved its purchasing of controlled substances over to another distributor, Rochester Drug Cooperative (RDC).  Its dealings with RDC are detailed further below.  But RDC eventually also imposed restrictions on Verree's purchasing of controlled substances after further scrutiny of its business.

86.     Verree has also spread its purchasing of drugs out amongst a host of other drug distributors and brokers, including Cardinal/Kinray; Trxade; and Matrix.  Verree has also submitted applications to other distributors, including Independent Pharmacy Cooperative.

### III.     Verree's controlled substance practices led to suspicious order reports filed by its distributors and prior DEA discipline.

87.     While Verree managed to conceal some of its business practices from the wholesalers in the ways outlined below, the activities that Verree did not—or could not—conceal generated concern among its wholesalers.

88.     The distributors repeatedly expressed those concerns through suspicious order reports to the DEA.  Drug distributors are obligated by regulation and statute to report to the DEA suspicious orders from their customers, including pharmacies like Verree.  Suspicious orders include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  21 C.F.R. § 1301.74; *see also* 21 U.S.C. § 832.

89.     Verree's drug distributors filed numerous suspicious order reports regarding their controlled substance purchasing and business activities.

90.     For example, on February 21, 2017, RDC filed a suspicious order report regarding

Verree's "cash sales," high quantity amounts of controlled substance prescriptions, and a high

prescriber:



91.     RDC filed another suspicious order report on Verree on April 27, 2018 for its

"high dispensing of controlled substances":



92.     In another example, RDC filed a suspicious order report with the DEA on

September 23, 2018 regarding Verree's high rate of cash dispensing—an indicator of

diversion—and the high number of patients receiving the "holy trinity" of drugs—opioids,

benzodiazepines, and muscle relaxants, which is another indicator of diversion:



**SUSPICIOUS ORDER/ACTIVITY REPORT**          RDC - METRO

**RDC LOG FILE #**   NJ201800000343                    **DATE:**  9-23-2018

**DETAILS OF SUSPICIOUS ORDER/ACTIVITY:**
RDC recently received dispensing records from Verree Pharmacy, RDC
Account # 003913. RDC has completed a review of the dispensing
information for the dispensing period of June 4, 2018, through
September 29, 2018. The review of the dispensing information found the
pharmacy is dispensing cash prescriptions at a rate 13.37%. In
addition, it appears 5 patients are receiving combination medications
of an Opioid + Anti-depressant (Benzo) + muscle relaxant. These
combinations have taken place 9 times during the dispensing period.

93.     But RDC was not the only distributor that filed suspicious order reports about Verree and its controlled substances.  For example, Cardinal/Kinray filed many suspicious order reports regarding Verree's outlier purchasing of controlled substances.

94.     The signs of Verree's illegal activity with respect to controlled substances went beyond the drug distributors.  For example, the DEA conducted a scheduled investigation of Verree on February 4, 2015, focusing on record-keeping and inventory requirements.

95.     The DEA's scheduled investigation resulted in a finding of violations and a letter of admonition to Verree.  The letter, dated March 4, 2015, states that the diversion investigators' accountability audit found discrepancies regarding OxyContin 30mg tablets, Percocet 5/325mg tablets, and oxycodone APAP 5/325mg tablets; and a non-compliant biennial inventory.

96.     Instead of pursuing an enforcement action, the DEA disciplined Verree by providing it with an opportunity to become compliant with the CSA through this letter of admonition.

27



97.     In Spivack's response of March 31, 2015, he falsely told the DEA that he would become compliant with the CSA.



Additional actions will be taken, if the need arises, to remain in conformity
with the Controlled Substances Act of 1970.

If you have any questions, please feel free to contact me.

Very truly yours,

Mitchell Spivack
Owner

**IV.**    **A DEA and HHS/OIG investigation uncovered Verree and Spivack's years-long schemes to illegally dispense or distribute controlled substances and commit health care fraud.**

98.    With all of this context, the DEA and the Office of Inspector General for the U.S. Department of Health and Human Services (HHS/OIG) opened and conducted an extensive investigation of Verree's controlled substance practices and billings to federal health care programs.

99.    The United States' investigation uncovered two blatantly illegal schemes:  a wholesale violation of the pharmacy's corresponding responsibility under the Controlled Substances Act to ensure proper dispensing of controlled substances; and systematic health care fraud with false billings to federal health care programs.

**A.**    **Verree Pharmacy and Spivack illegally dispensed and distributed thousands of opioids and other controlled substances despite red flags, signs of diversion, and the tragic consequences to the public.**

100.    After numerous attempts to educate, warn, and bring them into compliance, Verree, through Spivack and his employees at Verree, illegally dispensed and distributed thousands of dosage units of opioids and other controlled substances in violation of their corresponding responsibility.  Verree dispensed numerous pills and other dosage units of controlled substances based on "prescriptions" that carried numerous red flags and signs of

29

diversion.  Nonetheless, in order to keep its business going and retain the vast profits that came

from the business, Verree and Spivack illegally dispensed the controlled substances in violation

of the CSA.

> **1.      Verree Pharmacy and Spivack had been educated and warned—and had themselves acknowledged—their corresponding responsibility under the Controlled Substances Act.**

101.    For many years, the DEA and third parties had educated and warned Verree and

Spivack about their corresponding responsibility to investigate any red flags of diversion and

only dispense controlled substances if red flags had been resolved.  Indeed, Verree and Spivack

repeatedly acknowledged those responsibilities and claimed they were satisfying them.

102.    For example, the DEA made the Pharmacist Manual outlined above publicly

available to all pharmacies and pharmacists, including Verree and Spivack.  The Manual, as

discussed above, warned pharmacies and pharmacists of their corresponding responsibility to

investigate red flags and dispel any suspicion stemming from those red flags, as well as the legal

exposure that accompanied failing to do so.

103.    Beyond the DEA, other third parties also warned Verree and Spivack of their

corresponding responsibility obligations.

104.    For example, as early as 2014, RDC was taking steps to ensure that Verree and

Spivack were aware of their corresponding responsibility CSA obligations.  Spivack, on behalf

of Verree, acknowledged understanding these legal obligations and claimed to satisfy them:



105.    RDC continued to educate, warn, and ensure that Verree and Spivack knew of their corresponding responsibility obligations.  In 2015, Verree and Spivack again acknowledged them.

106.    However, RDC began recognizing Verree's controlled substance dispensing problems and started raising concerns with Verree's controlled substance practices in August 2016.

| RDC | COMPLIANCE TEAM FIELD REVIEW SUMMARY REPORT | Date of Report: 8-12-16 |
| --- | --- | --- |

Recommend Further RDC Action:        Yes: ✓    No: ☐

Other: **Due Diligence Policy Needed, Lower Cash Prescriptions**

107.    Verree—through Spivack, T.G., E.P., and L.K.—responded by providing RDC with its "Due Diligence Procedure for Controlled Substances" to ensure that Verree could keep purchasing controlled substances from RDC. Several of the commitments made in that document track the pharmacy's corresponding responsibility obligations.

**Verree Pharmacy**
**7960 Verree Road**
**Philadelphia, PA 19111**
███████████

**August 1, 2016**

**DUE DILIGENCE PROCEDURE FOR CONTROLLED SUBSTANCES**

- Verree Pharmacy conducts checks of customer's prescription activity via the state's Prescription Monitoring Program (PMP).
- Verree Pharmacy will limit the amount of cash payments accepted for CS prescriptions in accordance with acceptable 10% standard set by the DEA."
- Verree Pharmacy will require that patients use their third party insurance in all transactions for CS, unless a reasonable explanation is given by patient who is requesting to pay for the CS prescription by cash. Such explanation will be documented and noted on rear of prescription."
- "If patient and/ or prescriber is out of pharmacy's area of service, the on-duty pharmacist will use his/ her professional judgement before filling the prescription. Prescription will only be filled for valid documented reasons. Verification will be conducted by calling prescriber when the pharmacist deems necessary."

Additions to this Due Diligence Policy will be made as deemed necessary. A copy of this policy is kept in our Narcotic safe. The following personnel have read the above policy and have agreed to enforce it.

Mitchell Spivack (Pharmacist)   _Mitchell Spivack_

T██ G██ (Pharmacist)    ████████████████

E██ P██ (Technician)    ████████████████

L██ K██ (Technician)    ████████████████

108.    RDC continued to raise concerns and required Verree to meet heightened compliance standards in 2018.  For example, it instructed Verree to document the patient's diagnosis to justify the controlled substances dispensed; provide the reasons for cash payments for prescriptions, a red flag for diversion; and ensure that they had a compliant biennial inventory.



**RDC COMPLIANCE REVIEW SUMMARY REPORT**

Date of Report: 8-16-2018

Recommendations to Customer:
Advised Verree Pharmacy to continue to document PT diagnosis. Reasons for cash prescriptions should be documented as well. Educate PT's with no insurance of the benifits and ask why they do not have insurance, document the reason. Remember to sign, date, and place a start and ending time on the biennial inventory. Also ****

109.    RDC warned Verree of similar issues during this time period.  For example, in November 2017, RDC raised concerns to Verree about its cash dispensing and its "holy trinity" cocktail dispensing.

Hi Mitchell,

It was a pleasure meeting with you last Friday afternoon.

We also discussed the importance of documentation by pharmacist, not only PT diagnoses but reasons for cash dispensing as well. (Ex. Patient cannot afford, Insurance does not cover, PT lost employment...)

> In addition while preparing your PT view this Auditor notice a prescribing pattern by Doctor ▮▮▮▮ which is considered by DEA "The Holy Trinity" this is the prescribing of at least 1 opioid, a benzodiazepine and Carisoprodol. Please see the attached handout on this possibly harmful combination

110.    RDC raised concerns again in 2018, including concerns that the Verree's rate of cash dispensing was higher than it had committed to in its due diligence policy in 2016.

| From: | ▮▮▮▮▮▮▮ |
|-------|---------|
| To: | Mitchell Spivack |
| Cc: | Compliance; ▮▮▮▮▮ |
| Subject: | RDC Diagnosis Review Request 9-23-2018 |
| Date: | Sunday, September 23, 2018 4:36:15 PM |
| Attachments: | RX_Review_Vree_Pharmacy_9-23-2018.xlsx |

Date:          September 23, 2018

> ▮▮▮▮▮▮▮ An analysis of your dispensing information for the dispensing period of June 4, 2018, through September 29, 2018, showed your pharmacy cash dispensing for prescriptions was at a rate of 13.37%. Your pharmacy's cash dispensing is above the best practice of 10%.

111.    In November 2018, in the midst of these troubling indicators that revealed Verree had a "heightened risk," and after Verree repeatedly claimed it would fix the problems, RDC finally imposed restrictions on Verree's ability to purchase controlled substances.



Verree Pharmacy, #3913
7960 Verree Road
Philadelphia PA 19111
Mitchell Spivack

Dear Mr. Spivack,



Mon 11/5/2018 2:41 PM
▮▮▮▮▮▮▮
RDC Controlled Substance Reduction Verree Pharmacy
To ☐ Mitchell Spivack
Cc ☐ Compliance; ▮▮▮▮

> You are receiving this letter because RDC has deemed the controlled substance dispensing activity exhibited by your pharmacy to be associated with heightened risk by our standards and interpretations of regulatory due diligence and industry controlled substance best practices. Accordingly, effective as of the date of this letter RDC will subject your pharmacy to more stringent threshold restrictions of the quantity of controlled substances that you may order. These restrictions may be imposed on a monthly basis, and/or per controlled substance. As customary, RDC will further limit, suspend, or terminate your pharmacy's controlled substance ordering privileges if warranted by appropriate circumstances, or if the identified activity continues.

> **All Controlled Substances will be reduced by 30%**

112.     Verree, through Spivack, responded by again claiming that they understood their

corresponding responsibility and other obligations and were taking action to comply with them.



From:       Mitchell Spivack
To:
Subject:    Re: RDC Controlled Substance Reduction Verree Pharmacy
Date:       Tuesday, November 06, 2018 4:03:10 PM

Dear Mr.

I want to assure you that I take the issue of opioid abuse and the corresponding responsibility to monitor prescriptions for opioids very seriously. In the past several years, we have strived to do our due diligence and instituted several policies to help combat the abuse and misuse of opioids. We are now in the process of creating newer. stricter policies that will address your concerns and decrease the quantity of controlled substances filled at my pharmacy.

Also, as a result of our decreasing the amount of controlled substance prescriptions filled at our pharmacy, we will need to end our relationship with a significant amount of patients and providers. In this regard, I was hoping that we could get a short extension, until December 1, 2018, to institute the threshold reductions. I am concerned about patient safety and having sufficient time to let them know we can no longer fill their prescriptions.

113.     RDC issued these and other warnings about Verree's corresponding responsibility

violations.  Despite years of warnings and repeated claims by Spivack that the pharmacy would

engage in proper due diligence, the investigation revealed that those assurances were false.

> **2.     Despite acknowledging their legal responsibility, Verree and Spivack
> engaged in repeated and systematic violations of their corresponding
> responsibility by illegally dispensing and distributing controlled
> substances in the face of red flags.**

114.     The United States' investigation uncovered a years-long practice at Verree of

engaging in wholesale violations of their corresponding responsibility to investigate and dispel

the suspicion of red flags before dispensing controlled substances.  Verree and Spivack instead

sold the pills to customers and generated extraordinary profits—frequently with extraordinary

sums of cash from the customers.

115.     The United States utilized a pharmacy expert to evaluate Verree and Spivack's

controlled substance dispensing practices.  With decades of experience, the expert evaluated

Verree and its employees' corresponding responsibility obligation with a sample of sixteen of Verree's top controlled substance patients who obtained controlled substances from the pharmacy. He reviewed thousands of controlled substance dispensing events for these patients.

116.     After a thorough review, the expert concluded that Verree and its employees had violated their CSA corresponding responsibility obligation as to all of these patients—for thousands of controlled substance prescriptions dispensed between 2016 and 2019, including opioids and other highly dangerous controlled substances. Despite years of warnings and claims by Verree and Spivack that they had changed their practices to ensure compliance and satisfied their corresponding responsibility obligations, the expert's review revealed that they had woefully failed to do so.

117.     For example, the expert reviewed the controlled substances dispensed by Verree to patient A.R. A.R. had received Schedule II controlled substances—the most dangerous and addictive controlled substances—from six different providers. 75% of A.R.'s prescriptions at Verree were Schedule II controlled substances, an extraordinarily high percentage. Patient A.R. had also received long-term, high-dose oxycodone and fentanyl for at least 2.5 years, with no legitimate medical justifications to support the dispensing. While the CDC generally advises daily MME of 90 or below, A.R.'s MMEs repeatedly exceeded that amount. In addition, Verree dispensed the controlled substances early in violation of the providers' instructed days' supply on multiple occasions, especially in 2016 and 2018. Those early fills are particularly dangerous for fentanyl patches. There were also at least ten occasions when A.R. appeared to pay large sums of cash for the opioids. For these 74 controlled substance dispensing events, in which Verree, Spivack, T.G., E.P., and L.K. dispensed 5,215 dosage units of highly addictive Schedule

II controlled substances, the expert concluded that the dispensing was in violation of their corresponding responsibility and was outside the usual course of professional practice.

118.    As another example, the expert also reviewed the controlled substances dispensed by Verree to patient S.M.  S.M. had received Schedule II controlled substances from three or more different providers.  Over 75% of S.M.'s prescriptions were for Schedule II controlled substances.  Verree dispensed long-term, high-dose opioids for almost three years to patient S.M. In addition, Verree dispensed powerful amphetamines with opioids for almost a year, and switched to Vyvanse, which has the same therapeutic effect as amphetamines, for more than a year.  Again, despite the CDC recommended maximum dosage of 90 MME, Verree dispensed astronomic doses—over 460 MME starting in January 2016 and continuing through 2018. Between 2016 and 2018, Verree again dispensed many early refills of controlled substances in violation of the prescriber's instructions; some of those early refills were particularly dangerous, with one 13 days early and another 22 days early.  Between 2016 and 2018, patient S.M. paid hundreds of dollars per month at some points just for the oxycodone dispensed by Verree.  As further described below, the pharmacy notes also document charging S.M. extra for this illegal dispensing.  For example, starting in August 2017, the prescription comments for S.M.'s oxycodone dispensing—all recorded as being dispensed by Spivack—contain the notes "Chg Extra $15" or "Charge $15" without any explanation why Verree was charging extra for this illegal dispensing.  Once again, for the over a hundred controlled substance dispensing events, including 9,530 dosage units of Schedule II controlled substances dispensed by Verree, Spivack, T.G., E.P., and L.K., the expert concluded that the dispensing was a violation of their corresponding responsibility and was outside the usual course of professional practice.

119.   As another example, the expert also reviewed the controlled substances dispensed by Verree to patient M.P.  70% of M.P.'s prescriptions were for Schedule II controlled substances.  Verree dispensed long-term, high-dose opioids for almost three years to patient M.P., including oxycodone for those three years and concurrent methadone for approximately two years.  At the same time, Verree dispensed benzodiazepines and amphetamines—the latter of which is a drug generally deemed to be a contraindicated or counteracting drug with opioids— for approximately three years.  Again, despite the CDC recommended maximum dosage of 90 MME, Verree dispensed extreme doses—over 580 MME starting in January 2016 and up to 725 through 2018.  Between 2016 and 2018, Verree again dispensed numerous early refills of the oxycodone and methadone in violation of the prescriber's instructions.  Between 2016 and 2018, patient M.P. paid large sums of cash for many of the opioids; for example, from April to December 2016, M.P. paid over $5,000.  In addition, in June 2016, in dispensing OxyContin to M.P., the prescription comment notes that M.P. "wants brand."  Large cash payments for opioids and a request for "brand name" opioids are signs that the patient is possibly selling those drugs to other individuals.  For example, "brand name" drugs command higher prices when sold illegally outside normal pharmacy dispensing.  For the 166 controlled substance dispensing events, including 13,556 dosage units of Schedule II controlled substances dispensed by Verree, Spivack, T.G., E.P., and L.K., the expert concluded that the dispensing was a violation of their corresponding responsibility and was outside the usual course of professional practice.

120.   As a final example, the expert also reviewed the controlled substances dispensed by Verree to patient D.W.  67% of D.W.'s prescriptions were for Schedule II controlled substances.  Verree dispensed long-term, high-dose opioids for at least three years to patient D.W.  At the same time, Verree dispensed benzodiazepines for at least three years—a "red flag"

cocktail.  Verree again dispensed extreme doses—over 880 MME starting in January 2016 and

up to 930 through 2018.  Between 2016 and 2018, Verree again dispensed numerous early refills

of the oxycodone in violation of the prescriber's instructions.  As further described below, the

pharmacy notes also document charging D.W. extra for this illegal dispensing.  For example, the

prescription comments for D.W.'s oxycodone and benzodiazepine dispensing regularly refer to

statements like "Charge Extra 10," "Charge Extra 5," and even more indicative of diversion,

state: "Greenstone Brand Extra $10."  There is no reasonable, legitimate explanation for these

extra charges imposed for the obviously illegal dispensing.  For the 161 controlled substance

dispensing events, including 14,410 dosage units of Schedule II controlled substances dispensed

by Verree, Spivack, T.G., E.P., and L.K., the expert concluded that the dispensing by Verree was

a violation of their corresponding responsibility and was outside the usual course of professional

practice.

121.    The expert's review resulted in an overall finding that Verree had violated its

corresponding responsibility and dispensed outside the usual course of professional practice for

all of the patients he had reviewed—for a total of thousands of instances where Verree, through

Spivack and the others, illegally dispensed controlled substances despite obvious signs of

diversion and other "red flags."

122.    These are only a sample of Verree and Spivack's illegal controlled substance

dispensing and distribution.  Additional examples of the illegal dispensing and distribution are

discussed below.

123.    Verree submitted claims to Medicare Part D and Medicaid for many of these

illegal controlled substance prescriptions.  Between January 1, 2016 and October 29, 2021,

Verree submitted claims to Medicare Part D, and there were 12,305 corresponding PDEs just for

Schedule II controlled substances, for a total payment by Medicare of $4,008,869.  For example, Verree submitted claims to Medicare Part D and received payment for the Schedule II controlled substances to patients M.P. and D.W. described above, which were collectively dispensed and distributed by Verree, Spivack, T.G., E.P., and L.K.

124.    The claims submitted to Medicare Part D for these prescriptions violated the requirements outlined above, and Medicare Part D would not have paid for the illegally dispensed controlled substances had it known of the illegal dispensing.  The claims to and payments by Medicaid were similarly improper for these prescriptions.  For example, as to Medicare Part D, the prescriptions did not comply with "applicable State law requirements constituting a valid prescription," 42 C.F.R. § 423.100, as the prescriptions are not issued for a legitimate medical purpose in the usual course of professional practice, and the pharmacist's dispensing of the prescriptions violated the CSA.  In addition, the prescriptions are not for a medically accepted indication.  As to Medicaid, the prescriptions are not "medically necessary" and are therefore not reimbursable under Pennsylvania's Medicaid program.

### 3.    With restrictions on its ability to acquire and sell controlled substances, Verree implements a program for "narc members" who wanted to ensure they kept receiving the controlled substances.

125.    In the midst of RDC and other outside scrutiny and RDC beginning to limit Verree's ability to acquire controlled substances, Verree began implementing a new program with several of its patients to increase their profits.  Instead of the normal practice where patients would bring in dangerous and suspect controlled substance prescriptions and patients would use insurance or other forms of payment, Verree implemented additional "Narc Member" dues.  Those "Narc Member" dues, as Verree told the patients, helped them ensure that they would continue receiving their controlled substances, all in the midst of increased scrutiny of the

pharmacy.  It also had the benefit of enhancing Verree and its employees' profits, even though its controlled substance purchasing was being limited by RDC.

126.    Investigators interviewed patients J.C., C.M., and M.M. regarding the "Narc Member" dues.  All three patients informed the investigators that an employee of Verree told them they would be required to pay an extra fee on top of their insurance co-pay if they wished to continue receiving prescriptions for Schedule II narcotics.

127.    Patient C.M. told investigators that an individual from Verree told C.M. that something had changed and that they were having trouble filling prescriptions.  C.M. said the individual from Verree told C.M. that if he/she wanted to ensure that he/she would be able to have his/her monthly oxycodone prescription filled, he/she would have to pay an additional $50 per month.  On several occasions, someone at Verree would remind the cashier to charge the extra $50.

128.    Patient M.M. told investigators that an individual from Verree told him/her that, if he/she wanted to ensure that he/she would receive his/her monthly oxycodone prescription, M.M. would have to pay an extra $25 per month.  The same individual from Verree told M.M. that the reason for this arrangement was that the pharmacy was losing money.  M.M. identified E.P. as the person from Verree who told him/her this.

129.    Patient J.C. told investigators that an individual from Verree told J.C. that the laws were changing and that it would be a problem for him/her to get their prescriptions filled. In a subsequent communication, the same individual from Verree said that, if J.C. was willing to be part of a pharmacy club with a $100 cash fee, J.C. could receive his/her oxycodone prescriptions.  J.C. again attributed the statement to E.P.

130.     This Narc Membership scheme, in the midst of RDC limiting Verree's ability to purchase and dispense controlled substances, helped enhance Verree's profits from the illegal controlled substance dispensing it could still perform.

### 4.     Verree and Spivack also repeatedly dispensed and distributed controlled substances based on blatantly forged prescriptions.

131.     Prescriptions were frequently presented at Verree with blatant and flagrant alterations which should have been considered major "red flags" for the pharmacy and caused the pharmacy and its employees to refuse to provide the controlled substances.  The customers used the alterations to illegally add powerful Schedule II controlled substances, specifically oxycodone, to prescriptions containing lesser controlled substances or non-controlled drugs. Verree and Spivack, instead of refusing the obviously forged prescriptions, accepted payment from the customer and illegally dispensed the controlled substances.

132.     The forgeries included prescriptions that had obvious eraser marks, date changes, refill adjustments, and name changes.

133.     For example, on June 21, 2017, Verree, through pharmacist Spivack and technician L.K., received a prescription that contained obvious alterations to the date, the drug prescribed, and even had the refills scratched out[5]— making it clear that the prescription was altered and forged.  Instead of complying with their legal obligation and refusing the prescription, Verree accepted payment of $1,080 and dispensed 360 pills of Schedule II oxycodone 30mg.

---

[5] Refills are not permitted for Schedule II prescriptions.  *See* 21 C.F.R. § 1306.12(a).



134.    In another example, on May 3, 2017, Verree, through pharmacist T.G. and technician E.P., received a prescription that contained obvious alterations to the date and added unprescribed oxycodone—making it clear the prescription was forged.  Instead of complying with their legal obligation and refusing the prescription, Verree accepted payment of $720 and dispensed the Schedule II oxycodone 30mg.



135.     These are only two examples of several forged prescriptions identified by investigators that Verree accepted to illegally dispense controlled substances.

136.     On October 8, 2021, federal and state investigators interviewed the practitioner who was the purported prescriber of several forged prescriptions, including the two examples above.  The practitioner informed investigators that several prescriptions written under his/her DEA registration number were altered, and he informed investigators that no one at Verree ever contacted him/her to question these forged prescriptions.  There are no notations on the prescriptions from 2014 to the present, front or back, that Verree ever attempted to contact the prescriber to determine whether the prescriptions were legitimate.

137.     By dispensing controlled substances based on obviously forged prescriptions, Verree and Spivack illegally dispensed controlled substances that were not based on a legitimate medical purpose in the usual course of professional practice.

**5.     Verree and Spivack, when scrutinized and restricted by its drug distributors, repeatedly lied to ensure that the pharmacy's drug supply would be maintained.**

138.     Indicators of this wide-ranging illegal dispensing scheme by Verree, through Spivack, T.G., E.P., and L.K., became clear to third parties as time progressed, despite Verree's best efforts to keep it concealed.

139.     For example, a former employee of Verree reported to investigators that Verree filled prescriptions for a lot of narcotics, such as prescriptions for 300 pills of a narcotic for only a month's time.  He/she observed Verree routinely running out of narcotics and on one occasion observed customers waiting in a line so long it went out of the pharmacy's front door, causing him/her to remark about it being like people standing in line for concert tickets.  T.G. reprimanded the former employee for the comment, and Spivack fired him/her that same day.

140.    The third parties who were most sensitive to the hints of the illegal dispensing were Verree's drug distributors, who were under obligations to implement "effective controls and procedures to guard against theft and diversion of controlled substances," 21 C.F.R. § 1301.71(a), and obligated to report suspicious orders to the DEA.

141.    One of the earliest examples of this is McKesson's termination of Verree as a controlled substance customer in June 2013 based on a review of Verree's purchasing patterns, as mentioned above.

142.    RDC began implementing additional scrutiny of Verree in the midst of these signs of diversion starting around 2017.[6]  Those concerns and regular reviews by RDC's compliance staff culminated in a number of important compliance and monitoring measures required by RDC, and ultimately resulted in mandatory limitations on Verree's ability to purchase controlled substances from RDC.

143.    When RDC began applying this additional scrutiny to Verree and its controlled substance purchasing and dispensing practices, Verree—through Spivack—actively misled RDC's compliance staff by providing false information and assurances of compliance to maintain their drug supply.

---

[6] On April 23, 2019, the U.S. Attorney's Office for the Southern District of New York announced that Rochester Drug Cooperative had entered into a deferred prosecution agreement with that office for, *inter alia*, controlled substance crimes.  RDC admitted that, "from at least in or about January 2012, up to and including in or about March 2017, RDC violated the federal narcotics laws by distributing controlled substances – including opioids such as oxycodone and fentanyl – to pharmacy customers that RDC knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes."

144.    For example, RDC notified Verree in November 2018 that, because of the signs of Verree's problematic controlled substance dispensing, it would impose mandatory reductions in Verree's ability to acquire controlled substances from RDC.



You are receiving this letter because RDC has deemed the controlled substance dispensing activity exhibited by your pharmacy to be associated with heightened risk by our standards and interpretations of regulatory due diligence and industry controlled substance best practices.

**All Controlled Substances will be reduced by 30%**

RDC will institute the threshold reductions effective **November 19, 2018**, to afford time to mitigate any potential disruption to critical patient care. We understand that this action may be of temporary inconvenience, and apologize for such. We look forward to continuing to service your pharmacy needs under the new restrictions.

145.    Recognizing that this limitation would severely impact Verree's ability to illegally dispense controlled substances and cutting back on the profits that Verree and Spivack were making from the scheme, Spivack began providing false assurances to RDC to circumvent the restrictions.

146.    For example, on November 30, 2018, Spivack emailed RDC's head of

compliance.



| From: | Mitch Spivack |
| To: | |
| Subject: | Verree Pharmacy Compliance |
| Date: | Friday, November 30, 2018 8:14:30 AM |

To Mr. ▮▮▮▮▮▮▮▮▮

I am the owner/pharmacist of Verree Pharmacy.

We are fully aware of the "opioid crisis" and the responsibilities that come with being a pharmacy in this environment. We have always taken this VERY SERIOUSLY and have strived to maintain the highest degree of due diligence that is required. We have formulated numerous policies, including regularly checking the PMP website, to ensure that we are actively monitoring medication usage to avoid abuse.

We understand that our dispensing numbers are high

We have never tried to hide our dispensing nor have we attempted to open a different wholesaler to obtain product from a secondary source.

147.    While admitting that "our dispensing numbers are high" and claiming to be "fully

aware of the 'opioid crisis,'" the assurances Spivack provided to RDC to avoid the controlled

substance purchasing restriction were false.

148.    For example, Spivack claimed that they had never attempted to open an account

with a different wholesaler to obtain drugs from a secondary source—a sign that a pharmacy

could be trying to spread its purchasing out to avoid detection of problematic controlled

substance purchasing and dispensing by a single wholesaler.

149.    Spivack's claim was false.  Verree—through Spivack—had attempted to open an

account with an alternate wholesaler to purchase controlled substances.  However, after the

alternate supplier reviewed the application and conducted due diligence on Verree, it rejected the application.



Name of Pharmacy: Verree Pharmacy
Name of Owner/Pharmacist: Mitchell Spivack          Signature: MITCHELL SPIVACK K
Title: Pharmacist owner
Date: 10/14/2017

FORM 1

Dear Pharmacy,

Thank you for requesting approval from Independent Pharmacy Cooperative ("IPC") to purchase pharmaceuticals ("Controlled Substances") subject to governmental control including but not limited to controls provided in the U.S.

Spivack Inc DBA Verree Pharmacy has been non-controlled substance IPC Customer since 1997. In October 2017, Verree Pharmacy applied to become an IPC controlled customer. The IPC Compliance Department reviewed the application and conducted due diligence on the pharmacy. After this process, it was determined that Verree Pharmacy did not meet our business model for a controlled substance customer, so they were not approved.

150.    Verree made several other false assurances to RDC to keep obtaining controlled substances.

151.    For example, RDC retained an outside contractor to perform an "On-Site Assessment" of Verree in July 2019.  That visit involved a number of inquiries regarding Verree's history and dispensing practices.

152.    During the visit, Spivack falsely claimed to RDC's contractor that Verree's licenses were never subject to disciplinary action.  Spivack failed to disclose and actively concealed the letter of admonition—a form of disciplinary action by the DEA, described above—that Verree had received only a few years prior in 2015.

153.    Spivack also falsely claimed to RDC's contractor that Verree did not fill prescriptions for out-of-state patients—another indicator of potential diversion.

Pharmacy Owner Spivack advised that Verree Pharmacy does not fill prescriptions for out of state patients.  Pharmacy Owner Spivack advised that at this time Verree Pharmacy is not accepting new patients.

154.    Once again, Spivack failed to disclose and actively concealed that Verree did in fact fill prescriptions for out-of-state patients, such as the following Schedule II controlled substances dispensed:

| DOS | Drug Name | Narc Code | RPH | TCH | City | State |
|------|-----------|-----------|-----|-----|------|-------|
| 3/20/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | EWP | JACKSONVILLE | FL |
| 2/24/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | LK | VILLAS | NJ |
| 1/9/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | EWP | JACKSONVILLE | FL |
| 12/13/2018 | OXYCONTIN | | 2 MS | EWP | BEAR | DE |
| 11/27/2018 | FENTANYL 75MCG/HR DIS | | 2 MS | LK | HAYMARKET | VA |
| 11/27/2018 | OXYCODONE 15MG TAB (KVK) | | 2 MS | LK | HAYMARKET | VA |

155.    Verree, through Spivack, made many other false statements to RDC in an attempt to generate the illusion of compliance and avoid restrictions on its ability to acquire controlled substances from RDC.

156.    Federal investigators interviewed the head of compliance for RDC.  The head of compliance confirmed that these statements made by Verree through Spivack were false.  The head of compliance also concluded that Verree's false statements caused it to avoid a suspension of its ability to purchase controlled substances from RDC—and possibly termination as a customer.

> **6.    While Verree and Spivack profited heavily from this controlled substance and the health care fraud scheme, the community suffered the consequences of the illegal controlled substances.**

157.    The consequences of this illegal controlled substance dispensing scheme, as well as the health care fraud scheme outlined below, resulted in significant illicit profits for Verree and Spivack.

158.    Federal investigators conducted an analysis of Verree's financial statements.  That review revealed that, in addition to his normal paycheck, Spivack withdrew significant amounts from the pharmacy bank account in the form of his "profits" from the pharmacy's activities.

159.    For example, Spivack wrote himself a $100,000 check in May 2017; a $100,000 check in June 2017; a $75,000 check in July 2017; and a $50,000 check in August 2017.



160.    In total, Spivack received over $5 million in profits that he extracted from Verree, thanks in part to the illicit profits made by its illegal controlled substance dispensing and the health care fraud scheme outlined below.

161.    While Spivack was making millions of dollars from Verree, the consequences to the public were tragic.  The most egregious example of this is patient I.S., who had been receiving controlled substance prescriptions from Verree for years.  Patient I.S. was a Medicare beneficiary whose prescriptions were paid for by Part D.

162.    For years, Verree had dispensed numerous controlled substance prescriptions to I.S., including dangerous combinations of OxyContin, oxycodone, and alprazolam.

| Row Labels | Sum of Qty |
|---|---|
| ALPRAZOLAM (DAVA) | 4,290 |
| OXYCONTIN | 4,200 |
| OXYCODONE 20MG TAB (KVK) | 3,000 |
| LYRICA | 2,322 |
| OXYCODONE 10MG TAB | 1,620 |
| OXYCODONE 15MG TAB (KVK) | 1,470 |
| ZOLPIDEM 10MG TAB | 1,020 |
| OXYCODONE ER | 450 |
| ALPRAZOLAM | 120 |
| OXYCODONE 20MG TAB | 120 |
| OXYCODONE 80MG ER TAB(TEVA) | 90 |
| ZOLPIDEM | 30 |

163.    Between November 13, 2017 and December 8, 2017, Verree dispensed hundreds of additional pills of controlled substances to I.S., including OxyContin, oxycodone, alprazolam, and the non-controlled drug cyclobenzaprine.  This holy trinity cocktail was a particularly dangerous combination of controlled substances of opioids, benzodiazepines, and a muscle relaxant.  All of the controlled substances dispensed by Verree for patient I.S. were filled by Spivack and E.P.:

| DOS | Drug Name | Qty | RPH | TCH |
|---|---|---|---|---|
| 11/13/2017 | ZOLPIDEM 10MG TAB | 30 MS | | EWP |
| 11/13/2017 | ALPRAZOLAM (DAVA) | 120 MS | | EWP |
| 11/17/2017 | CYCLOBENZAPRINE TABLETS 10MG | 180 MS | | EWP |
| 11/17/2017 | LYRICA | 90 MS | | EWP |
| 11/17/2017 | OXYCONTIN | 90 MS | | EWP |
| 11/17/2017 | OXYCODONE 20MG TAB (KVK) | 120 MS | | EWP |
| 12/8/2017 | QUETIAPINE 25MG TAB | 60 MS | | EWP |
| 12/8/2017 | ALPRAZOLAM (DAVA) | 120 MS | | EWP |
| 12/8/2017 | ZOLPIDEM 10MG TAB | 30 MS | | EWP |

164.    None of the prescription comments for these prescriptions indicated that Spivack or E.P. took any action to address the red flags from this dangerous combination of drugs, such as calling the prescribers.

165.    Patient I.S. overdosed and died on December 17, 2017 in Philadelphia.  The City of Philadelphia Medical examiner determined that the cause of death was drug intoxication.

**CAUSE OF DEATH**

26. **Part I.** Enter the chain of events—diseases, injuries, or complications—that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line. Add additional lines if necessary

IMMEDIATE CAUSE ———————> a. Drug Intoxication
(Final disease or condition
resulting in death)                    Due to (or as a consequence of):

166.    The medical examiner conducted a drug screen and found the same drugs that

Verree dispensed in I.S.'s system:



167.    Bottles of drugs, bearing the Verree Pharmacy label, were found next to the dead

body of I.S.



168.    The government's expert pharmacist reviewed Verree and Spivack's dispensing to I.S. and concluded that it violated their corresponding responsibility when they dispensed this dangerous cocktail of controlled substances.  The expert concluded that the dispensing was outside the usual course of professional practice and, therefore, a violation of the CSA.

169.    Patient I.S.'s overdose and death is only one example of the tragic impact that Verree and Spivack's illegal dispensing had on the community.

**B.      Government investigators also uncovered a rampant health care fraud scheme by Verree, through Spivack and his co-conspirators, who falsely billed federal health care programs for drugs not dispensed, using the code "BBDF."**

170.    Not only was Verree engaged in an illegal controlled substance dispensing scheme, but it also had engaged for years in a scheme to defraud federal health care programs and other insurers by billing for drugs that were not actually dispensed.  Spivack, T.G., E.P., and L.K. were all significantly involved, participated, and contributed to the scheme, and one of them even admitted the scheme to investigators.  The damage to the United States through billings to federal health care programs was substantial.

       1.       **Verree, through Spivack and others, implemented the "BBDF" health care fraud scheme to enhance their profits.**

171.    In reviewing the evidence obtained, particularly the data obtained from Verree's pharmacy computer, federal investigators identified a recurring comment in numerous prescriptions—BBDF.

172.    Prescriptions attributable to Spivack, T.G., E.P., and L.K. regularly utilized this internal code.

173.    By evaluating the prescriptions, the concurrent comments, and other contextual clues, investigators determined that BBDF was an acronym for the "Bill But Don't Fill" fraud scheme.

174.    A review of even a few of the BBDF prescriptions made the scheme clear. Prescriptions that included BBDF in the comments showed patients refusing medication, returning medication, or not picking up medication.  Even more clearly, the comments revealed that Verree and the four co-conspirators were using BBDF as a means to cover their losses on other drugs and further line their pockets with illicit profits by falsely claiming to insurers that they had dispensed a drug to a patient or beneficiary, when in fact they had not.

| Drug Name | RxComment |
|---|---|
| CLOBETASOL PROP CR | BBDF 2/14 TO COVER BUMEX LOSS |
| POTASSIUM CHLORIDE 20 (K-DUR) | BBDF 8/27/15 CUSTOMER DOESNT WANT |
| DIFLORASONE OINT | BBDF PAYS WAY BELOW COST |
| ARIPIPRAZOLE 2MG TAB | BBDF LOSE MONEY |
| XIFAXAN 550MG TAB | BBDF ,PT DOESNT TAKE ANYMORE |
| VENTOLIN HFA | BBDF 4/4 TO COVER LOSSES |
| MUPIROCIN 2% CRE | BBDF TO PAY FOR MONEY LOSS FOR RIFAMPIN |
| ATORVASTATIN 20MG TAB | BBDF 4/20/16   REFILL DENIED PER MD 7/19/16 |
| VALSART/HCTZ 80-12.5 TAB | BBDF RETURNED |
| DIGOXIN 0.125MG TAB | BBDF   DOESN'T TAKE PER PATIENT 6/1/16 TAG |
| NUVIGIL 250MG | BBDF CARAFATE TO COVER LOSS--GENERIC MADE-THATS WHY WE LOST $ |
| BENZOYL PEROXIDE WASH | LOSER!!!  BBDF CLOTRIMAZOLE 4/28 |
| OSELTAMIVIR 75MG CAP | BIG LOSER - BBDF ANOTHER RX TO COVER LOSS-SEE E█████ |
| SYMBICORT (120 INH) | BBDF 10/2 TO COVER LOSERS |
| CLINDAMYCIN 300MG CAP | BBDF REFUSED BY CUSTOMER |
| HIBICLENS | BBDF   REFUSED BY CUSTOMER |
| SYMBICORT (120 INH) | BBDF RETURNED |

175.    A data analysis revealed that, between January 2016 and December 2019, thousands of prescription comments included BBDF in the prescription comment.[7]

176.    Prescriptions that had the BBDF comment were attributed to all four of the co-conspirators.  Spivack was the leading pharmacist on the BBDF entries—with over 2,500 different prescription billings with the BBDF code where he was the pharmacist since 2013.  E.P. was the technician for over 2,700 of these BBDF prescriptions since 2013, and L.K. was the technician for over 700 of them.  T.G. also had hundreds of such BBDF entries on prescriptions he handled.

177.    A data analysis revealed that, for all federal and private billings, Verree had made hundreds of thousands of dollars on these fraudulent billings where the prescription comment

---

[7] The BBDF comments also occurred prior to January 2016.

While Verree and Spivack may claim that the BBDF entry was automatically carried over into subsequent refills or similar prescriptions without any action taken by Verree, federal investigators determined that no such duplication occurred and that the prescription comments identified were unique for each prescription and prescription refill.

included the BBDF code.  The scheme may have extended even further for drugs where BBDF was not included in the comment.

178.     Interviews of third parties provided support for the conclusion that BBDF was their code for fraudulent billings.  For example, investigators interviewed a number of patients who confirmed that they refused or simply did not receive the drugs that Verree and the co-conspirators billed insurance for.

179.     Investigators interviewed patient R.R. regarding the "BBDF" billing scheme.  The investigators showed R.R. excerpts from Verree Pharmacy records which showed a prescription billed to Medicare on October 8, 2015 for $2,020.94.  There were also four refills on November 17, 2015 ($2,020.94), December 20, 2015 ($2,020.94), January 16, 2016 ($2,020.94), and March 13, 2016 ($2,202.51).  In addition, Verree noted in a comment: "BBDF, PT DOESN'T TAKE ANYMORE."  R.R. informed the investigators he/she did not take that medication more than the one original time.  Verree profited approximately $8,000 at the expense of Medicare, even noting R.R. was not taking the medication any longer.

180.     Investigators also interviewed patient W.H. regarding the BBDF scheme. Investigators showed W.H. a Lyrica refill request sent from Verree to his/her provider's office on May 24, 2018.  The Verree computer system contained the BBDF code for Lyrica prescriptions for W.H. on May 24, 2018 and August 31, 2018.  W.H. told investigators he/she did not receive any of this Lyrica, as he/she had stopped taking it.  Medicare paid Verree approximately $1,905.64 for the medication not dispensed.  W.H. provided similar information regarding BBDF entries for prescriptions ostensibly provided to W.H.'s spouse.

181.    Investigators also interviewed one of the Verree co-conspirators, L.K.  L.K. confirmed that each of the four co-conspirators used the pharmacy's computer system using their own screen name and password.

182.    Investigators presented L.K. with a number of prescriptions that contained the BBDF code.  When investigators asked L.K. if he was aware of the BBDF abbreviation, he stated without hesitation "Bill But Don't Fill."  He explained that Verree, in one example prescription presented to L.K., would bill the medication but did not fill the medication because the patient never picked it up.

183.    After being presented with several BBDF billings, L.K. acknowledged that BBDF was fraud.  The interview ended with L.K. referring to "shitting his pants" right now and being scared.

**2.    An analysis of Verree's drug purchasing compared to its billings revealed the broad scope of the scheme.**

184.    A Medicare integrity contractor conducted an independent analysis of Verree's Medicare and Medicaid billings and compared those billings to the amount of drugs that Verree actually purchased from its wholesalers.

185.    Federal investigators obtained the purchasing data independently from all of the wholesalers that they could identify.

186.    The Medicare integrity contractor conducted an analysis of Verree's billings and purchases between January 2, 2016 and January 10, 2020 for particular drugs.  The inquiry was essentially whether Verree was billing Medicare and Medicaid for more drugs than it had purchased.

187.    The results of that investigation further supported the existence of the scheme. The contractor concluded that, for this limited period of time and with a limited set of drugs,

Verree had billed Medicare and Medicaid, and Medicare and Medicaid paid thousands of dollars for drugs that the pharmacy could not have possibly dispensed to patients based on its purchases from the drug distributors.

188.    For example, with respect to the drug Invokana tab 100mg, the purchasing data from the drug distributors revealed that Verree had acquired 3,630 dosage units of the drug, but had billed Medicare and Medicaid for 4,500 units of the drug, resulting in a total potential loss of almost $13,000.

189.    The Medicare analysis was based on comparing all drugs acquired to the billings for only Medicare and Medicaid.  If there were any additional billings to other insurers, including private insurance companies or cash purchases, an even larger gap would exist for which no drugs had been acquired to cover the claims made to insurers.

190.    Federal investigators conducted a similar, but separate analysis to determine how many claims Verree had submitted to Medicare for drugs that contained the BBDF code.

191.    The federal investigators matched up the prescription numbers documented in the Medicare prescription drug events with the internal Verree data that contained the BBDF code. Examples of those claims are referenced in Exhibit A.

192.    The results of that analysis revealed that, between January 1, 2016 and April 29, 2019, Verree had improperly received over $125,000 from Medicare Part D for 716 PDE claims, based on "prescriptions" that had the BBDF fraud code attached to them.

193.    Additional review revealed that Verree similarly submitted prescription claims with BBDF to Medicaid, Tricare, and the Federal Employees Health Benefits Program.

194.    With respect to Tricare, between January 1, 2016 to December 31, 2019, Verree improperly received approximately $1,400, for approximately 12 claims, from the Tricare

program for "prescriptions" that had the BBDF fraud code attached to them. Examples of those claims are referenced in Exhibit A.

195.    With respect to FEHBP, between January 1, 2016 to December 31, 2019, Verree improperly received approximately $5,000, for approximately 35 claims, from FEHBP Carriers for "prescriptions" that had the BBDF fraud code attached to them. Examples of those claims are referenced in Exhibit A.

196.    As a result of the BBDF scheme by Verree, Spivack, T.G., E.P., and L.K., the United States was damaged by the fraudulent billings to Medicare Part D, Medicaid, Tricare, and FEHBP.

**C.    A DEA audit also revealed that Verree was missing thousands of controlled substances, including opioids.**

197.    Beyond the illegal dispensing and health care fraud, the DEA conducted an extensive accountability audit of Verree's controlled substances to determine whether Verree kept proper inventories and accounted for the dispensing of its pills.

198.    The DEA had previously found discrepancies in Verree's record-keeping, as documented in the 2015 letter of admonition. Spivack responded to the DEA by assuring them that measures had been taken to bring the pharmacy into compliance with the CSA.



199.    However, when the DEA conducted its audit of Verree in the current investigation, it discovered that Verree was unable to account for thousands of missing dosage units of controlled substances.

200.    The audit consisted of a review of the inventories, acquisition records, dispensing records, and any other disposal records for several controlled substances, including oxycodone, OxyContin, and alprazolam.  Verree was unable to account for thousands of dosage units of these controlled substances.

| Audit Period: May 13, 2017 BOB through October 10, 2019 | | | | |
|---|---|---|---|---|
| Controlled Substance | Total In | Total Out | Difference | % Difference |
| Alprazolam 2mg | 52,100 | 52,808 | 708 | 1.36% |
| Buprenorphine/Nalaxone sublingual film 8mg/2mg | 7,495 | 7,177 | -318 | -4.24% |
| Carisoprodol 350mg | 45,400 | 56,314 | 10,914 | 24.04% |
| Diazepam 10mg | 22,400 | 22,394 | -6 | -0.03% |
| Methadone 10mg | 120,979 | 121,029 | 50 | 0.04% |
| Oxycodone 30mg | 311,337 | 310,105 | -1,232 | -0.40% |
| OxyContin 30mg | 15,022 | 15,027 | 5 | 0.03% |
| Suboxone 8mg/2mg  sublingual film | 35,465 | 35,559 | 94 | 0.27% |
| Xanax 2mg | 30 | 40 | 10 | 33.33% |

201.    The missing dosage units included 10,914 dosage units of carisoprodol that it claimed to dispense but had no record of acquiring; and 1,232 dosage units of oxycodone 30mg that it had acquired but that had vanished from its inventory.

202.    On January 10, 2020, Spivack consented to an interview with his counsel and federal investigators on the missing controlled substances.  Spivack disclosed, in part, inexplicable inventory adjustments removing oxycodone pills in Verree's computer inventory that had no legitimate explanation.  Spivack highlighted for investigators that the inexplicable inventory adjustments all had E.P.'s initials attached to the entries.  For example, this inventory

entry attributes 100 missing dosage units of oxycodone 30mg to an inventory adjustment with

E.P.'s initials on August 27, 2019:



203.    Despite Spivack providing this information to federal investigators, and despite

information suggesting that E.P. was diverting oxycodone for illegitimate purposes, investigators

are not aware of E.P.'s employment at Verree being terminated.

### COUNT I:
### Unlawful Dispensing or Distribution of Controlled Substances:
### 21 U.S.C. §§ 842(a)(1), 829

204.    The United States realleges the above paragraphs as if fully set forth herein.

205.    Defendants Verree Pharmacy and Mitchell Spivack are subject to the

requirements of Part C of the CSA, 21 U.S.C. § 822.

206.    As outlined above, Verree Pharmacy and Mitchell Spivack illegally dispensed or distributed controlled substances, including oxycodone, without a valid and effective prescription on many occasions, in violation of 21 U.S.C. § 829.

207.    By illegally dispensing and distributing controlled substances from January 27, 2017 to the present in violation of 21 U.S.C. § 829, defendants Verree Pharmacy and Mitchell Spivack violated 21 U.S.C. § 842(a)(1) on each occasion.

208.    As a result of the violations set forth above and additional violations to be discovered through the investigation and discovery, defendants Verree Pharmacy and Mitchell Spivack are subject to the relief set forth in the CSA.

### COUNT II:
### Knowingly Presenting and Causing the Presentation of False Claims:
### 31 U.S.C. § 3729(a)(1)(A)

209.    The United States realleges the above paragraphs as if fully set forth herein.

210.    Defendants Verree Pharmacy and Mitchell Spivack, between January 27, 2016 to to the present, by failing to dispense drugs while falsely claiming to dispense them and billing for those false dispensing events to federal health care programs and thereby receiving reimbursement, knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to federal health care programs, including Medicare, Medicaid, Tricare, and FEHBP, in violation of 31 U.S.C. § 3729(a)(1)(A).

211.    For example, Verree Pharmacy did not have sufficient medication inventory to have dispensed all of the drugs for which it billed.  Verree's inventory and purchase history show that Verree never had or purchased inadequate amounts of prescription drugs to support the quantities for which it billed and was reimbursed by federal health care programs.

212.     Defendants utilized the BBDF code to fraudulently bill federal health care programs, including Medicare, Medicaid, Tricare, and FEHBP, for drugs that it did not actually dispense to beneficiaries.  Examples of those claims are referenced in Exhibit A.

213.     In addition, between January 27, 2016 to the present, defendants Verree Pharmacy and Mitchell Spivack, by dispensing and distributing controlled substances that violated the CSA and violated the applicable requirements for Medicare Part D and Medicaid, but nonetheless submitting false claims to Medicare Part D and Medicaid and receiving reimbursement for the drugs, knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to these federal health care programs in violation of 31 U.S.C. § 3729(a)(1)(A).

214.     By submitting false billings and claims to federal health care programs that falsely claimed to dispense drugs to beneficiaries that were not actually dispensed or otherwise did not satisfy the relevant payment criteria and with full knowledge of the fraud, defendants knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

215.     By virtue of these false and fraudulent claims, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each false claim submitted.

## COUNT III:
### Conspiring to Present and Cause the Presentation of False Claims:
### 31 U.S.C. § 3729(a)(1)(C)

216.     The United States realleges the above paragraphs as if fully set forth herein.

217.     Defendants Verree Pharmacy and Mitchell Spivack, between January 27, 2016 to the present, conspired with T.G., E.P., and L.K. to submit false billings and claims to federal health care programs that falsely claimed to dispense drugs to beneficiaries that were not actually

dispensed or otherwise did not satisfy the relevant payment criteria with full knowledge of the fraud.

218.    For example, the co-conspirators jointly utilized the BBDF code as part of their conspiracy to implement the health care fraud scheme.  The evidence collected reflects the co-conspirators working together to engage in the fraud scheme, and one of the co-conspirators admitted the fraud scheme to investigators.  The BBDF code's common and collective use among the co-conspirators reveals an agreement and understanding by the defendants and other co-conspirators to collectively engage in this scheme to submit false billings to federal health care programs with full knowledge of the fraud and falsity, in violation of 31 U.S.C. § 3729(a)(1)(C).  Examples of those claims are referenced in Exhibit A.

219.    In addition, the co-conspirators jointly conspired to submit false billings and claims to federal health care programs for controlled substances that were dispensed and distributed in violation of the CSA and the applicable requirements for Medicare Part D and Medicaid.  The coordinated dispensing and distribution for each illegal controlled substance and the corresponding claim to Medicare Part D and Medicaid by the co-conspirators reveals an agreement and understanding by the defendants and other co-conspirators to collectively engage in this scheme to submit false billings to federal health care programs with full knowledge of the fraud and falsity, in violation of 31 U.S.C. § 3729(a)(1)(C).

220.    By virtue of these false and/or fraudulent claims, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each false claim submitted.

### COUNT IV:
### Payment by Mistake

221.    The United States realleges the above paragraphs as if fully set forth herein.

222.     This is a claim for the recovery of monies paid by the United States to defendants Verree Pharmacy and Mitchell Spivack as a result of mistaken understandings of fact.

223.     The United States paid Verree Pharmacy for prescription drugs that it believed had actually been delivered to federal beneficiaries.  Instead, defendants billed for prescription drugs that were never actually dispensed to those federal beneficiaries.

224.     In addition, the United States paid Verree Pharmacy for claims for controlled substances for federal beneficiaries that the United States believed met the coverage and payment requirements under the CSA, Medicare, and Medicaid, but in fact did not meet those requirements.

225.     The United States made these payments without knowledge of material facts and under the mistaken belief that Verree Pharmacy was entitled to receive payment for such claims when it was not.

226.     The United States' mistaken beliefs were material to its decision to pay Verree Pharmacy for such claims.

227.     Accordingly, defendants Verree Pharmacy and Mitchell Spivack are liable to make restitution to the United States of the amounts of the payments made in error to them by the United States.

## COUNT V:
## Unjust Enrichment

228.     The United States realleges the above paragraphs as if fully set forth herein.

229.     This is a claim for the recovery of monies by which Verree Pharmacy and Mitchell Spivack have been unjustly enriched during the relevant time period at the expense of the United States.

230.    By directly or indirectly obtaining government funds to which they were not entitled, Verree Pharmacy and Mitchell Spivack were unjustly enriched, and are liable to account for and pay as restitution such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America demands judgment against defendants Verree Pharmacy and Mitchell Spivack as follows:

231.    For violations of 21 U.S.C. § 842(a)(1), civil penalties of up to $25,000 per violation occurring on or before November 2, 2015, 21 U.S.C. § 842(c)(1)(A); and civil penalties of up to $68,426 per violation occurring after November 2, 2015, 28 C.F.R. § 85.5;

232.    Entry of a preliminary and permanent injunction to restrain future violations, pursuant to 21 U.S.C. §§ 843(f), 882, enjoining defendants from obtaining, processing, administering, distributing, or dispensing controlled substances;

233.    Damages sustained by the United States, trebled, as mandated by 31 U.S.C. § 3729(a)(1);

234.    Civil penalties of between $5,500 and $11,000 for each false claim presented on or before November 2, 2015, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9); and civil penalties of between $11,803 and $23,607 for each false claim presented after November 2, 2015, 28 C.F.R. § 85.5;

235.    For payment by mistake, the amount of damages sustained by the United States as a result of its payment by mistake, to be proven at trial;

236.    For unjust enrichment, the sums by which Verree Pharmacy and Mitchell Spivack have been unjustly enriched, to be proven at trial; and

237.    Pre-judgment interest, post-judgment interest, costs, and such other and further

relief as the Court deems just and equitable.

### JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule

38 of the Federal Rules of Civil Procedure.

Respectfully submitted,


  /s/ Jennifer Arbittier Williams
JENNIFER ARBITTIER WILLIAMS
United States Attorney


 /s/ Gregory B. David
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division


 /s/ Charlene Keller Fullmer
CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division


 /s/ Anthony D. Scicchitano
ANTHONY D. SCICCHITANO
Assistant United States Attorney
PA 208607
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8380
anthony.scicchitano@usdoj.gov

*Attorneys for the*
*United States of America*

Dated: January 27, 2022

**Exhibit A to Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | Drug Name |
|---|---|---|---|
| Medicare Part D | 1/29/2016 | 1457551 | LEVOTHYROXINE |
| Medicare Part D | 2/3/2016 | 1462318 | ARIPIPRAZOLE 2MG TAB |
| Medicare Part D | 2/29/2016 | 1467747 | SPIRIVA HANDIHALER |
| Medicare Part D | 3/2/2016 | 1452030 | VOLTAREN GEL |
| OPM/FEHBP | 3/14/2016 | 1469442 | IBU |
| Medicare Part D | 3/31/2016 | 1471444 | CLINDAMYCIN 300MG CAP |
| Medicare Part D | 4/4/2016 | 1471743 | LEVOTHYROXIN 25MCG TAB |
| OPM/FEHBP | 4/11/2016 | 1472448 | PROAIR HFA |
| OPM/FEHBP | 4/21/2016 | 1473825 | FLUOCINOLONE ACETONIDE |
| Medicare Part D | 4/29/2016 | 1474620 | ELIQUIS 5MG TAB |
| Medicare Part D | 5/4/2016 | 1475152 | SPIRIVA HANDIHALER |
| OPM/FEHBP | 5/5/2016 | 1475328 | XARELTO |
| Tricare | 5/24/2016 | 1477297 | CIPRODEX OTIC SUSPENSION |
| Medicare Part D | 5/26/2016 | 1477609 | VENTOLIN HFA |
| Medicare Part D | 6/2/2016 | 1471209 | VENTOLIN HFA |
| Medicare Part D | 6/29/2016 | 1478351 | FAMCICLOVIR 500MG TAB |
| Medicare Part D | 7/1/2016 | 1481579 | SIMBRINZA 1-0.2% SUS |
| OPM/FEHBP | 7/18/2016 | 1483061 | ATORVASTATIN CALCIUM |
| Tricare | 7/22/2016 | 1483674 | ESTRACE 0.01% CREAM |
| Medicare Part D | 7/29/2016 | 1484413 | KETOCONAZOLE 2% CRE |
| Medicare Part D | 8/8/2016 | 1479298 | PROAIR HFA |
| Medicare Part D | 8/17/2016 | 1486315 | DICYCLOMINE CAPSULES |
| OPM/FEHBP | 8/24/2016 | 1486917 | ANUCORT-HC |
| Medicare Part D | 9/1/2016 | 1487762 | BUPROPION 150MG SR TABLET |
| OPM/FEHBP | 9/28/2016 | 1490449 | BREO ELLIPTA |
| OPM/FEHBP | 9/28/2016 | 1490448 | SPIRIVA HANDIHALER |
| Medicare Part D | 9/30/2016 | 1490764 | AMLODIPINE |
| Medicare Part D | 10/4/2016 | 1491080 | ATORVASTATIN 10MG TAB |
| Tricare | 10/19/2016 | 1492669 | IBUPROFEN 800 MG TABLET |
| Medicare Part D | 10/28/2016 | 1489577 | MYRBETRIQ 25MG TAB |
| Medicare Part D | 11/2/2016 | 1494089 | OMEPRAZOLE 40MG CAP |
| Medicare Part D | 11/29/2016 | 1496818 | PERMETHRIN CREAM |
| Medicare Part D | 12/8/2016 | 1497883 | PIOGLITA/MET 15-850MG TAB |
| Tricare | 12/19/2016 | 1499087 | OLOPATADINE HCL 0.1% EYE DROPS |
| Medicare Part D | 12/31/2016 | 1487623 | NOVOLIN N INSULIN |
| Medicare Part D | 1/3/2017 | 1500467 | FLUTICASONE NASAL SPRAY |
| Tricare | 1/6/2017 | 1500950 | POLYETHYLENE GLYCOL 3350 POWD |
| OPM/FEHBP | 1/19/2017 | 1502335 | CHANTIX STARTING MONTH PA |
| Medicare Part D | 1/31/2017 | 1497900 | PREDNISOLONE ACETATE SUSP |
| Medicare Part D | 2/3/2017 | 1504048 | LISINOPRIL 10MG TAB |
| OPM/FEHBP | 2/9/2017 | 1492086 | PREDNISOLONE ACETATE |
| Medicare Part D | 2/28/2017 | 1506567 | PANTOPRAZOLE 40MG TAB |
| Medicare Part D | 3/1/2017 | 1506762 | POLYETHYLENE GLYCOL POWDER |
| OPM/FEHBP | 3/6/2017 | 1507205 | SANTYL |
| OPM/FEHBP | 3/22/2017 | 1508633 | PRADAXA |

**Exhibit A to Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | Drug Name |
|---|---|---|---|
| Medicare Part D | 3/23/2017 | 1476721 | SYMBICORT |
| OPM/FEHBP | 4/1/2017 | 1509897 | SANTYL |
| Medicare Part D | 4/1/2017 | 1476720 | VENTOLIN HFA |
| Tricare | 4/6/2017 | 1510441 | CYCLOBENZAPRINE 10 MG TABLET |
| Medicare Part D | 4/25/2017 | 1484313 | ATORVASTATIN 80MG TAB |
| Medicare Part D | 5/1/2017 | 1512873 | SYMBICORT (120 INH) |
| OPM/FEHBP | 5/22/2017 | 1515067 | SYMBICORT |
| OPM/FEHBP | 5/22/2017 | 1515066 | TRADJENTA |
| OPM/FEHBP | 5/23/2017 | 1515183 | PROAIR HFA |
| Medicare Part D | 5/31/2017 | 1507237 | FLUTICASONE NASAL SPRAY |
| Medicare Part D | 6/2/2017 | 1514985 | LIDOCAINE 5% OIN |
| Medicare Part D | 6/30/2017 | 1517628 | MODAFINIL 100MG TAB |
| Medicare Part D | 7/5/2017 | 1519312 | MYRBETRIQ 50MG TAB |
| OPM/FEHBP | 7/24/2017 | 1521145 | AUGMENTED BETAMETHASONE D |
| OPM/FEHBP | 7/24/2017 | 1521144 | ECONAZOLE NITRATE |
| Medicare Part D | 7/28/2017 | 1521705 | OLOPATADINE 0.6% SPR |
| Medicare Part D | 8/1/2017 | 1513955 | DULERA 200-5MCG AER |
| OPM/FEHBP | 8/16/2017 | 1523461 | METHYLPREDNISOLONE DOSE P |
| OPM/FEHBP | 8/25/2017 | 1524356 | NOVOLOG MIX 70/30 PREFILL |
| Medicare Part D | 8/26/2017 | 1524415 | ATORVASTATIN 40MG TAB |
| Medicare Part D | 9/1/2017 | 1522767 | ADVAIR DISKUS |
| OPM/FEHBP | 9/7/2017 | 1524973 | EZETIMIBE |
| Tricare | 9/12/2017 | 1500950 | POLYETHYLENE GLYCOL 3350 POWD |
| Medicare Part D | 9/29/2017 | 1511494 | VENTOLIN HFA |
| Medicare Part D | 10/3/2017 | 1525490 | VENTOLIN HFA |
| Medicare Part D | 10/26/2017 | 1527545 | DULOXETINE 20MG CAP |
| OPM/FEHBP | 10/27/2017 | 1530417 | OMEPRAZOLE |
| Medicare Part D | 11/1/2017 | 1527760 | ADVAIR DISKUS |
| Medicare Part D | 11/27/2017 | 1528291 | LANTUS INSULIN |
| Medicare Part D | 12/1/2017 | 1534052 | GABAPENTIN 300MG CAP |
| Medicare Part D | 12/28/2017 | 1536591 | PROAIR HFA |
| Medicare Part D | 1/2/2018 | 1536958 | OMEPRAZOLE 20MG CAP |
| Medicare Part D | 1/31/2018 | 1512198 | OMEGA-3-ACID 1GM CAP |
| Medicare Part D | 2/2/2018 | 1540257 | UNIFINE PNTP 31GX8MM MIS |
| Medicare Part D | 2/26/2018 | 1542722 | NAPROXEN 500MG TAB |
| Medicare Part D | 3/6/2018 | 1537200 | ZIPRASIDONE 20MG CAP |
| OPM/FEHBP | 3/13/2018 | 1544264 | ATORVASTATIN CALCIUM |
| Medicare Part D | 3/30/2018 | 1545931 | ADVAIR DISKUS |
| Medicare Part D | 4/5/2018 | 1537831 | EZETIMIBE 10MG TAB |
| OPM/FEHBP | 4/20/2018 | 1517542 | TRINTELLIX |
| Medicare Part D | 4/27/2018 | 1543511 | LOSARTAN |
| Medicare Part D | 5/2/2018 | 1544561 | AZELASTINE 0.15% SPR |
| Medicare Part D | 5/31/2018 | 1549270 | VENTOLIN HFA |
| Medicare Part D | 6/1/2018 | 1537200 | ZIPRASIDONE 20MG CAP |
| Medicare Part D | 6/29/2018 | 1555308 | SYMBICORT (120 INH) |
| OPM/FEHBP | 7/2/2018 | 1555426 | SILVER SULFADIAZINE |

**Exhibit A to Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | Drug Name |
|---|---|---|---|
| Medicare Part D | 7/2/2018 | 1555477 | ADVAIR DISKUS |
| Tricare | 7/10/2018 | 1556254 | LOTEMAX 0.5% EYE DROPS |
| Tricare | 7/11/2018 | 1556289 | LEVOFLOXACIN 500 MG TABLET |
| Tricare | 7/11/2018 | 1556292 | SERTRALINE HCL 25 MG TABLET |
| Tricare | 7/11/2018 | 1556293 | SPIRIVA 18 MCG CP-HANDIHALER |
| OPM/FEHBP | 7/16/2018 | 1553829 | SPIRIVA HANDIHALER |
| OPM/FEHBP | 7/23/2018 | 1557468 | HYDROCORTISONE VALERATE |
| Medicare Part D | 7/26/2018 | 1543682 | LYRICA |
| Medicare Part D | 8/2/2018 | 1550751 | SPIRIVA HANDIHALER |
| Medicare Part D | 8/31/2018 | 1551424 | LYRICA |
| Medicare Part D | 9/4/2018 | 1561556 | WARFARIN 1MG TAB |
| OPM/FEHBP | 9/13/2018 | 1535235 | OXYBUTYNIN CHLORIDE ER |
| Medicare Part D | 9/28/2018 | 1534240 | VENTOLIN HFA |
| Medicare Part D | 10/8/2018 | 1564906 | VASCEPA 1GM CAP |
| Medicare Part D | 10/31/2018 | 1567189 | BUDESONIDE 3MG ER CAP |
| Medicare Part D | 11/1/2018 | 1558616 | VENTOLIN HFA |
| OPM/FEHBP | 11/6/2018 | 1558293 | SPIRIVA RESPIMAT |
| OPM/FEHBP | 11/13/2018 | 1568667 | MYRBETRIQ |
| OPM/FEHBP | 11/24/2018 | 1548272 | ECONAZOLE NITRATE |
| Medicare Part D | 11/28/2018 | 1569978 | DOXYCYCLINE HYCLATE |
| Medicare Part D | 12/3/2018 | 1565107 | SYMBICORT |
| Medicare Part D | 12/26/2018 | 1572549 | ECONAZOLE CREAM |
| Medicare Part D | 1/2/2019 | 1573017 | DESMOPRESSIN 0.1MG TAB |
| Medicare Part D | 1/31/2019 | 1575931 | OMEPRAZOLE |
| Medicare Part D | 2/2/2019 | 1576120 | ZIPRASIDONE 20MG CAP |
| OPM/FEHBP | 2/19/2019 | 1577544 | NARCAN |
| Medicare Part D | 2/28/2019 | 1578462 | NARCAN SPRAY |
| Medicare Part D | 3/1/2019 | 1578648 | OMEGA-3-ACID 1GM CAP |
| OPM/FEHBP | 3/11/2019 | 1579455 | XIFAXAN |
| Medicare Part D | 3/29/2019 | 1581043 | BREO ELLIPTA 100-25 INH |
| Medicare Part D | 4/2/2019 | 1581382 | HYDROCORTISONE LOTION |
| Medicare Part D | 4/29/2019 | 1583567 | SERTRALINE 50MG TAB |
| Tricare | 7/23/2019 | 1590676 | METHOTREXATE 2.5 MG TABLET |
| OPM/FEHBP | 9/26/2019 | 1581585 | MYRBETRIQ |
| OPM/FEHBP | 12/2/2019 | 1573754 | WIXELA INHUB |

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Spivack, Inc. d/b/a Verree Pharmacy & Mitchell Spivack |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Anthony D. Scicchitano
U.S. Attorney's Office, 615 Chestnut Street, Suite 1250
Philadelphia, PA 19106 (215) 861-8380

Attorneys *(If Known)*
Anthony J. Mahajan, Esq., and Daniel G. Giaquinto
Frier Levitt, 84 Bloomfield Ave., Pine Brook, NJ 07058
973-852-8359

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
       Plaintiff

☐ 2  U.S. Government
       Defendant

☐ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District *(specify)*

☐ 6  Multidistrict Litigation - Transfer

☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Controlled Substances Act, 21 U.S.C. § 842, False Claims Act, 31 U.S.C. § 3729, and common law
Brief description of cause:
Civil complaint for civil penalties, damages, and injunctive relief under the Controlled Substances Act and False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
Jan 27, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ AUSA Anthony D. Scicchitano

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)    **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    **(b)**    **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    **(c)**    **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

    United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

    United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

    Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

    Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.    **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: <u>Nature of Suit Code Descriptions</u>.

V.     **Origin.**  Place an "X" in one of the seven boxes.

    Original Proceedings.  (1) Cases which originate in the United States district courts.

    Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

    Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

    Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

    Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

    Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

    Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

    **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.    **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

    Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

    Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 615 Chestnut Street, Ste. 1250, Philadelphia, PA _____

Address of Defendant: _____ 7960 Verree Road, Philadelphia, PA; Montgomery County, PA _____

Place of Accident, Incident or Transaction: _____ 7960 Verree Road, Philadelphia, Pennsylvania _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 01/27/2022     /s/ Anthony D. Scicchitano, AUSA     PA 208607
                                           *Attorney-at-Law / Pro Se Plaintiff*         *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

| | |
|---|---|
| **A.**   *Federal Question Cases:* | **B.**   *Diversity Jurisdiction Cases:* |
| ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts | ☐ 1. Insurance Contract and Other Contracts |
| ☐ 2. FELA | ☐ 2. Airplane Personal Injury |
| ☐ 3. Jones Act-Personal Injury | ☐ 3. Assault, Defamation |
| ☐ 4. Antitrust | ☐ 4. Marine Personal Injury |
| ☐ 5. Patent | ☐ 5. Motor Vehicle Personal Injury |
| ☐ 6. Labor-Management Relations | ☐ 6. Other Personal Injury *(Please specify):* _____ |
| ☐ 7. Civil Rights | ☐ 7. Products Liability |
| ☐ 8. Habeas Corpus | ☐ 8. Products Liability – Asbestos |
| ☐ 9. Securities Act(s) Cases | ☐ 9. All other Diversity Cases |
| ☐ 10. Social Security Review Cases |      *(Please specify):* _____ |
| ☑ 11. All other Federal Question Cases | |
|      *(Please specify):* False Claims Act, Controlled Substances Ac | |

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I,   AUSA Anthony D. Scicchitano  , counsel of record *or* pro se plaintiff, do hereby certify:

☐   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑   Relief other than monetary damages is sought.

DATE: 01/27/2022     /s/ Anthony D. Scicchitano, AUSA     PA 208607
                                           *Attorney-at-Law / Pro Se Plaintiff*         *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| SPIVACK, INC. d/b/a VERREE | : |
| PHARMACY and  MITCHELL SPIVACK, | : |
| Defendants. | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local
    Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.     (X)

| 1/27/2022 | /s/ Anthony D. Scicchitano | United States of America |
|---|---|---|
| Date | Anthony D. Scicchitano, Attorney-at-law | Attorney for |

| 215.861.8380 | 215.861.8618 | anthony.scicchitano@usdoj.gov |
|---|---|---|
| Telephone | Fax Number | E-Mail Address |

**(Civ. 660) 10/02**

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)      The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)      In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)      The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)      Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)      Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.