**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br> Plaintiff, | |
| v. | Civil Action No. 22-343 |
| SPIVACK, INC. d/b/a VERREE PHARMACY,<br>MITCHELL SPIVACK, TODD GOODMAN,<br>ERIC PESTRACK, and LEE KAMP,<br> Defendants. | Jury Trial Demanded |

## <u>AMENDED COMPLAINT</u>

The United States brings this suit to hold Verree Pharmacy, its then-owner/pharmacist

Mitchell Spivack, pharmacist Todd Goodman, and pharmacy technicians Eric Pestrack and Lee

Kamp accountable for the illegal dispensing of controlled substances, including opioids, and

fraud on Medicare and other federal health care programs.  Spivack, the other employees, and

Verree Pharmacy—which was the top retail pharmacy purchaser of oxycodone in the entire state

of Pennsylvania, pictured here—created a destructive enterprise that illegally dispensed

unparalleled quantities of opioids and other controlled substances into the Philadelphia

community and this District.



The pharmacy and its employees had a responsibility to dispense these risky and addictive drugs only when appropriate.  Instead, the pharmacy, Spivack, and the other employees prioritized profits over patients, dispensing the drugs as long as the patients paid, despite numerous red flags suggestive of diversion—such as opioids in extreme doses, dangerous combinations of opioids and other "cocktail" drugs preferred by those addicted, excessive cash payments for the drugs, and other signs that the pills were being diverted for illegal purposes.  To avoid scrutiny from the drug distributors that sold the pills, Verree, through Spivack, made false statements to maintain the façade of legitimacy in order to keep the pharmacy stocked with these pills.  Tragically, patients suffered the severe consequences of this illegal scheme, including at least one patient who overdosed and died, found next to Verree Pharmacy bottles Spivack and Pestrack dispensed.

At the same time, Verree, Spivack, and the other employees were also orchestrating an expansive health care fraud scheme involving fraudulent billings for drugs not actually dispensed.  The cornerstone of the scheme was a code used by the pharmacy employees in their internal computer system: BBDF or "Bill But Don't Fill."  This fraud—which Kamp admitted to investigators—resulted in significant damages to Medicare and other federal programs.

The Verree schemes—maintained for years with sophisticated means and multiple participants—had a devastating impact on the community and on federal health care programs. This lawsuit seeks to impose the civil penalties and damages on Verree, Spivack, Goodman, Pestrack, and Kamp that their conduct demands.

### PARTIES

1.      Plaintiff is the United States of America.

2.      Defendant Spivack, Inc. d/b/a Verree Pharmacy (Verree) is a Pennsylvania corporate entity.  Verree was owned by Mitchell Spivack.  Verree was registered with the

Pennsylvania pharmacy licensing board.  The Drug Enforcement Administration (DEA) granted Verree a registration on September 8, 1987, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 7960 Verree Road, Philadelphia, Pennsylvania.[1]

3.       Defendant Mitchell Spivack is an individual residing in Montgomery County, Pennsylvania.  Spivack owned and managed Verree at all times relevant to this Complaint.  He was registered with the Pennsylvania pharmacy licensing board as Verree's pharmacist-in-charge at all times relevant to this Complaint.  He was registered as a pharmacist as of March 16, 1982.

4.       Defendant Todd Goodman is an individual residing in Montgomery County, Pennsylvania.  Goodman worked as a pharmacist at Verree at all times relevant to this Complaint.  He was registered with the Pennsylvania pharmacy licensing board as a licensed pharmacist as of August 15, 1986.[2]

5.       Defendant Eric Pestrack is an individual residing in Montgomery County, Pennsylvania.  Pestrack worked as a pharmacy technician at Verree Pharmacy at all times relevant to this Complaint.

6.       Defendant Lee Kamp is an individual residing in Philadelphia, Pennsylvania.  Kamp worked as a pharmacy technician or assistant at Verree Pharmacy at all times relevant to this Complaint.

7.       Defendants Verree, Spivack, Goodman, Pestrack, and Kamp are collectively referred to as the "defendants."

---

[1] State records indicate that Mitchell Spivack owns Spivack, Inc.  However, another entity is now using the d/b/a of Verree Pharmacy.  Nonetheless, at all times relevant to this Complaint, Verree Pharmacy was the d/b/a trade name of Spivack, Inc. and was owned by Mitchell Spivack.

[2] While Goodman is also an attorney who holds an active bar registration with the Pennsylvania Disciplinary Board, the United States is not aware of Goodman representing Verree Pharmacy as counsel in any capacity.

## JURISDICTION AND VENUE

8.     This action is brought by the United States for civil penalties and injunctive relief under the Controlled Substances Act, 21 U.S.C. §§ 801-971, as well as civil damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

9.     This Court has subject matter jurisdiction over the Controlled Substances Act civil penalties, 21 U.S.C. § 842, pursuant to 21 U.S.C. § 842(c)(1)(A), and 28 U.S.C. §§ 1331, 1345, 1355.

10.     This Court has subject matter jurisdiction over the Controlled Substances Act injunctive relief pursuant to 21 U.S.C. §§ 843(f), 882, and 28 U.S.C. §§ 1331, 1345.

11.     This Court has subject matter jurisdiction over the False Claims Act counts for civil damages and penalties pursuant to 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331, 1345, 1355.

12.     This Court has subject matter jurisdiction over the common law claims pursuant to 28 U.S.C. §§ 1331 and 1345.

13.     This Court has personal jurisdiction over Verree because the entity is found in, incorporated in, transacted business in, licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

14.     This Court has personal jurisdiction over Spivack, Goodman, Pestrack, and Kamp because they reside in, are domiciled in, transacted business in, were licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

15.     Venue is proper in the Eastern District of Pennsylvania because the defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, 28 U.S.C. § 1391; the claims accrued in this District, and the defendants are found in this District, 28 U.S.C. § 1395; and because the defendants are located, reside, did

4

business, and engaged in the illegal conduct in this District, 21 U.S.C. § 843(f); 31 U.S.C.

§ 3732(a).

## THE CONTROLLED SUBSTANCES ACT

16.     The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and its regulations

govern the distribution and dispensing of controlled substances.  The CSA establishes strict

guidelines "to ensure a sufficient supply for legitimate medical . . . purposes and to deter

diversion of controlled substances to illegal purposes.  The substances are regulated because of

their potential for abuse and likelihood to cause dependence when abused and because of their

serious and potentially unsafe nature if not used under proper circumstances."  75 Fed. Reg.

61613 (Oct. 6, 2010).

**I.      Controlled substances are strictly regulated and scheduled based on their potential
for abuse and medical uses.**

17.     Federal legislation dictates how prescription drugs are categorized.  Drugs can be

placed in Schedules I through V based on, *inter alia*, their "potential for abuse" and whether they

have "a currently accepted medical use in treatment."  21 U.S.C. § 812(b).  For example,

Schedule II controlled substances are those that have a "high potential for abuse" that "may lead

to severe psychological or physical dependence," but have "a currently accepted medical use in

treatment."  *Id.*

18.     Pursuant to legislation and administrative action by the DEA, certain drugs have

been categorized as controlled substances.  For example:

a)      the opioid oxycodone (including drugs that contain it such as OxyContin,

oxycodone-acetaminophen (APAP), and Percocet), the opioid fentanyl, the

opioid methadone, and the amphetamine lisdexamfetamine (with brand

5

names including Vyvanse) are drugs categorized as Schedule II controlled

substances, *see* 21 C.F.R. § 1308.12;

b) buprenorphine (including drugs that contain it, and with brand names

including Suboxone) is a drug categorized as a Schedule III controlled

substance, *see* 21 C.F.R. § 1308.13;

c) the benzodiazepine alprazolam (with brand names including Xanax), the

benzodiazepine diazepam, zolpidem, and the muscle relaxant carisoprodol

(with brand names including Soma) are drugs categorized as Schedule IV

controlled substances, *see* 21 C.F.R. § 1308.14; and

d) pregabalin (with brand names including Lyrica) is a drug categorized as a

Schedule V controlled substance, *see* 21 C.F.R. § 1308.15.

## II.   Entities that distribute controlled substances or dispense them directly to patients, such as retail pharmacies, are required to register with the DEA and maintain strict controls.

19.    The CSA requires those who distribute or dispense controlled substances,

including pharmacies that dispense controlled substances pursuant to a prescription, to obtain a

registration from the DEA.  21 U.S.C. § 822(a).  Individuals or entities who have a registration

are commonly referred to as "registrants."

20.    The registration requirements for those who dispense are based on the statute's

definition of a "dispenser," which is defined as "a practitioner who [] delivers a controlled

substance to an *ultimate user*" "pursuant to the lawful order of, a practitioner, including the

prescribing and administering of a controlled substance."  21 U.S.C. § 802(10) (emphasis added).

That definition includes retail pharmacies that dispense controlled substances directly to patients.

*See id.* § 802(21) (defining "practitioner" to include a "pharmacy").  When controlled substances

are delivered not pursuant to a valid prescription, the CSA defines this delivery as a "distribution." *See* 21 U.S.C. § 802(11).

21.     Even when a registrant such as a retail pharmacy falls within the definition of "dispenser" and receives authorization through a DEA registration to dispense controlled substances, it may only dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA. *Id.* § 822(b).

III.    **Retail pharmacies registered with the DEA are generally permitted to dispense controlled substances only to patients with a valid prescription for a legitimate medical purpose.**

22.     For those entities such as retail pharmacies registered to dispense controlled substances, the CSA establishes strict limitations on when a controlled substance can be dispensed to the patient and ultimate user.  It generally provides that, unless a non-pharmacy practitioner dispenses directly or there is an emergency, Schedule II, III, and IV controlled substances can only be dispensed upon a "prescription."  21 U.S.C. § 829(a), (b).

23.     Even with an emergency, the "prescribing individual practitioner shall cause a written prescription for the emergency quantity prescribed to be delivered to the dispensing pharmacist" "[w]ithin 7 days after authorizing [the] emergency oral prescription."  21 C.F.R. § 1306.11(d)(4).  The prescription must also satisfy various other written requirements outlined in § 1306.11 and § 1306.05.[3]

---

[3] With respect to the form of the prescription, the CSA's implementing regulations require that a prescription for a controlled substance "be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."  *Id.* § 1306.05(a).

24.     A prescription is effective only if issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).

25.     In addition, the CSA's implementing regulations provide direction specifically for pharmacists by providing that "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ."  *Id.* § 1306.06.

26.     The CSA's implementing regulations explicitly warn pharmacists of the consequences of dispensing or distributing a controlled substance without satisfying these requirements.  "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* [for proper dispensing of controlled substances] rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. [§ ]829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." § 1306.04(a) (emphasis added); *see also United States v. Rottschaefer*, 178 F. App'x 145, 147 (3d Cir. 2006) ("The CSA's implementing regulations provide that, to be effective, a prescription 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice' . . . .").

**IV.     When pharmacists are presented with "red flags" through the prescription or otherwise, they cannot dispense the controlled substance unless they have dispelled the suspicion arising from those "red flags."**

27.     With respect to a pharmacist's "corresponding responsibility" to ensure proper dispensing and distribution of controlled substances, pharmacists have a legal duty to ensure that

prescriptions for controlled substances are legitimate before dispensing the controlled substance. The fact that a licensed physician actually or ostensibly prescribed a controlled substance does not obligate a pharmacist to fill that prescription.  A reasonably prudent pharmacist must be familiar with suspicious activity or "red flags" indicating that the controlled substances prescribed are at risk for abuse or diversion.

28.    A "red flag" can include anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice.  Some of the red flags for diversion that all pharmacists should be familiar with include the following:

a)    The prescriptions are for high dosage strengths of the drug and/or for large quantities.

b)    The prescriptions are part of a prescription "cocktail."  A prescription "cocktail" is usually a prescription for an opioid, such as oxycodone, combined with a prescription for a benzodiazepine (anti-anxiety drug) such as alprazolam (also known by its brand name, Xanax), and possibly a muscle relaxant, such as carisoprodol (also known by its brand name, Soma).  Cocktail combinations are often sought by drug abusers because they produce an intensified "high," but they can be particularly deadly.  The combination of an opioid, benzodiazepine, and muscle relaxant is sometimes referred to as a "Trinity" cocktail.

c)    Patients are willing to pay large sums of cash (or write checks or use credit cards) for controlled substances, especially when the patients have insurance coverage available for the drugs.

d)      Two or more controlled substance prescriptions are issued together which indicate duplicate therapy, for example, when a patient is issued two or more prescriptions known to treat the same condition in the same manner.

e)      The patient's address is a significant distance from the prescriber's address and/or the pharmacy's address.

29.     When confronted with one or multiple red flags concerning a prescription for controlled substances, a pharmacist must intervene and resolve the red flags to determine whether or not the prescription is for a legitimate purpose before filling the prescription.  The pharmacist must also document his or her findings for future use and reference.

30.     Depending on the type of red flag, there are different steps that the pharmacist can take to determine whether or not the prescription is for a legitimate medical purpose.  These steps involve obtaining more information from the physician, the patient, or both.  For example, in situations where a customer from out of town is attempting to fill a controlled substance prescription, a pharmacist should seek information from the patient as to why he or she is in the area trying to fill the prescription at this pharmacy.

31.     When a pharmacist contacts a physician to address red flags, the standard practice is for the pharmacist to document that contact and the information the pharmacist learns. Documentation noting the red flag and how the pharmacist handled it is required.  This ensures that the information is available for other pharmacy staff in the future.  Documentation is required even in a pharmacy with only one pharmacist because perfect recall of every encounter with every patient is not realistic.  If there is no documentation detailing how the pharmacist addressed the red flag, then it is reasonable to assume that the red flag was not resolved.  For example, if a conversation with the physician about the patient or the drug is not noted on the

prescription or in the patient's profile, then a presumption that conversation did not happen is appropriate.

32.    There are some red flags that a pharmacist cannot resolve by contacting the physician, obtaining a report from the prescription drug monitoring program,[4] or obtaining more information from the patient, such as those cases when the pharmacist has reason to believe that the physician is complicit in abuse or diversion of the controlled substance.

33.    As a general matter, when red flags remain unresolved, a reasonable pharmacist exercising his or her corresponding responsibility should not dispense the controlled substance prescription.

**V.    The DEA has warned pharmacists of this corresponding responsibility to ensure the legitimacy of controlled substance prescriptions prior to dispensing.**

34.    The DEA has provided clear public guidance to make pharmacists fully aware of their corresponding responsibility to ensure the legitimacy of controlled substance prescriptions and dispel any suspicion when presented with a red flag.

35.    In 2010, the DEA issued a version of the *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*.[5]  The Pharmacist's Manual is "a guide to assist pharmacists in their understanding of the Federal Controlled Substances Act and its implementing regulations as they pertain to the pharmacy profession."

---

[4] The prescription drug monitoring program (PDMP) is a state-run database that contains information on drugs, particularly controlled substances, dispensed to patients.  The database generally contains information on each dispensing event, such as the date, patient identifiers, pharmacy identifiers, prescriber identifiers, and the drug dispensed.  The PDMP is used by prescribers and pharmacies to investigate past dispensing history or practices, such as a patient's history of obtaining controlled substances.

[5] The Pharmacist's Manual was publicly available at: https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/index.html.

36.     After reminding pharmacists of their corresponding responsibility obligations

outlined above, the Pharmacist's Manual explains that:

> A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license (see *United States v. Kershman*, 555 F.2d 198 [United States Court Of Appeals, Eighth Circuit, 1977]).

37.     The Pharmacist's Manual also reminds pharmacists of their "responsibility to

ensure that a prescription has been issued by an appropriately registered or exempt practitioner."

38.     As for the red flags that obligate a pharmacist to dispel suspicion prior to

dispensing, the Pharmacist's Manual identifies examples of "criteria [that] may indicate that a

prescription was not issued for a legitimate medical purpose:"

> - The prescriber writes significantly more prescriptions (or in larger quantities) compared to other practitioners in the area.

> - The prescriber writes prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Drug abusers often request prescriptions for "uppers and downers" at the same time.

> - The patient appears to be returning too frequently. A prescription which should last for a month in legitimate use is being refilled on a biweekly, weekly or even a daily basis.

39.     The Pharmacist's Manual also warns about the danger of forged prescriptions.

> **Types of Fraudulent Prescriptions**
>
> Pharmacists should be aware of the various kinds of forged prescriptions that may be presented for dispensing. Some patients, in an effort to obtain additional amounts of legitimately prescribed drugs, alter the practitioner's prescription.

> When there is a question about any aspect of the prescription order, the pharmacist should contact the prescriber for verification or clarification.

40. The Pharmacist's Manual provides additional instruction on how to handle forged prescriptions:

> If a pharmacist believes the prescription is forged or altered, he/she should not dispense it and call the local police.

## VI. The CSA imposes strict obligations on dispensers to comply with record-keeping requirements to ensure accountability and protect against diversion of controlled substances.

41. Entities registered with the DEA to dispense controlled substances are also obligated to comply with important record-keeping and accountability measures to protect against the loss and diversion of controlled substances.

42. For example, every entity registered to dispense controlled substances is obligated to:

a) conduct a biennial inventory that includes "a complete and accurate record of all stocks thereof on hand," 21 U.S.C. § 827(a)(1); 21 C.F.R. § 1304.11(a), (c), (e)(6);

b) "maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him," including a record of dispensing, 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1304.21(a); § 1304.22(c); and

c) maintain the prescriptions underlying the dispensing, § 1304.04(h).

43. To the extent a dispenser has a theft or loss of a controlled substance that would impact inventory and accountability counts of the controlled substances, the dispenser is required to file a theft/loss report with the DEA.  21 C.F.R. § 1301.76(b).

13

**VII.    Pharmacies and pharmacists that violate these legal obligations expose themselves to substantial civil penalties and injunctive relief.**

44.    The CSA imposes substantial civil penalties on any person who dispenses controlled substances in violation of their corresponding responsibility.

45.    Any person "who is subject to the requirements of Part C [of the CSA who] distribute[s] or dispense[s] a controlled substance in violation of [the valid prescription requirement in] section 829 of this title" is subject to a significant civil penalty per violation.  21 U.S.C. § 842(a)(1); *see, e.g.*, *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2017 WL 1405164, at *4 (N.D.W. Va. Apr. 19, 2017), *aff'd sub nom. United States v. Wasanyi*, 801 F. App'x 904 (4th Cir. 2020).

46.    Each violation exposes the person to "a civil penalty of not more than $25,000" for each violation on or before November 2, 2015, and not more than $68,426 for each violation after November 2, 2015.  21 U.S.C. § 842(a)(1), (c)(1)(A); 28 C.F.R. § 85.5.

47.    As for equitable relief, the CSA authorizes the Attorney General "to commence a civil action for appropriate declaratory or injunctive relief relating to violations of this section, section 842 of this title, or 856 of this title."  21 U.S.C. § 843(f); *see also* 21 U.S.C. § 882 (conferring jurisdiction on the district courts "to enjoin violations of this subchapter").

## MEDICARE PART D

48.    Medicare is a federal program administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency within the U.S. Department of Health and Human Services, to pay for the costs of certain health care services provided to eligible individuals. Individual entitlement to Medicare is largely based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.

14

49. One piece of the Medicare program is a voluntary prescription drug benefit program known as Medicare Part D, which covers the costs of certain prescription drugs for Medicare beneficiaries.  42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

50. Medicare provides Part D coverage through plan "sponsors," which are private entities that administer the prescription drug plans on behalf of the federal government.

51. Generally, pharmacies submit claims to Medicare Part D plan sponsors for covered outpatient drugs.  Part D plan sponsors provide reimbursement to pharmacies for these drugs, such as oxycodone, Lyrica, and Invokana, dispensed to Medicare beneficiaries enrolled in Part D.

52. The pharmacy's claims for these drugs are documented in a prescription drug event (PDE) record, which contains information about the drug dispensed, the beneficiary, the practitioner who prescribed the drug, and the drug's cost.  Medicare relies on the accuracy of the information in the claim when making payments.

53. CMS makes payments to reimburse the sponsors through: (a) monthly estimated payments based upon the beneficiaries enrolled; (b) cost-sharing subsidies for low-income individuals; and (c) payments made annually that reconcile the estimated monthly payments with the allowable costs the sponsor actually incurred.  The PDE records are a significant factor determining the reimbursement amounts.

54. Part D plan sponsors repeatedly certify their compliance with applicable federal laws, regulations, and CMS guidance and certify to the accuracy and truthfulness of the data in the PDE records as a condition of payment.

55. Medicare only covers drugs that are for a medically accepted indication, which is any use approved under the Food, Drug, and Cosmetic Act, or which is supported by one or more

citations included or approved for inclusion in one of the listed compendia.  42 U.S.C.

§§ 1395w-102(e), 1396r-8(g)(1)(B) & (k)(6); 42 C.F.R. § 423.100.  PDEs submitted to Medicare

that are not for a medically accepted indication do not contain accurate, complete, and truthful

information about all data related to payment.

56.     If prescriptions are issued for something other than a medically accepted

indication, they are not covered by Part D.  42 U.S.C. §§ 1395w-102(e), 1396r-8(k)(6).

57.     In addition, with prescriptions for controlled substances that are not issued for a

legitimate medical purpose, such as recreational use, those drugs are not for "medically accepted

indications" and are therefore not covered Medicare Part D drugs.

58.     Finally, Part D plan sponsors are only permitted to provide benefits for Part D

drugs "that require a prescription if those drugs are dispensed upon a valid prescription."  42

C.F.R. § 423.104(h).  A prescription is only valid if it "complies with all applicable State law

requirements constituting a valid prescription."  42 C.F.R. § 423.100.  Pennsylvania state law

provides that, for example, "[a] prescription for a controlled substance must be issued for a

legitimate medical purpose by a licensed practitioner in the usual course of professional

practice."  28 Pa. Code § 25.52; *see also* 49 Pa. Code § 27.18(u) ("A violation by a pharmacist of

the Federal Controlled Substances Act (21 U.S.C.A. § 321 *et seq.*) or The Controlled Substance,

Drug, Device and Cosmetic Act (35 P.S. §§ 780-101-780-144) or the rules and regulations

promulgated thereunder constitutes a violation of this chapter and of the act."); *id.* § 27.18(b)(2).

**MEDICAID**

59.     Medicaid, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a

cooperative federal-state program that provides medical assistance to certain low-income

individuals.  To participate in Medicaid, a state must have a plan for medical assistance that has

been approved by CMS, which administers the federal Medicaid program. *Id.* § 1396a. As part of a state's plan, a state may offer outpatient prescription drug coverage. *Id.* § 1396d(a)(12).

60.     Although pharmacy coverage is an optional benefit under federal Medicaid law, all states currently provide coverage for outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their state Medicaid programs.

61.     CMS administers the Medicaid program at the federal level, and the Pennsylvania Department of Human Services (DHS) processes Medicaid claims directly or through a contractor for Medicaid beneficiaries in Pennsylvania.

62.     Pennsylvania Medicaid only pays for drugs that are "medically necessary." 55 Pa. Code §§ 1121.1, 1121.21.

## TRICARE

63.     TRICARE (formerly known as CHAMPUS), is part of the United States military's health care system, designed to maintain the health of active-duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, and military retirees and their dependents. The military health system, which is administered by the U.S. Department of Defense (DOD), is composed of the direct care system, consisting of military hospitals and military clinics, and the benefit program, known as TRICARE. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

64.     TRICARE prescription drug benefits are provided through three different programs: military treatment facility outpatient pharmacies, TRICARE network retail pharmacies, and TRICARE's mail order service. TRICARE contracts with a pharmacy benefit manager (PBM) to administer its retail and mail order pharmacy programs. In addition,

TRICARE beneficiaries can also pay out-of-pocket to fill prescriptions at non-network retail pharmacies and submit claims for reimbursement directly with TRICARE's PBM.  The claims process is different for each of these pharmaceutical programs.

65.     When a TRICARE beneficiary brings a prescription to a TRICARE network retail pharmacy, for example, the pharmacy submits an electronic claim to the PBM for that prescription event.  The PBM sends an electronic response to the pharmacy that confirms the beneficiary's TRICARE coverage and, if the prescription claim is granted, informs the pharmacy of the calculated pharmacy reimbursement amount and the co-pay (if applicable) to be collected from the beneficiary.  The pharmacy then collects the co-pay amount (if any) from the beneficiary and dispenses the medication.  After a 10-day hold to ensure the prescription was picked up and not returned to the shelf by the pharmacy, the PBM sends a TRICARE Encounter Data (TED) record electronically to TRICARE.  The TED record includes information regarding the prescription event, including the reimbursement amount to be paid to the dispensing pharmacy.  TRICARE then authorizes the PBM to make payment to the pharmacy for the amount remaining (after co-pay) on the claim.  The PBM sends the payment to the pharmacy. After the payment is made by the PBM's bank, the PBM's bank requests reimbursement from the Federal Reserve Bank (FRB).  The FRB then transfers funds to the PBM's bank account.

**FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM**

66.     The Federal Employees Health Benefits Program (FEHBP) is a federally-funded insurance program established by Congress in 1959, pursuant to the Federal Employees Health Benefits Act.  5 U.S.C. § 8901 *et seq.*  FEHBP is for federal employees, retirees, and their spouses and unmarried children under the age of 26.  5 C.F.R. § 890.302.

67.     The Office of Personnel Management (OPM) administers FEHBP and contracts with various health insurance carriers (Carriers) to provide services to FEHBP members.  5

U.S.C. §§ 8902, 8909(a).  Benefits provided to FEHBP members include prescription drug coverage.

68.     Monies for the FEHBP are maintained by the United States Treasury in the Employees Health Benefits Fund (the Fund), which OPM administers.  5 U.S.C. § 8909(a).  The Fund—which the United States Treasury holds and invests—is the source of all relevant payments to the Carriers for services rendered to FEHBP members.  5 U.S.C. § 8909.

69.     Federal agencies and their employees contribute to the Fund through health insurance premiums, referred to as contributions.  5 U.S.C. § 8906.  Federal employees' portions of the contribution are withheld from each paycheck, then forwarded to the Fund by the employing agency, along with the agency's share of the premium.  5 U.S.C. § 8906(d), (e).  The Treasury holds and invests the Treasury Fund balances.  5 U.S.C. § 8909.  Proceeds from the Fund are used to pay Carriers for covered claims paid on behalf of FEHBP members.

70.     Carriers do not have any right to monies from the Treasury for reimbursement of benefits unless and until they incur legitimate costs for actual covered services rendered to the members and submit claims to the Government for the payment for those services.  FEHBP benefits are payable only for services necessary to prevent, diagnose, or treat an illness, disease, injury, or condition.

## FACTS

**I.      Verree Pharmacy registered with the DEA in 1987 to start operating as a retail pharmacy.**

71.     As outlined above, defendant Spivack Inc. d/b/a Verree Pharmacy is a Pennsylvania corporate entity that was owned, managed, and operated by pharmacist Mitchell Spivack at all times relevant to this complaint.  The DEA granted Verree a registration on

September 8, 1987, as a retail pharmacy authorized to purchase and dispense Schedule II-V

controlled substances at 7960 Verree Road, Philadelphia, Pennsylvania.



72.     Defendant Spivack is a pharmacist who was licensed in Pennsylvania.  He was the

owner and pharmacist-in-charge of Verree at all times relevant to this complaint.

73.     Verree and Spivack employed, among others, three other individuals who were

involved in the pharmacy: pharmacist Todd Goodman; pharmacy technician Eric Pestrack; and

pharmacy technician/assistant Lee Kamp.  Prescriptions that were dispensed by Verree were

almost always listed in their computer system as being handled by one of these two pharmacists,

Spivack or Goodman, and one of these two pharmacy technicians, Pestrack or Kamp.

74.     Verree utilized a computer system to acquire, track, dispense, and bill for its

drugs.  This system generally required Spivack, Goodman, Pestrack, and Kamp to log onto the

computers each morning with their own login and password, assigning their initials to each

activity taken.  That computer system was imaged by the DEA upon consent and preserved in its original state.  Below is a screen shot of the "home" screen of that computer system:



75.     When the pharmacy took certain actions, such as dispensing a prescription to a patient, its computer system would log the initials of both the pharmacist and the pharmacy technician who took the action.  The computer system used the initials of the pharmacist and technician who had logged into the computer.  The allegations below utilize that logging to reflect which of the Verree employees took the relevant action.

76.     Verree was able to bill, among other insurers, Medicare Part D for drugs it dispensed to Medicare Part D beneficiaries.  Its national provider identifier (NPI) was 1821198573.

77.     Verree was also enrolled as a pharmacy that could bill Medicaid in Pennsylvania for drugs dispensed to Medicaid beneficiaries.  It was enrolled no later than 1987.  Pestrack was listed as one of the managing employees for purposes of Verree's Medicaid enrollment.



78.     Verree dispensed numerous drugs, both controlled and non-controlled substances. In addition, Verree billed federal and private health care programs, as well as individual patients, numerous times for drugs.

**II.     Verree has been a nationwide and regional outlier in its deviant purchasing, dispensing, and billing of controlled substances, with resulting scrutiny from its drug wholesalers and others.**

79.     Verree has obtained its controlled substances and non-controlled drugs from many different wholesalers over the years.  Its total purchasing of those drugs, particularly oxycodone, has made it an outlier.

80.     The DEA conducted analyses of Verree and its purchasing through its Automated Reports and Consolidated Orders System (ARCOS).  ARCOS is designed to track the delivery of certain controlled substances from the manufacturer all the way through its purchase by a pharmacy or other dispenser.  ARCOS allows the DEA to track the quantity and types of purchases that pharmacies are making and compare those purchases to other pharmacies.

81.     First, a comparison was made by the DEA of the ARCOS ordering patterns for Verree of oxycodone 30mg for pharmacies in their area and across the country.  For example, in

2017, Verree purchased 159,100 dosage units of oxycodone 30mg, which sharply exceeded the average purchasing of pharmacies in its zip code, in Pennsylvania, and even across the country.



82.      Second, an ARCOS analysis was performed by the DEA of all pharmacies in Pennsylvania sorted by their purchasing of oxycodone.  For retail pharmacies, Verree was one of the top purchasers of oxycodone in Pennsylvania in 2016 and 2017.  The following year, in 2018, Verree became the top retail pharmacy purchasing oxycodone for the entire state of Pennsylvania.

83.      Finally, a more granular comparison was made by the DEA of the ARCOS ordering patterns for Verree with pharmacies located in the same zip code from 2016 to 2019. During this time frame, there were at least 15 additional DEA registered pharmacies located in the Philadelphia, PA 19111 zip code.  This comparison indicates that Verree ranked as the top pharmacy in the purchasing of oxycodone product compared to other local pharmacies in the zip code.  Specifically:

a)      For 2016, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 692,300 tablets of combined oxycodone product.  The second top pharmacy purchased 232,500 tablets of combined oxycodone product.

b)      For 2017, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 623,100 tablets of combined oxycodone product.  The second top pharmacy purchased 273,600 tablets of combined oxycodone product.

c)      For 2018, Verree Pharmacy was the top purchaser of oxycodone product, purchasing 570,250 tablets of combined oxycodone product.  The second top pharmacy purchased 418,900 tablets of combined oxycodone product.

d)      For 2019, Verree Pharmacy was the second top purchaser of oxycodone product, purchasing 339,700 tablets of combined oxycodone product with the top pharmacy, a cancer center pharmacy, purchasing 447,800 tablets of combined oxycodone product.

84.     Verree has also been an extreme outlier in its insurance billings for controlled substances.  For example, between January 2016 and October 2021, Medicare Part D paid Verree approximately $16 million for 157,306 prescription drug events (PDEs).  Schedule II controlled substances accounted for over $4 million of the total paid amount, accounting for over 25% of the total amount paid by Part D.  Nearly half (43.29%) of all beneficiaries associated with Verree had at least one prescription drug event for an opioid drug.  OxyContin and oxycodone HCL extended release were the top drugs for Verree's claims to Medicare by total paid, with a total paid of almost $2.9 million.

85.     For 2016, Verree was ranked as #24 nationwide and #3 in Pennsylvania for retail-only pharmacies based on the total morphine milligram equivalent (MME)[6] dispensed for Medicare Part D.  For 2017, Verree was ranked as #12 nationwide and #3 in Pennsylvania for retail-only pharmacies based on the total morphine milligram equivalent (MME) dispensed for Medicare Part D.

86.     Verree's deviant controlled substance activity has presented an issue in its relationships with its drug wholesalers, from whom Verree purchases controlled substances and other drugs.

87.     For example, Verree initially purchased many of its drugs from McKesson Corporation.  However, in June 2013, McKesson terminated their ability to purchase controlled substances.  Information obtained by federal investigators revealed that McKesson terminated Verree based on a review of its purchasing patterns.  Verree was therefore not permitted to order controlled substances from McKesson after this date.

88.     Verree then moved its purchasing of controlled substances over to another distributor, Rochester Drug Cooperative (RDC).  Its dealings with RDC are detailed further below.  But RDC eventually also imposed restrictions on Verree's purchasing of controlled substances after further scrutiny of its business.

89.     Verree has also spread its purchasing of drugs out amongst a host of other drug distributors and brokers, including Cardinal/Kinray; Trxade; and Matrix.  Verree has also submitted applications to other distributors, including Independent Pharmacy Cooperative.

---

[6] Morphine milligram equivalents (MME), aka morphine equivalent doses (MED), are values that represent the potency of an opioid dose relative to morphine.  MME is a means to standardize the total opioid dose across different drugs and dosages.

**III.    Verree's controlled substance practices led to suspicious order reports filed by its distributors and prior DEA discipline.**

90.    While Verree managed to conceal some of its business practices from the wholesalers in the ways outlined below, the activities that Verree did not—or could not—conceal generated concern among its wholesalers.

91.    The distributors repeatedly expressed those concerns through suspicious order reports to the DEA.  Drug distributors are obligated by regulation and statute to report to the DEA suspicious orders from their customers, including pharmacies like Verree.  Suspicious orders include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  21 C.F.R. § 1301.74; *see also* 21 U.S.C. § 832.

92.    Verree's drug distributors filed numerous suspicious order reports regarding their controlled substance purchasing and business activities.

93.    For example, on February 21, 2017, RDC filed a suspicious order report regarding Verree's "cash sales," high quantity amounts of controlled substance prescriptions, and a high prescriber:



94.     RDC filed another suspicious order report on Verree on April 27, 2018 for its "high dispensing of controlled substances":



**Date and time:**   **April 27, 2018**

Rochester Drug Cooperative
116 Lehigh Drive
Fairfield, NJ, 07004

XX "Red Flag" activity

**Suspicious Order / Activity Reporting**

**RDC Log File # NJ2018-156**

RDC reviewed a dispensing report from Verree Pharmacy for the period of 1-10-2018 to 4-10-2018 showed several high dispensing of controlled substances by the pharmacy. The following doctor(s)/Nurse Practitioner(s) and /or Physician Assistants have prescribed the following controlled substance:

95.     In another example, RDC filed a suspicious order report with the DEA on September 23, 2018 regarding Verree's high rate of cash dispensing—an indicator of diversion—and the high number of patients receiving the "holy trinity" of drugs—opioids, benzodiazepines, and muscle relaxants, which is another indicator of diversion:

**SUSPICIOUS ORDER/ACTIVITY REPORT**          **RDC - METRO**

**RDC LOG FILE #**   NJ201800000343          **DATE:**  9-23-2018

**DETAILS OF SUSPICIOUS ORDER/ACTIVITY:**
RDC recently received dispensing records from Verree Pharmacy, RDC Account # 003913. RDC has completed a review of the dispensing information for the dispensing period of June 4, 2018, through September 29, 2018. The review of the dispensing information found the pharmacy is dispensing cash prescriptions at a rate 13.37%. In addition, it appears 5 patients are receiving combination medications of an Opioid + Anti-depressant (Benzo) + muscle relaxant. These combinations have taken place 9 times during the dispensing period.

96.     But RDC was not the only distributor that filed suspicious order reports about Verree and its controlled substances.  For example, Cardinal/Kinray filed many suspicious order reports regarding Verree's outlier purchasing of controlled substances.

97.     The signs of Verree's illegal activity with respect to controlled substances went beyond the drug distributors.  For example, the DEA conducted a scheduled investigation of Verree on February 4, 2015, focusing on record-keeping and inventory requirements.

98.     The DEA's scheduled investigation resulted in a finding of violations and a letter of admonition to Verree.  The letter, dated March 4, 2015, states that the diversion investigators' accountability audit found discrepancies regarding OxyContin 30mg tablets, Percocet 5/325mg tablets, and oxycodone APAP 5/325mg tablets; and a non-compliant biennial inventory.

99.     Instead of pursuing an enforcement action, the DEA disciplined Verree by providing it with an opportunity to become compliant with the CSA through this letter of admonition.



**U. S. Department of Justice**
Drug Enforcement Administration

Philadelphia Division
600 Arch Street,  Suite #10224
Philadelphia, PA 19106

*www.dea.gov*

MAR 0 4 2015

Verree Pharmacy
c/o Mitchell Spivack, Owner
7960 Verree Road
Philadelphia, PA 19111

Dear Mr. Spivack:

    On February 4, 2015, Drug Enforcement Administration (DEA) Diversion Investigators (DIs) from the Philadelphia Division conducted a scheduled investigation at your pharmacy, Verree

19111.  The investigation revealed the following violations of the Controlled Substances Act of 1970 and its implementing regulations:

100.    In Spivack's response of March 31, 2015, he falsely told the DEA that he would

become compliant with the CSA.

> VERREE PHARMACY
> 7960 Verree Road
> Philadelphia PA 19111

> March 31, 2015
>
> Ms. Donetta M. Spears
> Diversion Program Manager
> Philadelphia Division
> 600 Arch Street
> Suite 10224
> Philadelphia PA 19106
>
> Re: Verree Pharmacy
>
> Dear Ms. Spears:

> Additional actions will be taken, if the need arises, to remain in conformity
> with the Controlled Substances Act of 1970.
>
> If you have any questions, please feel free to contact me.
>
> Very truly yours,
>
> Mitchell Spivack
> Owner

**IV.    A DEA and HHS/OIG investigation uncovered the defendants' years-long schemes to illegally dispense or distribute controlled substances and commit health care fraud.**

101.    With all of this context, the DEA and the Office of Inspector General for the U.S.

Department of Health and Human Services (HHS/OIG) opened and conducted an extensive

investigation of Verree and its employees' controlled substance practices and billings to federal

health care programs.

102.    The United States' investigation uncovered two blatantly illegal schemes:  a wholesale violation of the pharmacy and its employees' corresponding responsibility under the Controlled Substances Act to ensure proper dispensing of controlled substances; and systematic health care fraud with false billings to federal health care programs.

**A.    Verree and the individual defendants illegally dispensed and distributed thousands of opioids and other controlled substances despite red flags, signs of diversion, and the tragic consequences to the public.**

103.    After numerous attempts to educate, warn, and bring them into compliance, Verree, through Spivack, Goodman, Pestrack, and Kamp, illegally dispensed and distributed thousands of dosage units of opioids and other controlled substances in violation of their corresponding responsibility.  Verree and the individual defendants dispensed numerous pills and other dosage units of controlled substances based on "prescriptions" that carried numerous red flags and signs of diversion.  Nonetheless, in order to keep its business going and retain the vast profits that came from the business, Verree, Spivack, Goodman, Pestrack, and Kamp illegally dispensed the controlled substances in violation of the CSA.

**1.    Verree Pharmacy and the individual defendants had been educated and warned—and had themselves acknowledged—their corresponding responsibility under the Controlled Substances Act.**

104.    For many years, the DEA and third parties had educated and warned Verree and the individual defendants about their corresponding responsibility to investigate any red flags of diversion and only dispense controlled substances if red flags had been resolved.  Indeed, they repeatedly acknowledged those responsibilities and claimed they were satisfying them.

105.    For example, the DEA made the Pharmacist Manual outlined above publicly available to all pharmacies and pharmacists, including the defendants.  The Manual, as discussed above, warned pharmacies and pharmacists of their corresponding responsibility to investigate

red flags and dispel any suspicion stemming from those red flags, as well as the legal exposure that accompanied failing to do so.

106.    Beyond the DEA, other third parties also warned the defendants of their corresponding responsibility obligations.

107.    For example, as early as 2014, RDC was taking steps to ensure that Verree and the individual defendants were aware of their corresponding responsibility CSA obligations. Spivack, on behalf of Verree, acknowledged understanding these legal obligations and claimed to satisfy them:



ROCHESTER DRUG COOPERATIVE – CUSTOMER QUESTIO...

|  | | |
|---|---|---|
| Do the pharmacists understand the DEA regulation pertaining to the "corresponding responsibilities" of a pharmacist when filling a controlled substance prescription? | ☒ YES | ☐ NO |
| Does the pharmacy re fill quantities of controlled substances early? | ☐ YES | ☒ NO |
| Does one or more of the practitioners commonly prescribe controlled substances in "cocktail" combinations? If YES, provide prescribers information, DEA state license and describe combinations. | ☐ YES | ☒ NO |
| Are one or more of the practitioners writing a disproportion share of the prescriptions for controlled substances? If YES, provide prescriber(s) information with DEA and state license. | ☐ YES | ☒ NO |

108.    RDC continued to educate, warn, and ensure that the defendants knew of their corresponding responsibility obligations.  In 2015, Verree, through Spivack, again acknowledged them.



109.    However, RDC began recognizing Verree's controlled substance dispensing problems and started raising concerns with Verree's controlled substance practices in August 2016.



110.    Verree—through Spivack, Goodman, Pestrack, and Kamp—responded by providing RDC with its "Due Diligence Procedure for Controlled Substances" to ensure that

Verree could keep purchasing controlled substances from RDC.  Several of the commitments made in that document track the pharmacy's corresponding responsibility obligations.

**Verree Pharmacy**
**7960 Verree Road**
**Philadelphia, PA 19111**

**August 1, 2016**
**DUE DILIGENCE PROCEDURE FOR CONTROLLED SUBSTANCES**

- Verree Pharmacy conducts checks of customer's prescription activity via the state's Prescription Monitoring Program (PMP).

- Verree Pharmacy will limit the amount of cash payments accepted for CS prescriptions in accordance with acceptable 10% standard set by the DEA."
- Verree Pharmacy will require that patients use their third party insurance in all transactions for CS, unless a reasonable explanation is given by patient who is requesting to pay for the CS prescription by cash. Such explanation will be documented and noted on rear of prescription."

- "If patient and/ or prescriber is out of pharmacy's area of service, the on-duty pharmacist will use his/ her professional judgement before filling the prescription. Prescription will only be filled for valid documented reasons. Verification will be conducted by calling prescriber when the pharmacist deems necessary."

Additions to this Due Diligence Policy will be made as deemed necessary. A copy of this policy is kept in our Narcotic safe. The following personnel have read the above policy and have agreed to enforce it.

Mitchell Spivack (Pharmacist)

Todd Goodman (Pharmacist)

Eric Pestrack (Technician)

Lee Kamp (Technician)

111.    RDC continued to raise concerns and required Verree to meet heightened compliance standards in 2018.  For example, it instructed Verree to document the patient's diagnosis to justify the controlled substances dispensed; provide the reasons for cash payments for prescriptions, a red flag for diversion; and ensure that they had a compliant biennial inventory.



**RDC COMPLIANCE REVIEW SUMMARY REPORT**

Date of Report: 8-16-2018

Recommendations to Customer:

Advised Verree Pharmacy to continue to document PT diagnosis. Reasons for cash prescriptions should be documented as well. Educate PT's with no insurance of the benifits and ask why they do not have insurance, document the reason. Remember to sign, date, and place a start and ending time on the biennial inventory. Also ****

112. RDC warned Verree of similar issues during this time period. For example, in November 2017, RDC raised concerns to Verree about its cash dispensing and its "holy trinity" cocktail dispensing.

Hi Mitchell,

It was a pleasure meeting with you last Friday afternoon.

We also discussed the importance of documentation by pharmacist, not only PT diagnoses but reasons for cash dispensing as well. (Ex. Patient cannot afford, Insurance does not cover, PT lost employment...)

In addition while preparing your PT view this Auditor notice a prescribing pattern by Doctor

is considered by DEA "The Holy Trinity" this is the prescribing of at least 1 opioid, a benzodiazepine and Carisoprodol. Please see the attached handout on this possibly harmful combination

113.    RDC raised concerns again in 2018, including concerns that the Verree's rate of

cash dispensing was higher than it had committed to in its due diligence policy in 2016.

Date:          September 23, 2018                           An analysis of your
dispensing information for the dispensing period of June 4, 2018, through September 29, 2018,
showed your pharmacy cash dispensing for prescriptions was at a rate of 13.37%. Your pharmacy's
cash dispensing is above the best practice of 10%.

114.    In November 2018, in the midst of these troubling indicators that revealed Verree

had a "heightened risk," and after Verree repeatedly claimed it would fix the problems, RDC

finally imposed restrictions on Verree's ability to purchase controlled substances.

**Verree Pharmacy, #3913**
**7960 Verree Road**
**Philadelphia PA 19111**
**Mitchell Spivack**

Dear Mr. Spivack,

You are receiving this letter because RDC has deemed the controlled substance dispensing activity exhibited by your pharmacy
to be associated with heightened risk by our standards and interpretations of regulatory due diligence and industry controlled
substance best practices. Accordingly, effective as of the date of this letter RDC will subject your pharmacy to more stringent
threshold restrictions of the quantity of controlled substances that you may order. These restrictions may be imposed on a
monthly basis, and/or per controlled substance.  As customary, RDC will further limit, suspend, or terminate your pharmacy's
controlled substance ordering privileges if warranted by appropriate circumstances, or if the identified activity continues.

**All Controlled Substances will be reduced by 30%**

115.    Verree, through Spivack, responded by again claiming that they understood their

corresponding responsibility and other obligations and were taking action to comply with them.

| From: | Mitchell Spivack |
|---|---|
| Subject: | Re: RDC Controlled Substance Reduction Verree Pharmacy |
| Date: | Tuesday, November 06, 2018 4:03:10 PM |

I want to assure you that I take the issue of  opioid abuse and the
corresponding responsibility to monitor prescriptions for opioids very seriously. In the past several years, we have strived to do our
due diligence and instituted several policies to help combat the abuse and misuse of opioids. We are now  in the process of
creating newer. stricter policies that will address your concerns and decrease the quantity of controlled substances filled at my
pharmacy.

> Also, as a result of our decreasing the amount of controlled substance prescriptions filled at our pharmacy, we will need to end our relationship with a significant amount of patients and providers. In this regard, I was hoping that we could get a short extension, until December 1, 2018, to institute the threshold reductions. I am concerned about patient safety and having sufficient time to let them know we can no longer fill their prescriptions.

116.    RDC issued these and other warnings about Verree and the individuals' corresponding responsibility violations.  Despite years of warnings and repeated claims by Spivack that the pharmacy would engage in proper due diligence, the investigation revealed that those assurances were false.

> **2.     Despite acknowledging their legal responsibility, the defendants engaged in repeated and systematic violations of their corresponding responsibility by illegally dispensing and distributing controlled substances in the face of red flags.**

117.    The United States' investigation uncovered a years-long practice at Verree of the defendants engaging in wholesale violations of their corresponding responsibility to investigate and dispel the suspicion of red flags before dispensing controlled substances.  Verree, Spivack, Goodman, Pestrack, and Kamp instead sold the pills to customers and generated extraordinary profits—frequently with extraordinary sums of cash from the customers.

118.    The United States utilized a pharmacy expert to evaluate the defendants' controlled substance dispensing practices.  With decades of experience, the expert evaluated Verree and its employees' corresponding responsibility obligation with a sample of sixteen of Verree's top controlled substance patients who obtained controlled substances from the pharmacy.  He reviewed thousands of controlled substance dispensing events for these patients.

119.    After a thorough review, the expert concluded that Verree and its employees had violated their CSA corresponding responsibility obligation as to all of these patients—for thousands of controlled substance prescriptions dispensed between 2016 and 2019, including opioids and other highly dangerous controlled substances.  Despite years of warnings and claims by Verree and Spivack that they had changed their practices to ensure compliance and satisfied

their corresponding responsibility obligations, the expert's review revealed that they had woefully failed to do so.

120.    For example, the expert reviewed the controlled substances dispensed by Verree to patient A.R.  A.R. had received Schedule II controlled substances—the most dangerous and addictive controlled substances—from six different providers.  75% of A.R.'s prescriptions at Verree were Schedule II controlled substances, an extraordinarily high percentage.  Patient A.R. had also received long-term, high-dose oxycodone and fentanyl for at least 2.5 years, with no legitimate medical justifications to support the dispensing.  While the CDC generally advises daily MME of 90 or below, A.R.'s MMEs repeatedly exceeded that amount.  In addition, Verree dispensed the controlled substances early in violation of the providers' instructed days' supply on multiple occasions, especially in 2016 and 2018.  Those early fills are particularly dangerous for fentanyl patches.  There were also at least ten occasions when A.R. appeared to pay large sums of cash for the opioids.  For these 74 controlled substance dispensing events, in which Verree, Spivack, Goodman, Pestrack, and Kamp dispensed 5,215 dosage units of highly addictive Schedule II controlled substances, the expert concluded that the dispensing was in violation of their corresponding responsibility and was outside the usual course of professional practice.

121.    As another example, the expert also reviewed the controlled substances dispensed by Verree to patient S.M.  S.M. had received Schedule II controlled substances from three or more different providers.  Over 75% of S.M.'s prescriptions were for Schedule II controlled substances.  Verree dispensed long-term, high-dose opioids for almost three years to patient S.M. In addition, Verree dispensed powerful amphetamines with opioids for almost a year, and switched to Vyvanse, which has the same therapeutic effect as amphetamines, for more than a

year.  Again, despite the CDC recommended maximum dosage of 90 MME, Verree dispensed astronomic doses—over 460 MME starting in January 2016 and continuing through 2018. Between 2016 and 2018, Verree again dispensed many early refills of controlled substances in violation of the prescriber's instructions; some of those early refills were particularly dangerous, with one 13 days early and another 22 days early.  Between 2016 and 2018, patient S.M. paid hundreds of dollars per month at some points just for the oxycodone dispensed by Verree.  As further described below, the pharmacy notes also document charging S.M. extra for this illegal dispensing.  For example, starting in August 2017, the prescription comments for S.M.'s oxycodone dispensing—all recorded as being dispensed by Spivack—contain the notes "Chg Extra $15" or "Charge $15" without any explanation why Verree was charging extra for this illegal dispensing.  Once again, for the over a hundred controlled substance dispensing events, including 9,530 dosage units of Schedule II controlled substances dispensed by Verree, Spivack, Goodman, Pestrack, and Kamp, the expert concluded that the dispensing was a violation of their corresponding responsibility and was outside the usual course of professional practice.

122.    As another example, the expert also reviewed the controlled substances dispensed by Verree to patient M.P.  70% of M.P.'s prescriptions were for Schedule II controlled substances.  Verree dispensed long-term, high-dose opioids for almost three years to patient M.P., including oxycodone for those three years and concurrent methadone for approximately two years.  At the same time, Verree dispensed benzodiazepines and amphetamines—the latter of which is a drug generally deemed to be a contraindicated or counteracting drug with opioids— for approximately three years.  Again, despite the CDC recommended maximum dosage of 90 MME, Verree dispensed extreme doses—over 580 MME starting in January 2016 and up to 725 through 2018.  Between 2016 and 2018, Verree again dispensed numerous early refills of the

oxycodone and methadone in violation of the prescriber's instructions.  Between 2016 and 2018,

patient M.P. paid large sums of cash for many of the opioids; for example, from April to

December 2016, M.P. paid over $5,000.  In addition, in June 2016, in dispensing OxyContin to

M.P., the prescription comment notes that M.P. "wants brand."  Large cash payments for opioids

and a request for "brand name" opioids are signs that the patient is possibly selling those drugs to

other individuals.  For example, "brand name" drugs command higher prices when sold illegally

outside normal pharmacy dispensing.  For the 166 controlled substance dispensing events,

including 13,556 dosage units of Schedule II controlled substances dispensed by Verree,

Spivack, Goodman, Pestrack, and Kamp, the expert concluded that the dispensing was a

violation of their corresponding responsibility and was outside the usual course of professional

practice.

123.     As a final example, the expert also reviewed the controlled substances dispensed

by Verree to patient D.W.  67% of D.W.'s prescriptions were for Schedule II controlled

substances.  Verree dispensed long-term, high-dose opioids for at least three years to patient

D.W.  At the same time, Verree dispensed benzodiazepines for at least three years—a "red flag"

cocktail.  Verree again dispensed extreme doses—over 880 MME starting in January 2016 and

up to 930 through 2018.  Between 2016 and 2018, Verree again dispensed numerous early refills

of the oxycodone in violation of the prescriber's instructions.  As further described below, the

pharmacy notes also document charging D.W. extra for this illegal dispensing.  For example, the

prescription comments for D.W.'s oxycodone and benzodiazepine dispensing regularly refer to

statements like "Charge Extra 10," "Charge Extra 5," and even more indicative of diversion,

state: "Greenstone Brand Extra $10."  There is no reasonable, legitimate explanation for these

extra charges imposed for the obviously illegal dispensing.  For the 161 controlled substance

dispensing events, including 14,410 dosage units of Schedule II controlled substances dispensed by Verree, Spivack, Goodman, Pestrack, and Kamp, the expert concluded that the dispensing by Verree was a violation of their corresponding responsibility and was outside the usual course of professional practice.

124.    The expert's review resulted in an overall finding that Verree and the individual defendants had violated their corresponding responsibility and dispensed outside the usual course of professional practice for all of the patients he had reviewed—for a total of thousands of instances where Verree, through Spivack, Goodman, Pestrack, and Kamp, illegally dispensed controlled substances despite obvious signs of diversion and other "red flags."

125.    These are only a sample of the defendants' illegal controlled substance dispensing and distribution.  Additional examples of the illegal dispensing and distribution are discussed below.

126.    Verree, through the individual defendants, submitted claims to Medicare Part D and Medicaid for many of these illegal controlled substance prescriptions.  Between January 1, 2016 and October 29, 2021, Verree submitted claims to Medicare Part D, and there were 12,305 corresponding PDEs just for Schedule II controlled substances, for a total payment by Medicare of $4,008,869.  For example, Verree submitted claims to Medicare Part D and received payment for the Schedule II controlled substances to patients M.P. and D.W. described above, which were collectively dispensed and distributed by Verree, Spivack, Goodman, Pestrack, and Kamp.

127.    The claims submitted to Medicare Part D for these prescriptions violated the requirements outlined above, and Medicare Part D would not have paid for the illegally dispensed controlled substances had it known of the illegal dispensing.  The claims to and payments by Medicaid were similarly improper for these prescriptions.  For example, as to

Medicare Part D, the prescriptions did not comply with "applicable State law requirements constituting a valid prescription," 42 C.F.R. § 423.100, as the prescriptions are not issued for a legitimate medical purpose in the usual course of professional practice, and the pharmacist's dispensing of the prescriptions violated the CSA.  In addition, the prescriptions are not for a medically accepted indication.  As to Medicaid, the prescriptions are not "medically necessary" and are therefore not reimbursable under Pennsylvania's Medicaid program.

> 3. **With restrictions on their ability to acquire and sell controlled substances, the defendants implemented a program for "narc members" who wanted to ensure they kept receiving the controlled substances.**

128.    In the midst of RDC and other outside scrutiny and RDC beginning to limit Verree's ability to acquire controlled substances, Verree and the individual defendants began implementing a new program with several of its patients to increase their profits.  Instead of the normal practice where patients would bring in dangerous and suspect controlled substance prescriptions and patients would use insurance or other forms of payment, the Verree defendants implemented additional "Narc Member" dues.  Those "Narc Member" dues, as the Verree defendants told the patients, helped them ensure that they would continue receiving their controlled substances, all in the midst of increased scrutiny of the pharmacy.  It also had the benefit of enhancing Verree and its employees' profits, even though its controlled substance purchasing was being limited by RDC.

129.    Investigators interviewed patients J.C., C.M., and M.M. regarding the "Narc Member" dues.  All three patients informed the investigators that an employee of Verree told them they would be required to pay an extra fee on top of their insurance co-pay if they wished to continue receiving prescriptions for Schedule II narcotics.

130.    Patient C.M. told investigators that an individual from Verree told C.M. that something had changed and that they were having trouble filling prescriptions.  C.M. said the

individual from Verree told C.M. that if he/she wanted to ensure that he/she would be able to have his/her monthly oxycodone prescription filled, he/she would have to pay an additional $50 per month.  On several occasions, someone at Verree would remind the cashier to charge the extra $50.

131.    Patient M.M. told investigators that an individual from Verree told him/her that, if he/she wanted to ensure that he/she would receive his/her monthly oxycodone prescription, M.M. would have to pay an extra $25 per month.  The same individual from Verree told M.M. that the reason for this arrangement was that the pharmacy was losing money.  M.M. identified Pestrack as the person from Verree who told him/her this.

132.    Patient J.C. told investigators that an individual from Verree told J.C. that the laws were changing and that it would be a problem for him/her to get their prescriptions filled. In a subsequent communication, the same individual from Verree said that, if J.C. was willing to be part of a pharmacy club with a $100 cash fee, J.C. could receive his/her oxycodone prescriptions.  J.C. again attributed the statement to Pestrack.

133.    This Narc Membership scheme, in the midst of RDC limiting Verree's ability to purchase and dispense controlled substances, helped enhance Verree's profits and payments to the individual defendants from the illegal controlled substance dispensing they could still perform.

        **4.    The defendants also repeatedly dispensed and distributed controlled substances based on blatantly forged prescriptions.**

134.    Prescriptions were frequently presented at Verree with blatant and flagrant alterations which should have been considered major "red flags" for the pharmacy and caused the pharmacy and its employees to refuse to provide the controlled substances.  The customers used the alterations to illegally add powerful Schedule II controlled substances, specifically

oxycodone, to prescriptions containing lesser controlled substances or non-controlled drugs. Verree and the individual defendants, instead of refusing the obviously forged prescriptions, accepted payment from the customer and illegally dispensed the controlled substances.

135.    The forgeries included prescriptions that had obvious eraser marks, date changes, refill adjustments, and name changes.

136.    For example, on June 21, 2017, Verree, through pharmacist Spivack and technician Kamp, received a prescription that contained obvious alterations to the date, the drug prescribed, and even had the refills scratched out[7]— making it clear that the prescription was altered and forged.  Instead of complying with their legal obligation and refusing the prescription, Verree accepted payment of $1,080 and dispensed 360 pills of Schedule II oxycodone 30mg.



137.    In another example, on May 3, 2017, Verree, through pharmacist Goodman and technician Pestrack, received a prescription that contained obvious alterations to the date and

---

[7] Refills are not permitted for Schedule II prescriptions.  *See* 21 C.F.R. § 1306.12(a).

added unprescribed oxycodone—making it clear the prescription was forged.  Instead of complying with their legal obligation and refusing the prescription, Verree accepted payment of $720 and dispensed the Schedule II oxycodone 30mg.



138.    These are only two examples of several forged prescriptions identified by investigators that Verree accepted to illegally dispense controlled substances.

139.    On October 8, 2021, federal and state investigators interviewed the practitioner who was the purported prescriber of several forged prescriptions, including the two examples above.  The practitioner informed investigators that several prescriptions written under his/her DEA registration number were altered, and he informed investigators that no one at Verree ever contacted him/her to question these forged prescriptions.  There are no notations on the prescriptions from 2014 to the present, front or back, that Verree ever attempted to contact the prescriber to determine whether the prescriptions were legitimate.

140.    By dispensing controlled substances based on obviously forged prescriptions, Verree, through Spivack, Goodman, Pestrack, and Kamp, illegally dispensed controlled substances that were not based on a legitimate medical purpose in the usual course of professional practice.

     **5.**     **Verree and Spivack, when scrutinized and restricted by its drug distributors, repeatedly lied to ensure that the pharmacy's drug supply would be maintained.**

141.    Indicators of this wide-ranging illegal dispensing scheme by Verree, through Spivack, Goodman, Pestrack, and Kamp, became clear to third parties as time progressed, despite their best efforts to keep it concealed.

142.    For example, a former employee of Verree reported to investigators that Verree filled prescriptions for a lot of narcotics, such as prescriptions for 300 pills of a narcotic for only a month's time.  He/she observed Verree routinely running out of narcotics and on one occasion observed customers waiting in a line so long it went out of the pharmacy's front door, causing him/her to remark about it being like people standing in line for concert tickets.  Goodman reprimanded the former employee for the comment, and Spivack fired him/her that same day.

143.    The third parties who were most sensitive to the hints of the illegal dispensing were Verree's drug distributors, who were under obligations to implement "effective controls and procedures to guard against theft and diversion of controlled substances," 21 C.F.R. § 1301.71(a), and obligated to report suspicious orders to the DEA.

144.    One of the earliest examples of this is McKesson's termination of Verree as a controlled substance customer in June 2013 based on a review of Verree's purchasing patterns, as mentioned above.

145.    RDC began implementing additional scrutiny of Verree in the midst of these signs of diversion starting around 2017.[8]  Those concerns and regular reviews by RDC's compliance

---

[8] On April 23, 2019, the U.S. Attorney's Office for the Southern District of New York announced that Rochester Drug Cooperative had entered into a deferred prosecution agreement with that office for, *inter alia*, controlled substance crimes.  RDC admitted that, "from at least in or about January 2012, up to and including in or about March 2017, RDC violated the federal narcotics laws by distributing controlled substances – including opioids such as oxycodone and

staff culminated in a number of important compliance and monitoring measures required by RDC, and ultimately resulted in mandatory limitations on Verree's ability to purchase controlled substances from RDC.

146.    When RDC began applying this additional scrutiny to Verree and its controlled substance purchasing and dispensing practices, Verree—through Spivack—actively misled RDC's compliance staff by providing false information and assurances of compliance to maintain their drug supply.

147.    For example, RDC notified Verree in November 2018 that, because of the signs of Verree's problematic controlled substance dispensing, it would impose mandatory reductions in Verree's ability to acquire controlled substances from RDC.

November 5, 2018

**Verree Pharmacy, #3913**
**7960 Verree Road**
**Philadelphia PA 19111**
**Mitchell Spivack**

Dear Mr. Spivack,

You are receiving this letter because RDC has deemed the controlled substance dispensing activity exhibited by your pharmacy to be associated with heightened risk by our standards and interpretations of regulatory due diligence and industry controlled substance best practices.

fentanyl – to pharmacy customers that RDC knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes."

> **All Controlled Substances will be reduced by 30%**
>
> RDC will institute the threshold reductions effective **November 19, 2018**, to afford time to mitigate any potential disruption to critical patient care. We understand that this action may be of temporary inconvenience, and apologize for such. We look forward to continuing to service your pharmacy needs under the new restrictions.

148.    Recognizing that this limitation would severely impact Verree's ability to illegally dispense controlled substances and cutting back on the profits that Verree and Spivack were making from the scheme, Spivack began providing false assurances to RDC to circumvent the restrictions.

149.    For example, on November 30, 2018, Spivack emailed RDC's head of compliance.

> I am the owner/pharmacist of Verree Pharmacy.

> We are fully aware of the "opioid crisis" and the responsibilities that come with being a pharmacy in this environment. We have always taken this VERY SERIOUSLY and have strived to maintain the highest degree of due diligence that is required. We have formulated numerous policies, including regularly checking the PMP website, to ensure that we are actively monitoring medication usage to avoid abuse.

> We understand that our dispensing numbers are high

> We have never tried to hide our dispensing nor have we attempted to open a different wholesaler to obtain product from a secondary source.

150.    While admitting that "our dispensing numbers are high" and claiming to be "fully aware of the 'opioid crisis,'" the assurances Spivack provided to RDC to avoid the controlled substance purchasing restriction were false.

151.    For example, Spivack claimed that they had never attempted to open an account with a different wholesaler to obtain drugs from a secondary source—a sign that a pharmacy could be trying to spread its purchasing out to avoid detection of problematic controlled substance purchasing and dispensing by a single wholesaler.

152.     Spivack's claim was false.  Verree—through Spivack—had attempted to open an

account with an alternate wholesaler to purchase controlled substances.  However, after the

alternate supplier reviewed the application and conducted due diligence on Verree, it rejected the

application.



Spivack Inc DBA Verree Pharmacy has been non-controlled substance IPC Customer since 1997. In October 2017, Verree Pharmacy applied to become an IPC controlled customer. The IPC Compliance Department reviewed the application and conducted due diligence on the pharmacy. After this process, it was determined that Verree Pharmacy did not meet our business model for a controlled substance customer, so they were not approved.

153.     The defendants made several other false assurances to RDC to keep

obtaining controlled substances.

154.     For example, RDC retained an outside contractor to perform an "On-Site

Assessment" of Verree in July 2019.  That visit involved a number of inquiries regarding

Verree's history and dispensing practices.

155.     During the visit, Spivack falsely claimed to RDC's contractor that Verree's

licenses were never subject to disciplinary action.  Spivack failed to disclose and actively

concealed the letter of admonition—a form of disciplinary action by the DEA, described

above—that Verree had received only a few years prior in 2015.

156.     Spivack also falsely claimed to RDC's contractor that Verree did not fill

prescriptions for out-of-state patients—another indicator of potential diversion.

Pharmacy Owner Spivack advised that Verree Pharmacy does not fill prescriptions for out of state patients.  Pharmacy Owner Spivack advised that at this time Verree Pharmacy is not accepting new patients.

157. Once again, Spivack failed to disclose and actively concealed that Verree did in fact fill prescriptions for out-of-state patients, such as the following Schedule II controlled substances dispensed:

| DOS | Drug Name | Narc Code | RPH | TCH | City | State |
|---|---|---|---|---|---|---|
| 3/20/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | EWP | JACKSONVILLE | FL |
| 2/24/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | LK | VILLAS | NJ |
| 1/9/2019 | OXYCOD/APAP 5-325MG TAB | | 2 TAG | EWP | JACKSONVILLE | FL |
| 12/13/2018 | OXYCONTIN | | 2 MS | EWP | BEAR | DE |
| 11/27/2018 | FENTANYL 75MCG/HR DIS | | 2 MS | LK | HAYMARKET | VA |
| 11/27/2018 | OXYCODONE 15MG TAB (KVK) | | 2 MS | LK | HAYMARKET | VA |

158. Verree, through Spivack, made many other false statements to RDC in an attempt to generate the illusion of compliance and avoid restrictions on its ability to acquire controlled substances from RDC.

159. Federal investigators interviewed the head of compliance for RDC. The head of compliance confirmed that these statements made by Verree through Spivack were false. The head of compliance also concluded that Verree's false statements caused it to avoid a suspension of its ability to purchase controlled substances from RDC—and possibly termination as a customer.

### 6. While Verree and Spivack profited heavily from this controlled substance and the health care fraud scheme, the community suffered the consequences of the illegal controlled substances.

160. The consequences of this illegal controlled substance dispensing scheme, as well as the health care fraud scheme outlined below, resulted in significant illicit profits for Verree and Spivack and significant payments made to Goodman, Pestrack, and Kamp.

161. Federal investigators conducted an analysis of Verree's financial statements. That review revealed that, in addition to his normal paycheck, Spivack withdrew significant amounts from the pharmacy bank account in the form of his "profits" from the pharmacy's activities.

162.    For example, Spivack wrote himself a $100,000 check in May 2017; a $100,000

check in June 2017; a $75,000 check in July 2017; and a $50,000 check in August 2017.



163.    In total, Spivack received over $5 million in profits that he extracted from Verree,

thanks in part to the illicit profits made by its illegal controlled substance dispensing and the

health care fraud scheme outlined below.

164.    Additional checks were issued to Goodman, Pestrack, and Kamp.

165.    While Spivack was making millions of dollars from Verree, the consequences to

the public were tragic.  The most egregious example of this is patient I.S., who had been

receiving controlled substance prescriptions from Verree for years.  Patient I.S. was a Medicare

beneficiary whose prescriptions were paid for by Part D.

166.    For years, Verree had dispensed numerous controlled substance prescriptions to

I.S., including dangerous combinations of OxyContin, oxycodone, and alprazolam.

| Row Labels | Sum of Qty |
|---|---|
| ALPRAZOLAM (DAVA) | 4,290 |
| OXYCONTIN | 4,200 |
| OXYCODONE 20MG TAB (KVK) | 3,000 |
| LYRICA | 2,322 |
| OXYCODONE 10MG TAB | 1,620 |
| OXYCODONE 15MG TAB (KVK) | 1,470 |
| ZOLPIDEM 10MG TAB | 1,020 |
| OXYCODONE ER | 450 |
| ALPRAZOLAM | 120 |
| OXYCODONE 20MG TAB | 120 |
| OXYCODONE 80MG ER TAB(TEVA) | 90 |
| ZOLPIDEM | 30 |

167.     Between November 13, 2017 and December 8, 2017, the Verree defendants dispensed hundreds of additional pills of controlled substances to I.S., including OxyContin, oxycodone, alprazolam, and the non-controlled drug cyclobenzaprine.  This holy trinity cocktail was a particularly dangerous combination of controlled substances of opioids, benzodiazepines, and a muscle relaxant.  All of the controlled substances dispensed by Verree for patient I.S. were filled by Spivack and Pestrack:

| DOS | Drug Name | Qty | RPH | TCH |
|---|---|---|---|---|
| 11/13/2017 | ZOLPIDEM 10MG TAB | 30 MS | EWP | |
| 11/13/2017 | ALPRAZOLAM (DAVA) | 120 MS | EWP | |
| 11/17/2017 | CYCLOBENZAPRINE TABLETS 10MG | 180 MS | EWP | |
| 11/17/2017 | LYRICA | 90 MS | EWP | |
| 11/17/2017 | OXYCONTIN | 90 MS | EWP | |
| 11/17/2017 | OXYCODONE 20MG TAB (KVK) | 120 MS | EWP | |
| 12/8/2017 | QUETIAPINE 25MG TAB | 60 MS | EWP | |
| 12/8/2017 | ALPRAZOLAM (DAVA) | 120 MS | EWP | |
| 12/8/2017 | ZOLPIDEM 10MG TAB | 30 MS | EWP | |

168.     None of the prescription comments for these prescriptions indicated that Spivack or Pestrack took any action to address the red flags from this dangerous combination of drugs, such as calling the prescribers.

169.     Patient I.S. overdosed and died on December 17, 2017 in Philadelphia.  The City of Philadelphia Medical examiner determined that the cause of death was drug intoxication.



170.     The medical examiner conducted a drug screen and found the same drugs that Verree dispensed in I.S.'s system:



171.    Bottles of drugs, bearing the Verree Pharmacy label, were found next to the dead

body of I.S.



172.     The government's expert pharmacist reviewed the defendants' dispensing to I.S. and concluded that it violated their corresponding responsibility when they dispensed this dangerous cocktail of controlled substances.  The expert concluded that the dispensing was outside the usual course of professional practice and, therefore, a violation of the CSA.

173.     Patient I.S.'s overdose and death is only one example of the tragic impact that Verree and the individual defendants' illegal dispensing had on the community.

**B.      Government investigators also uncovered a rampant health care fraud scheme by Verree, through Spivack and the co-conspirator defendants, who falsely billed federal health care programs for drugs not dispensed, using the code "BBDF."**

174.     Not only were the defendants engaged in an illegal controlled substance dispensing scheme, but they also had engaged for years in a scheme to defraud federal health care programs and other insurers by billing for drugs that were not actually dispensed.  Spivack, Goodman, Pestrack, and Kamp were all significantly involved, participated, and contributed to the scheme, and Kamp even admitted the scheme to investigators.  The damage to the United States through billings to federal health care programs was substantial.

**1.      Verree, through Spivack and the co-conspirator defendants, implemented the "BBDF" health care fraud scheme to enhance their profits.**

175.     In reviewing the evidence obtained, particularly the data obtained from Verree's pharmacy computer, federal investigators identified a recurring comment in numerous prescriptions—BBDF.

176.     Prescriptions attributable to Spivack, Goodman, Pestrack, and Kamp regularly utilized this internal code.

177.    By evaluating the prescriptions, the concurrent comments, and other contextual clues, investigators determined that BBDF was an acronym for the "Bill But Don't Fill" fraud scheme.

178.    A review of even a few of the BBDF prescriptions made the scheme clear. Prescriptions that included BBDF in the comments showed patients refusing medication, returning medication, or not picking up medication.  Even more clearly, the comments revealed that Verree and the four co-conspirators were using BBDF as a means to cover their losses on other drugs and further line their pockets with illicit profits by falsely claiming to insurers that they had dispensed a drug to a patient or beneficiary, when in fact they had not.

| Drug Name | RxComment |
|---|---|
| CLOBETASOL PROP CR | BBDF 2/14 TO COVER BUMEX LOSS |
| POTASSIUM CHLORIDE 20 (K-DUR) | BBDF 8/27/15 CUSTOMER DOESNT WANT |
| DIFLORASONE OINT | BBDF PAYS WAY BELOW COST |
| ARIPIPRAZOLE 2MG TAB | BBDF LOSE MONEY |
| XIFAXAN 550MG TAB | BBDF ,PT DOESNT TAKE ANYMORE |
| VENTOLIN HFA | BBDF 4/4 TO COVER LOSSES |
| MUPIROCIN 2% CRE | BBDF TO PAY FOR MONEY LOSS FOR RIFAMPIN |
| ATORVASTATIN 20MG TAB | BBDF 4/20/16   REFILL DENIED PER MD 7/19/16 |
| VALSART/HCTZ 80-12.5 TAB | BBDF RETURNED |
| DIGOXIN 0.125MG TAB | BBDF   DOESN'T TAKE PER PATIENT 6/1/16 TAG |
| NUVIGIL 250MG | BBDF CARAFATE TO COVER LOSS--GENERIC MADE-THATS WHY WE LOST $ |
| BENZOYL PEROXIDE WASH | LOSER!!!  BBDF CLOTRIMAZOLE 4/28 |
| OSELTAMIVIR 75MG CAP | BIG LOSER - BBDF ANOTHER RX TO COVER LOSS-SEE ERIC |
| SYMBICORT (120 INH) | BBDF 10/2 TO COVER LOSERS |
| CLINDAMYCIN 300MG CAP | BBDF REFUSED BY CUSTOMER |
| HIBICLENS | BBDF   REFUSED BY CUSTOMER |
| SYMBICORT (120 INH) | BBDF RETURNED |

179.    A data analysis revealed that, between January 2016 and December 2019, thousands of prescription comments included BBDF in the prescription comment.[9]

---

[9] The BBDF comments also occurred prior to January 2016.

While the defendants may claim that the BBDF entry was automatically carried over into subsequent refills or similar prescriptions without any action taken by Verree, federal investigators determined that no such duplication occurred and that the prescription comments identified were unique for each prescription and prescription refill.

180.     Prescriptions that had the BBDF comment were attributed to all four of the co-conspirator defendants.  Spivack was the leading pharmacist on the BBDF entries—with over 2,500 different prescription billings with the BBDF code where he was the pharmacist since 2013.  Pestrack was the technician for over 2,700 of these BBDF prescriptions since 2013, and Kamp was the technician for over 700 of them.  Goodman also had hundreds of such BBDF entries on prescriptions he handled.

181.     A data analysis revealed that, for all federal and private billings, Verree had made hundreds of thousands of dollars on these fraudulent billings where the prescription comment included the BBDF code.  The scheme may have extended even further for drugs where BBDF was not included in the comment.

182.     Interviews of third parties provided support for the conclusion that BBDF was their code for fraudulent billings.  For example, investigators interviewed a number of patients who confirmed that they refused or simply did not receive the drugs for which Verree and the co-conspirators billed insurance.

183.     Investigators interviewed patient R.R. regarding the "BBDF" billing scheme.  The investigators showed R.R. excerpts from Verree Pharmacy records which showed a prescription billed to Medicare on October 8, 2015 for $2,020.94.  There were also four refills on November 17, 2015 ($2,020.94), December 20, 2015 ($2,020.94), January 16, 2016 ($2,020.94), and March 13, 2016 ($2,202.51).  In addition, Verree noted in a comment: "BBDF, PT DOESN'T TAKE ANYMORE."  R.R. informed the investigators he/she did not take that medication more than the one original time.  Verree profited approximately $8,000 at the expense of Medicare, even noting R.R. was not taking the medication any longer.

184.    Investigators also interviewed patient W.H. regarding the BBDF scheme. Investigators showed W.H. a Lyrica refill request sent from Verree to his/her provider's office on May 24, 2018.  The Verree computer system contained the BBDF code for Lyrica prescriptions for W.H. on May 24, 2018 and August 31, 2018.  W.H. told investigators he/she did not receive any of this Lyrica, as he/she had stopped taking it.  Medicare paid Verree approximately $1,905.64 for the medication not dispensed.  W.H. provided similar information regarding BBDF entries for prescriptions ostensibly provided to W.H.'s spouse.

185.    Investigators also interviewed one of the Verree co-conspirators, Lee Kamp. Kamp confirmed that each of the four co-conspirators used the pharmacy's computer system using their own screen name and password.

186.    Investigators presented Kamp with a number of prescriptions that contained the BBDF code.  When investigators asked Kamp if he was aware of the BBDF abbreviation, he stated without hesitation "Bill But Don't Fill."  He explained that Verree, in one example prescription presented to Kamp, would bill the medication but did not fill the medication because the patient never picked it up.

187.    After being presented with several BBDF billings, Kamp acknowledged that BBDF was fraud.  The interview ended with Kamp referring to "shitting his pants" right now and being scared.

### 2.    An analysis of Verree's drug purchasing compared to its billings revealed the broad scope of the scheme.

188.    A Medicare integrity contractor conducted an independent analysis of Verree's Medicare and Medicaid billings and compared those billings to the amount of drugs that Verree actually purchased from its wholesalers.

189.    Federal investigators obtained the purchasing data independently from all of the wholesalers that they could identify.

190.    The Medicare integrity contractor conducted an analysis of Verree's billings and purchases between January 2, 2016 and January 10, 2020 for particular drugs.  The inquiry was essentially whether Verree was billing Medicare and Medicaid for more drugs than it had purchased.

191.    The results of that investigation further supported the existence of the scheme. The contractor concluded that, for this limited period of time and with a limited set of drugs, Verree had billed Medicare and Medicaid, and Medicare and Medicaid paid thousands of dollars for drugs that the pharmacy could not have possibly dispensed to patients based on its purchases from the drug distributors.

192.    For example, with respect to the drug Invokana tab 100mg, the purchasing data from the drug distributors revealed that Verree had acquired 3,630 dosage units of the drug, but had billed Medicare and Medicaid for 4,500 units of the drug, resulting in a total potential loss of almost $13,000.

193.    The Medicare analysis was based on comparing all drugs acquired to the billings for only Medicare and Medicaid.  If there were any additional billings to other insurers, including private insurance companies or cash purchases, an even larger gap would exist for which no drugs had been acquired to cover the claims made to insurers.

194.    Federal investigators conducted a similar, but separate analysis to determine how many claims Verree had submitted to Medicare for drugs that contained the BBDF code.

195.    The federal investigators matched up the prescription numbers documented in the Medicare prescription drug events with the internal Verree data that contained the BBDF code. Examples of those claims are referenced in Exhibit A.

196.    The results of that analysis revealed that, between January 1, 2016 and April 29, 2019, Verree had improperly received over $125,000 from Medicare Part D for 716 PDE claims, based on "prescriptions" that had the BBDF fraud code attached to them.

197.    Additional review revealed that Verree similarly submitted prescription claims with BBDF to Medicaid, Tricare, and the Federal Employees Health Benefits Program.

198.    With respect to Tricare, between January 1, 2016 to December 31, 2019, Verree improperly received approximately $1,400, for approximately 12 claims, from the Tricare program for "prescriptions" that had the BBDF fraud code attached to them.  Examples of those claims are referenced in Exhibit A.

199.    With respect to FEHBP, between January 1, 2016 to December 31, 2019, Verree improperly received approximately $5,000, for approximately 35 claims, from FEHBP Carriers for "prescriptions" that had the BBDF fraud code attached to them.  Examples of those claims are referenced in Exhibit A.

200.    As a result of the BBDF scheme by Verree, Spivack, Goodman, Pestrack, and Kamp, the United States was damaged by the fraudulent billings to Medicare Part D, Medicaid, Tricare, and FEHBP.

**C.     A DEA audit also revealed that Verree was missing thousands of controlled substances, including opioids.**

201.    Beyond the illegal dispensing and health care fraud, the DEA conducted an extensive accountability audit of Verree's controlled substances to determine whether Verree kept proper inventories and accounted for the dispensing of its pills.

202.    The DEA had previously found discrepancies in Verree's record-keeping, as documented in the 2015 letter of admonition.  Spivack responded to the DEA by assuring them that measures had been taken to bring the pharmacy into compliance with the CSA.



203.    However, when the DEA conducted its audit of Verree in the current investigation, it discovered that Verree was unable to account for thousands of missing dosage units of controlled substances.

204.    The audit consisted of a review of the inventories, acquisition records, dispensing records, and any other disposal records for several controlled substances, including oxycodone, OxyContin, and alprazolam.  Verree was unable to account for thousands of dosage units of these controlled substances.

| Audit Period: May 13, 2017 BOB through October 10, 2019 | | | | |
|---|---|---|---|---|
| Controlled Substance | Total In | Total Out | Difference | % Difference |
| Alprazolam 2mg | 52,100 | 52,808 | 708 | 1.36% |
| Buprenorphine/Nalaxone sublingual film 8mg/2mg | 7,495 | 7,177 | -318 | -4.24% |
| Carisoprodol 350mg | 45,400 | 56,314 | 10,914 | 24.04% |
| Diazepam 10mg | 22,400 | 22,394 | -6 | -0.03% |
| Methadone 10mg | 120,979 | 121,029 | 50 | 0.04% |
| Oxycodone 30mg | 311,337 | 310,105 | -1,232 | -0.40% |
| OxyContin 30mg | 15,022 | 15,027 | 5 | 0.03% |
| Suboxone 8mg/2mg  sublingual film | 35,465 | 35,559 | 94 | 0.27% |
| Xanax 2mg | 30 | 40 | 10 | 33.33% |

205.    The missing dosage units included 10,914 dosage units of carisoprodol that it

claimed to dispense but had no record of acquiring; and 1,232 dosage units of oxycodone 30mg

that it had acquired but that had vanished from its inventory.

206.    On January 10, 2020, Spivack consented to an interview with his counsel and

federal investigators on the missing controlled substances.  Spivack disclosed, in part,

inexplicable inventory adjustments removing oxycodone pills in Verree's computer inventory

that had no legitimate explanation.  Spivack highlighted for investigators that the inexplicable

inventory adjustments all had Pestrack's initials attached to the entries.  For example, this

inventory entry attributes 100 missing dosage units of oxycodone 30mg to an inventory

adjustment with Pestrack's initials on August 27, 2019:



207.    Despite Spivack providing this information to federal investigators, and despite

information suggesting that Pestrack was diverting oxycodone for illegitimate purposes,

investigators are not aware of Pestrack's employment at Verree being terminated.

### COUNT I – ALL DEFENDANTS:
### Unlawful Dispensing or Distribution of Controlled Substances:
### 21 U.S.C. §§ 842(a)(1), 829

208.    The United States realleges the above paragraphs as if fully set forth herein.

209.    Defendants Verree Pharmacy, Mitchell Spivack, Todd Goodman, Eric Pestrack,

and Lee Kamp are subject to the requirements of Part C of the CSA, 21 U.S.C. § 822.

210.    As outlined above, the defendants illegally dispensed or distributed controlled substances, including oxycodone, without a valid and effective prescription on many occasions, in violation of 21 U.S.C. § 829.

211.    By illegally dispensing and distributing controlled substances from January 27, 2017 to the present in violation of 21 U.S.C. § 829, defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp violated 21 U.S.C. § 842(a)(1) on each occasion.

212.    As a result of the violations set forth above and additional violations to be discovered through the investigation and discovery, defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp are subject to the relief set forth in the CSA.

### COUNT II – ALL DEFENDANTS:
### Knowingly Presenting and Causing the Presentation of False Claims:
### 31 U.S.C. § 3729(a)(1)(A)

213.    The United States realleges the above paragraphs as if fully set forth herein.

214.    Defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp, between January 27, 2016 to the present, by failing to dispense drugs while falsely claiming to dispense them and billing for those false dispensing events to federal health care programs and thereby receiving reimbursement, knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to federal health care programs, including Medicare, Medicaid, Tricare, and FEHBP, in violation of 31 U.S.C. § 3729(a)(1)(A).

215.    For example, Verree Pharmacy did not have sufficient medication inventory to have dispensed all of the drugs for which it billed.  Verree's inventory and purchase history show that Verree never had or purchased inadequate amounts of prescription drugs to support the quantities for which it billed and was reimbursed by federal health care programs.

216.    Defendants utilized the BBDF code to fraudulently bill federal health care programs, including Medicare, Medicaid, Tricare, and FEHBP, for drugs that it did not actually dispense to beneficiaries.  Examples of those claims are referenced in Exhibit A.

217.    In addition, between January 27, 2016 to the present, defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp, by dispensing and distributing controlled substances that violated the CSA and violated the applicable requirements for Medicare Part D and Medicaid, but nonetheless submitting false claims to Medicare Part D and Medicaid and receiving reimbursement for the drugs, knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to these federal health care programs in violation of 31 U.S.C. § 3729(a)(1)(A).

218.    By submitting false billings and claims to federal health care programs that falsely claimed to dispense drugs to beneficiaries that were not actually dispensed or otherwise did not satisfy the relevant payment criteria and with full knowledge of the fraud, defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

219.    By virtue of these false and fraudulent claims, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each false claim submitted.

### COUNT III – ALL DEFENDANTS:
### Conspiring to Present and Cause the Presentation of False Claims:
### 31 U.S.C. § 3729(a)(1)(C)

220.    The United States realleges the above paragraphs as if fully set forth herein.

221.    Defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp, between January 27, 2016 to the present, conspired to submit false billings and claims to federal health

care programs that falsely claimed to dispense drugs to beneficiaries that were not actually dispensed or otherwise did not satisfy the relevant payment criteria with full knowledge of the fraud.

222.    For example, the co-conspirators jointly utilized the BBDF code as part of their conspiracy to implement the health care fraud scheme.  The evidence collected reflects the co-conspirators working together to engage in the fraud scheme, and one of the co-conspirators admitted the fraud scheme to investigators.  The BBDF code's common and collective use among the co-conspirators reveals an agreement and understanding by the defendants and other co-conspirators to collectively engage in this scheme to submit false billings to federal health care programs with full knowledge of the fraud and falsity, in violation of 31 U.S.C. § 3729(a)(1)(C).  Examples of those claims are referenced in Exhibit A.

223.    In addition, the co-conspirators jointly conspired to submit false billings and claims to federal health care programs for controlled substances that were dispensed and distributed in violation of the CSA and the applicable requirements for Medicare Part D and Medicaid.  The coordinated dispensing and distribution for each illegal controlled substance and the corresponding claim to Medicare Part D and Medicaid by the co-conspirators reveals an agreement and understanding by the defendants and other co-conspirators to collectively engage in this scheme to submit false billings to federal health care programs with full knowledge of the fraud and falsity, in violation of 31 U.S.C. § 3729(a)(1)(C).

224.    By virtue of these false and/or fraudulent claims, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each false claim submitted.

## COUNT IV – ALL DEFENDANTS:
### Payment by Mistake

225.    The United States realleges the above paragraphs as if fully set forth herein.

226.    This is a claim for the recovery of monies paid by the United States to defendants Verree Pharmacy and Mitchell Spivack as a result of mistaken understandings of fact caused by defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp.

227.    The United States paid Verree Pharmacy for prescription drugs that it believed had actually been delivered to federal beneficiaries.  Instead, defendants billed for prescription drugs that were never actually dispensed to those federal beneficiaries.

228.    In addition, the United States paid Verree Pharmacy for claims for controlled substances for federal beneficiaries that the United States believed met the coverage and payment requirements under the CSA, Medicare, and Medicaid, but in fact did not meet those requirements.

229.    The United States made these payments without knowledge of material facts and under the mistaken belief that Verree Pharmacy was entitled to receive payment for such claims when it was not.

230.    The United States' mistaken beliefs were material to its decision to pay Verree Pharmacy for such claims.

231.    Accordingly, defendants Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp are liable to make restitution to the United States of the amounts of the payments made in error to them by the United States.

## COUNT V – ALL DEFENDANTS:
### Unjust Enrichment

232.    The United States realleges the above paragraphs as if fully set forth herein.

233.     This is a claim for the recovery of monies by which Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp have been unjustly enriched during the relevant time period at the expense of the United States.

234.     By directly or indirectly obtaining government funds to which they were not entitled, Verree Pharmacy, Spivack, Goodman, Pestrack, and Kamp were unjustly enriched, and are liable to account for and pay as restitution such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America demands judgment against defendants as follows:

235.     For violations of 21 U.S.C. § 842(a)(1), civil penalties of up to $25,000 per violation occurring on or before November 2, 2015, 21 U.S.C. § 842(c)(1)(A); and civil penalties of up to $68,426 per violation occurring after November 2, 2015, 28 C.F.R. § 85.5;

236.     Entry of a preliminary and permanent injunction to restrain future violations, pursuant to 21 U.S.C. §§ 843(f), 882, enjoining defendants from obtaining, processing, administering, distributing, or dispensing controlled substances;

237.     Damages sustained by the United States, trebled, as mandated by 31 U.S.C. § 3729(a)(1);

238.     Civil penalties of between $5,500 and $11,000 for each false claim presented on or before November 2, 2015, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9); and civil penalties of between $11,803 and $23,607 for each false claim presented after November 2, 2015, 28 C.F.R. § 85.5;

239.     For payment by mistake, the amount of damages sustained by the United States as a result of its payment by mistake, to be proven at trial;

240.    For unjust enrichment, the sums by which the defendants have been unjustly

enriched, to be proven at trial; and

241.    Pre-judgment interest, post-judgment interest, costs, and such other and further

relief as the Court deems just and equitable.

### JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule

38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

  /s/ Jennifer Arbittier Williams
JENNIFER ARBITTIER WILLIAMS
United States Attorney

 /s/ Gregory B. David
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

 /s/ Charlene Keller Fullmer
CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

 /s/ Anthony D. Scicchitano
ANTHONY D. SCICCHITANO
Assistant United States Attorney
PA 208607
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8380
anthony.scicchitano@usdoj.gov

*Attorneys for the*
*United States of America*

Dated: February 28, 2022

**Exhibit A to Amended Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | RPh | Tch | Drug Name |
|---|---|---|---|---|---|
| Medicare Part D | 1/29/2016 | 1457551 | TAG | EWP | LEVOTHYROXINE |
| Medicare Part D | 2/3/2016 | 1462318 | TAG | EWP | ARIPIPRAZOLE 2MG TAB |
| Medicare Part D | 2/29/2016 | 1467747 | MS | LK | SPIRIVA HANDIHALER |
| Medicare Part D | 3/2/2016 | 1452030 | TAG | EWP | VOLTAREN GEL |
| OPM/FEHBP | 3/14/2016 | 1469442 | MS | LK | IBUPROFEN 600MG TAB |
| Medicare Part D | 3/31/2016 | 1471444 | MS | LK | CLINDAMYCIN 300MG CAP |
| Medicare Part D | 4/4/2016 | 1471743 | MS | LK | LEVOTHYROXIN 25MCG TAB |
| OPM/FEHBP | 4/11/2016 | 1472448 | MS | EWP | PROAIR HFA |
| OPM/FEHBP | 4/21/2016 | 1473825 | MS | LK | FLUOCINOLONE ACETONIDE |
| Medicare Part D | 4/29/2016 | 1474620 | MS | EWP | ELIQUIS 5MG TAB |
| Medicare Part D | 5/4/2016 | 1475152 | TAG | EWP | SPIRIVA HANDIHALER |
| OPM/FEHBP | 5/5/2016 | 1475328 | MS | EWP | XARELTO |
| Tricare | 5/24/2016 | 1477297 | MS | LK | CIPRODEX OTIC SUSPENSION |
| Medicare Part D | 5/26/2016 | 1477609 | MS | EP | VENTOLIN HFA |
| Medicare Part D | 6/2/2016 | 1471209 | MS | EWP | VENTOLIN HFA |
| Medicare Part D | 6/29/2016 | 1478351 | TAG | EWP | FAMCICLOVIR 500MG TAB |
| Medicare Part D | 7/1/2016 | 1481579 | TAG | LK | SIMBRINZA 1-0.2% SUS |
| OPM/FEHBP | 7/18/2016 | 1483061 | MS | LK | ATORVASTATIN CALCIUM |
| Tricare | 7/22/2016 | 1483674 | MS | LK | ESTRACE 0.01% CREAM |
| Medicare Part D | 7/29/2016 | 1484413 | MS | EWP | KETOCONAZOLE 2% CRE |
| Medicare Part D | 8/8/2016 | 1479298 | MS | EWP | PROAIR HFA |
| Medicare Part D | 8/17/2016 | 1486315 | TAG | EWP | DICYCLOMINE CAPSULES |
| OPM/FEHBP | 8/24/2016 | 1486917 | TAG | LK | ANUCORT-HC |
| Medicare Part D | 9/1/2016 | 1487762 | MS | EWP | BUPROPION 150MG SR TABLET |
| OPM/FEHBP | 9/28/2016 | 1490448 | TAG | EWP | SPIRIVA HANDIHALER |
| OPM/FEHBP | 9/28/2016 | 1490449 | TAG | EWP | BREO ELLIPTA |
| Medicare Part D | 9/30/2016 | 1490764 | MS | LK | AMLODIPINE |
| Medicare Part D | 10/4/2016 | 1491080 | MS | LK | ATORVASTATIN 10MG TAB |
| Tricare | 10/19/2016 | 1492669 | TAG | EWP | IBUPROFEN 800 MG TABLET |
| Medicare Part D | 10/28/2016 | 1489577 | MS | EWP | MYRBETRIQ 25MG TAB |
| Medicare Part D | 11/2/2016 | 1494089 | TAG | EWP | OMEPRAZOLE 40MG CAP |
| Medicare Part D | 11/29/2016 | 1496818 | MS | LK | PERMETHRIN CREAM |
| Medicare Part D | 12/8/2016 | 1497883 | MS | LK | PIOGLITA/MET 15-850MG TAB |
| Tricare | 12/19/2016 | 1499087 | MS | EWP | OLOPATADINE HCL 0.1% EYE DROPS |
| Medicare Part D | 12/31/2016 | 1487623 | MS | LK | NOVOLIN N INSULIN |
| Medicare Part D | 1/3/2017 | 1500467 | MS | EWP | FLUTICASONE NASAL SPRAY |
| Tricare | 1/6/2017 | 1500950 | MS | EWP | POLYETHYLENE GLYCOL 3350 POWD |
| OPM/FEHBP | 1/19/2017 | 1502335 | MS | EWP | CHANTIX STARTING MONTH PA |
| Medicare Part D | 1/31/2017 | 1497900 | MS | EP | PREDNISOLONE ACETATE SUSP |
| Medicare Part D | 2/3/2017 | 1504048 | MS | EWP | LISINOPRIL 10MG TAB |
| OPM/FEHBP | 2/9/2017 | 1492086 | MS | LK | PREDNISOLONE ACETATE |
| Medicare Part D | 2/28/2017 | 1506567 | MS | EP | PANTOPRAZOLE 40MG TAB |
| Medicare Part D | 3/1/2017 | 1506762 | TAG | EWP | POLYETHYLENE GLYCOL POWDER |
| OPM/FEHBP | 3/6/2017 | 1507205 | MS | EWP | SANTYL |
| OPM/FEHBP | 3/22/2017 | 1508633 | TAG | EWP | PRADAXA |
| Medicare Part D | 3/23/2017 | 1476721 | MS | EWP | SYMBICORT |

**Exhibit A to Amended Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | RPh | Tch | Drug Name |
|---|---|---|---|---|---|
| Medicare Part D | 4/1/2017 | 1476720 MS | LK | | VENTOLIN HFA |
| OPM/FEHBP | 4/1/2017 | 1509897 MS | LK | | SANTYL |
| Tricare | 4/6/2017 | 1510441 MS | EWP | | CYCLOBENZAPRINE 10 MG TABLET |
| Medicare Part D | 4/25/2017 | 1484313 MS | EWP | | ATORVASTATIN 80MG TAB |
| Medicare Part D | 5/1/2017 | 1512873 MS | EWP | | SYMBICORT (120 INH) |
| OPM/FEHBP | 5/22/2017 | 1515066 MS | EWP | | TRADJENTA |
| OPM/FEHBP | 5/22/2017 | 1515067 MS | EWP | | SYMBICORT |
| OPM/FEHBP | 5/23/2017 | 1515183 MS | LK | | PROAIR HFA |
| Medicare Part D | 5/31/2017 | 1507237 TAG | EWP | | FLUTICASONE NASAL SPRAY |
| Medicare Part D | 6/2/2017 | 1514985 MS | EWP | | LIDOCAINE 5% OIN |
| Medicare Part D | 6/30/2017 | 1517628 MS | LK | | MODAFINIL 100MG TAB |
| Medicare Part D | 7/5/2017 | 1519312 MS | EWP | | MYRBETRIQ 50MG TAB |
| OPM/FEHBP | 7/24/2017 | 1521144 MS | EWP | | ECONAZOLE NITRATE |
| OPM/FEHBP | 7/24/2017 | 1521145 MS | EWP | | AUGMENTED BETAMETHASONE D |
| Medicare Part D | 7/28/2017 | 1521705 MS | LK | | OLOPATADINE 0.6% SPR |
| Medicare Part D | 8/1/2017 | 1513955 MS | EWP | | DULERA 200-5MCG AER |
| OPM/FEHBP | 8/16/2017 | 1523461 MS | LK | | METHYLPREDNISOLONE DOSE P |
| OPM/FEHBP | 8/25/2017 | 1524356 TAG | EWP | | NOVOLOG MIX 70/30 PREFILL |
| Medicare Part D | 8/26/2017 | 1524415 TAG | | | ATORVASTATIN 40MG TAB |
| Medicare Part D | 9/1/2017 | 1522767 MS | EWP | | ADVAIR DISKUS |
| OPM/FEHBP | 9/7/2017 | 1524973 MS | EWP | | EZETIMIBE |
| Tricare | 9/12/2017 | 1500950 MS | LK | | POLYETHYLENE GLYCOL 3350 POWD |
| Medicare Part D | 9/29/2017 | 1511494 TAG | EWP | | VENTOLIN HFA |
| Medicare Part D | 10/3/2017 | 1525490 MS | EWP | | VENTOLIN HFA |
| Medicare Part D | 10/26/2017 | 1527545 MS | EWP | | DULOXETINE 20MG CAP |
| OPM/FEHBP | 10/27/2017 | 1530417 MS | EWP | | OMEPRAZOLE |
| Medicare Part D | 11/1/2017 | 1527760 TAG | EWP | | ADVAIR DISKUS |
| Medicare Part D | 11/27/2017 | 1528291 MS | EWP | | LANTUS INSULIN |
| Medicare Part D | 12/1/2017 | 1534052 MS | EWP | | GABAPENTIN 300MG CAP |
| Medicare Part D | 12/28/2017 | 1536591 MS | EWP | | PROAIR HFA |
| Medicare Part D | 1/2/2018 | 1536958 MS | LK | | OMEPRAZOLE 20MG CAP |
| Medicare Part D | 1/31/2018 | 1512198 MS | LK | | OMEGA-3-ACID 1GM CAP |
| Medicare Part D | 2/2/2018 | 1540257 MS | EP | | UNIFINE PNTP 31GX8MM MIS |
| Medicare Part D | 2/26/2018 | 1542722 MS | EWP | | NAPROXEN 500MG TAB |
| Medicare Part D | 3/6/2018 | 1537200 MS | LK | | ZIPRASIDONE 20MG CAP |
| OPM/FEHBP | 3/13/2018 | 1544264 MS | EP | | ATORVASTATIN CALCIUM |
| Medicare Part D | 3/30/2018 | 1545931 MS | EWP | | ADVAIR DISKUS |
| Medicare Part D | 4/5/2018 | 1537831 TAG | EWP | | EZETIMIBE 10MG TAB |
| OPM/FEHBP | 4/20/2018 | 1517542 MS | EWP | | TRINTELLIX |
| Medicare Part D | 4/27/2018 | 1543511 MS | EWP | | LOSARTAN |
| Medicare Part D | 5/2/2018 | 1544561 MS | EWP | | AZELASTINE 0.15% SPR |
| Medicare Part D | 5/31/2018 | 1549270 TAG | LK | | VENTOLIN HFA |
| Medicare Part D | 6/1/2018 | 1537200 MS | EWP | | ZIPRASIDONE 20MG CAP |
| Medicare Part D | 6/29/2018 | 1555308 MS | LK | | SYMBICORT (120 INH) |
| OPM/FEHBP | 7/2/2018 | 1555426 TAG | EWP | | SILVER SULFADIAZINE |
| Medicare Part D | 7/2/2018 | 1555477 TAG | EWP | | ADVAIR DISKUS |

**Exhibit A to Amended Complaint**

*United States v. Spivack, Inc. d/b/a Verree Pharmacy and Mitchell Spivack*

| Program | Fill Date | RX Number | RPh | Tch | Drug Name |
|---|---|---|---|---|---|
| Tricare | 7/10/2018 | 1556254 | MS | EWP | LOTEMAX 0.5% EYE DROPS |
| Tricare | 7/11/2018 | 1556289 | TAG | EWP | LEVOFLOXACIN 500 MG TABLET |
| Tricare | 7/11/2018 | 1556292 | TAG | EWP | SERTRALINE HCL 25 MG TABLET |
| Tricare | 7/11/2018 | 1556293 | TAG | EWP | SPIRIVA 18 MCG CP-HANDIHALER |
| OPM/FEHBP | 7/16/2018 | 1553829 | MS | EWP | SPIRIVA HANDIHALER |
| OPM/FEHBP | 7/23/2018 | 1557468 | MS | EWP | HYDROCORTISONE VALERATE |
| Medicare Part D | 7/26/2018 | 1543682 | MS | EWP | LYRICA |
| Medicare Part D | 8/2/2018 | 1550751 | MS | EWP | SPIRIVA HANDIHALER |
| Medicare Part D | 8/31/2018 | 1551424 | TAG | EWP | LYRICA |
| Medicare Part D | 9/4/2018 | 1561556 | MS | EWP | WARFARIN 1MG TAB |
| OPM/FEHBP | 9/13/2018 | 1535235 | MS | EWP | OXYBUTYNIN CHLORIDE ER |
| Medicare Part D | 9/28/2018 | 1534240 | MS | LK | VENTOLIN HFA |
| Medicare Part D | 10/8/2018 | 1564906 | TAG | EWP | VASCEPA 1GM CAP |
| Medicare Part D | 10/31/2018 | 1567189 | TAG | LK | BUDESONIDE 3MG ER CAP |
| Medicare Part D | 11/1/2018 | 1558616 | MS | EWP | VENTOLIN HFA |
| OPM/FEHBP | 11/6/2018 | 1558293 | MS | EWP | SPIRIVA RESPIMAT |
| OPM/FEHBP | 11/13/2018 | 1568667 | MS | EWP | MYRBETRIQ |
| OPM/FEHBP | 11/24/2018 | 1548272 | TAG | EWP | ECONAZOLE NITRATE |
| Medicare Part D | 11/28/2018 | 1569978 | TAG | EWP | DOXYCYCLINE HYCLATE |
| Medicare Part D | 12/3/2018 | 1565107 | MS | LK | SYMBICORT |
| Medicare Part D | 12/26/2018 | 1572549 | TAG | LK | ECONAZOLE CREAM |
| Medicare Part D | 1/2/2019 | 1573017 | TAG | EWP | DESMOPRESSIN 0.1MG TAB |
| Medicare Part D | 1/31/2019 | 1575931 | MS | LK | OMEPRAZOLE |
| Medicare Part D | 2/2/2019 | 1576120 | ER | EWP | ZIPRASIDONE 20MG CAP |
| OPM/FEHBP | 2/19/2019 | 1577544 | MS | LK | NARCAN |
| Medicare Part D | 2/28/2019 | 1578462 | MS | EWP | NARCAN SPRAY |
| Medicare Part D | 3/1/2019 | 1578648 | MS | EWP | OMEGA-3-ACID 1GM CAP |
| OPM/FEHBP | 3/11/2019 | 1579455 | MS | LK | XIFAXAN |
| Medicare Part D | 3/29/2019 | 1581043 | ER | EWP | BREO ELLIPTA 100-25 INH |
| Medicare Part D | 4/2/2019 | 1581382 | MS | EWP | HYDROCORTISONE LOTION |
| Medicare Part D | 4/29/2019 | 1583567 | MS | LK | SERTRALINE 50MG TAB |
| Tricare | 7/23/2019 | 1590676 | MS | LK | METHOTREXATE 2.5 MG TABLET |
| OPM/FEHBP | 9/26/2019 | 1581585 | MS | EWP | MYRBETRIQ |
| OPM/FEHBP | 12/2/2019 | 1573754 | MS | EWP | WIXELA INHUB |